UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

LARRY JACKSON,

                Plaintiff,

                                         **MEMORANDUM & ORDER**
            v.                                11-CV-3028 (PKC)

THE CITY OF NEW YORK, JESUS TELLADO,
STANLEY MACNEAR, JOHN CZULADA, JAMES T.
GHERARDI, RYANN DUNN, PATRICK
D'ONOFRIO, ROBERT J. DEFERRARI, KENNETH
BRAUMANN, BEN KURIAN, PETER BONETA,
THOMAS E. REO, MICHAEL FAILLA, ROBERT E.
RUSSO, and BRIAN E. HEEREY,

                Defendants.

-----------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

       Pending before the Court is the motion for partial summary judgment of the Defendant City of New York ("City") and the individual police officer defendants ("Individual Defendants") (collectively, "Defendants"). Plaintiff, a New York City police officer, brought suit alleging claims arising from an incident at his home in which he was arrested and detained while off-duty by Defendants. Defendants presently move to dismiss all of Plaintiff's claims with the exception of Plaintiff's excessive force, and related state law assault and battery, claims, which Defendants admit pose a disputed issue of material fact concerning the force used. (Dkt. 58 at 2 n.1.) For the reasons set forth below, Defendants' motion is granted in part, and denied in part.

I.      The Party Incident

On August 21, 2010, Plaintiff, a police officer in the New York City Police Department ("NYPD"), held a 21st birthday party for his daughter at his home beginning around 5:30 p.m. (Dkt. 56 ("Def. St.") ¶¶ 7–11.)[1]  A disc jockey played music from the backyard of Plaintiff's home from approximately 7:00 p.m. to midnight.  Alcohol was served at the party; Plaintiff had one drink that evening.  (Def. St. ¶¶ 12–17; Dkt. 57-5 at 22.)

At approximately 12:30 a.m. that night, an argument erupted outside Plaintiff's home between a party guest and an unknown man.  (Def. St. ¶ 19.)  The unidentified man brandished a gun during the argument, after which approximately 10 to 15 other individuals arrived with bats and other weapons.  (Def. St. ¶ 20; Dkt. 57-4 at 69.)  Several people at the party called 911 to report the man with the gun.  (Def. St. ¶ 21; Dkt. 60-2 (Ex. 5A1) at 1.)

Plaintiff went outside and interceded in the argument.  He successfully diffused the situation by directing the individuals with the weapons away from his home and down the street. (Def. St. ¶ 22; Dkt. 57-4 at 68–69.)  Plaintiff followed them down the street to ensure that they

---

[1] The Court construes any disputed facts in the light most favorable to Plaintiff, as the non-moving party.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970).  However, where Plaintiff either (i) admits or (ii) denies without citing to admissible evidence certain of the facts alleged in Defendants' Local Rule 56.1 Statement, this Court shall deem any such facts undisputed.  *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)–(d) ("56.1 Statement").  A standalone citation to a 56.1 Statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citations to a party's 56.1 Statement incorporates by reference the documents cited therein.  Where relevant, however, the Court may cite directly to underlying documents.  Citations to "Def. St." refer to Defendants' Rule 56.1 Statement.  (Dkt. 56.)  Citations to "Pl. St." refer to Plaintiff's counterstatement.  (Dkt. 60.)  However, although Plaintiff's Rule 56.1 Counterstatement is in the Court's possession, the Court is unable to locate it on the docket.  Accordingly, the Court attaches hereto an electronic copy of Plaintiff's Rule 56.1 Counterstatement as Court's Exhibit 1.

were gone from the area.  (Def. St. ¶ 22; Dkt. 57-4 at 68–69.)  Plaintiff then returned to his house to find the party guests "more or less in the street."  (Dkt. 57-4 at 69.)

At approximately 1:30 a.m., Officer John Czulada and Sergeant Stanley MacNear arrived at Plaintiff's house in response to the 911 call reporting the man with the gun.  (Dkt. 57-4 at 64.) Plaintiff's domestic partner, Charlene Strong, who had called 911, told the officers that she was the "lady of the house" and was "the one that called for help."  (Dkt. 60-2 (Ex. 11B) at ECF 52.)[2]

After the officers were on the scene, Tiffanie Johnson, Plaintiff's niece, "stuck her head out [] the [front] door" and yelled to Plaintiff, "they are fighting" because two individuals had started fighting inside the house.  (Def. St. ¶¶ 24–25; Dkt. 57-4 at 72; Dkt. 60-3 (Ex. 12) at 30; Dkt. 57-5 at 32.)[3]  After Johnson yelled that there was a fight, Officer Czulada ran into the house, with Plaintiff following closely after him.  (Dkt. 60-3 (Ex. 13A) at 75 and at ECF 12; Dkt. 60-3 (Ex. 12) at 34.)  Other officers on the scene entered Plaintiff's home after hearing screams coming from inside the house.  (Dkt. 60-2 at ECF 70; Dkt. 60-3 (Ex. 12) at 34.)

When Sergeant MacNear arrived at the scene, bystanders approached him and reported that "there had been a fight and there was a man that had a gun."  (Dkt. 60-2 (Ex. 11D) at ECF 68.)  Officer Czulada also believed that the officers were responding to a call about a man with a gun.  (Dkt. 60-2 at ECF 62.)

---

[2] Citations to "ECF" reference the pagination of the Electronic Court Filing system, and not the document's internal pagination.

[3] This altercation between the guests in Plaintiff's house was unrelated to the altercation in the street between Plaintiff and the group accompanying the man with the gun, which had been diffused by then, but occurred soon after the outside incident.  (*See* Dkt. 30 at 8–9.)

The scene inside the house was chaotic after the police entered.[4]  Johnson saw one of the officers choking Plaintiff.  (Dkt. 60-3 (Ex. 12) at 34.)  Plaintiff was eventually detained, placed in handcuffs, and transported to the 113th Precinct in Jamaica, Queens.  (Def. St. ¶ 29.)  Three other individuals from the party also were arrested.  (Def. St. ¶ 30.)  The officers did not formally process Plaintiff's detention as an arrest.  (Def. St. ¶ 34.)

The parties dispute whether Plaintiff identified himself as a police officer to the responding officers, resisted arrest, or fought with the responding officers.  Whereas Defendants argue that Plaintiff failed to identify himself as a police officer (Dkt. 58 at 9–10), Plaintiff maintains that he announced several times that he was a member of the NYPD before, during, and after the altercation.  (*See* Dkt. 57-4 at 96.)[5]  Plaintiff's claim is corroborated by several other non-party witnesses, including Johnson and Strong.  (*See, e.g.*, Dkt. 60-5 at ECF 18–19; Dkt. 60-6 at ECF 6–7.)  On the other hand, several police officers testified[6] that Plaintiff did not so identify himself or at least that they did not hear him do so.  (*See* Dkt. 60-5 at ECF 46; Dkt.

---

[4] Plaintiff has submitted to the Court a video partially capturing the chaos that ensued after the police entered his home.  The approximately 46-second video depicts tremendous commotion in the living room and kitchen of Plaintiff's home, with people on the floor and the police struggling to both restrain and repel people.  A lot of screaming and yelling is heard on the video.  Unidentified voices in the background yell, "Stop it!"  The person taking the video is heard exclaiming, "This is insane, s**t's gotta' end, s**t's gotta' end, man!" and "He's a police officer!"  Other voices yell, "He's police! He's a police officer!"  Near the end of the video, the police appear to detain an individual on the ground while other guests of the party approach them in apparent attempts to intervene.  Meanwhile, voices can be heard yelling, "Let me go!"  Because of the erratic filming of the video, it is impossible to determine based on the video itself what happened inside Plaintiff's home, or to identify any of the individuals seen or heard on the video.  Plaintiff's video is on file with the Clerk of Court as Court's Exhibit 2.

[5] Plaintiff testified during his deposition in this matter on September 18, 2012 that he informed the responding officers several times that he was a police officer.  (*See, e.g.*, Dkt. 60-3 at ECF 10; Dkt. 60-16 at ECF 37.)  Unless otherwise indicated, references to Plaintiff's testimony are to his September 2012 deposition testimony.

[6] Unless otherwise indicated, references to the testimony of these officers are to their deposition testimony in this case.

60-7 at ECF 25–26.)  One non-party witness also testified that Plaintiff did not identify himself as a police officer, in part, because he was being choked and was therefore unable to do so. (Dkt. 60-5 at ECF 66; Dkt. 60-7 at ECF 63; Dkt. 60-8 at ECF 7.)

II.     Post-Arrest Investigation and Disposition

Once at the station house, Plaintiff was placed in the youth officer's room, fell to the floor, and noticed that his hand was injured and bleeding.  (Def. St. ¶¶ 31–33.)  Officers called an ambulance and Plaintiff was taken to Booth Memorial Hospital in Queens, New York.  (Def. St. ¶ 33.)  Following treatment, Plaintiff was returned to the precinct and instructed to remain at the precinct by officers from the NYPD's Internal Affairs Bureau ("Internal Affairs") and Investigations Division.  (Def. St. ¶ 34.)  That day, Internal Affairs placed Plaintiff on modified duty and his service weapon was confiscated.  (Def. St. ¶ 35.)

Following an investigation, Internal Affairs recommended that Plaintiff be charged with "failing to identify himself as a police officer, making physical contact with a uniformed member of the service[,] and resisting being placed in handcuffs."  (Def. St. ¶ 37.)  Internal Affairs also censured Defendants Czulada and Jesus Tellado for failing to comply with departmental arrest procedures.  (Def. St. ¶ 38.)  Plaintiff "rejected" the charges, which remain the subject of an ongoing internal NYPD trial.  (Def. St. ¶ 39.)[7]

Plaintiff sustained a broken hand as a result of the party incident and arrest.  (Dkt. 57-4 at 35.)  During his subsequent rehabilitation and recovery, Plaintiff continued to work on modified duty.  (Dkt. 57-4 at 33.)  In approximately December 2010, an NYPD doctor examined Plaintiff

_____

[7] Plaintiff's departmental trial has concluded since the filing of this motion.  On January 13, 2014, the parties advised the Court that "the Trial Commissioner recommended that plaintiff be found guilty of engaging in serious misconduct" but that the NYPD Commissioner has not yet taken final action with respect to that recommendation.  (Dkts. 64–65.)

and cleared him to return to full duty.  (Dkt. 57-4 at 36.)  Although unclear from the record, it

appears that Plaintiff remains employed with the NYPD as a police officer on modified duty

pending the resolution of his departmental trial.  (*See* Dkt 57-4 at 52.)

Plaintiff initiated this action on June 24, 2011.  (Dkt. 1.)  Plaintiff's amended complaint

(Dkt. 30) alleges a litany of state and federal claims as set forth below:

Counts 1, 2, 14, and 15 allege racial employment discrimination under 28 U.S.C. §§ 1981

and 1983, and New York State and City human rights laws.

Count 3 alleges abuse of authority under 28 U.S.C. § 1983.

Counts 4–11 are brought under the Fourth Amendment and allege illegal search of

Plaintiff's home, illegal search and seizure of his person, false arrest, unlawful detention,

malicious prosecution, and excessive force.

Counts 12 and 13 allege *Monell* claims against the City of New York for failure to train

and discipline.

Counts 16–23 allege New York State law claims for negligence, assault and battery, false

arrest, false imprisonment, and intentional infliction of emotional distress.[8]

*SUMMARY JUDGMENT STANDARD*

"Summary judgment is appropriate where there are no genuine disputes concerning any

material facts, and where the moving party is entitled to judgment as a matter of law."  *Harvis*

*Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs., L.P.)*, 153

---

[8] Defendants in their motion argue that Plaintiff's illegal search and seizure of the person, false arrest, unlawful detention, and false imprisonment claims are the same claim, namely false arrest.  (Dkt. 58 at 2 n.1.)  Plaintiff's opposition does not rebut this characterization and Plaintiff likewise aggregates his arguments in his opposition.  Accordingly, the Court finds that Counts 5, 6, 7, 9, 21, and 22 are duplicative, and hereby construes them to set forth one claim for false arrest.  The Court, however, construes Count 8 as separately alleging a claim of unreasonable detention, as the Second Circuit has viewed unreasonable detention as a separate claim under certain circumstances, as discussed *infra*.  (*See* Dkt. 30 at 25–35.)

F.3d 61, 67 (2d Cir. 1998) (*citing* Fed. R. Civ. Proc. 56(c)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir.1997); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *McLee*, 109 F.3d at 134.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson,* 477 U.S. at 256). "Mere conclusory allegations or denials will not suffice," *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986), and a plaintiff opposing summary judgment must offer "some hard evidence showing that its version of the events is not wholly fanciful." *Miner v. Clinton Cnty., New York*, 541 F.3d 464, 471 (2d Cir. 2008). It is within this framework that the Court addresses the present summary judgment motion.

## *DISCUSSION*

I.      Counts 1, 2, 14, and 15:  Racial Employment Discrimination

Plaintiff alleges racial employment discrimination under United States Code Title 28 Sections 1981 and 1983, the New York State Human Rights Law ("NYSHRL") § 296, and the New York City Administrative Code § 8-107 ("NYCHRL"). Discrimination claims under Sections 1981 and 1983 share "[m]ost of the core substantive standards that apply to claims of

discriminatory conduct in violation of Title VII[.]"[9]  *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d

206, 225 (2d Cir. 2004).  None of the relevant differences between the analysis of discrimination

claims under Title VII and Sections 1981 and 1983 are applicable here.[10]  *See id.* at 225–227

(describing the doctrinal differences between Title VII and Sections 1981 and 1983 cases).

Moreover, "[a] § 1983 action may not . . . be brought to vindicate rights conferred only by a

statute that contains its own structure for private enforcement, such as Title VII."  *Id.* at 225.

Accordingly, Plaintiff's Section 1981 and 1983 claims for employment discrimination are

analyzed under Title VII.  *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010)

(analyzing Section 1981 and 1983 claims under Title VII's *McDonnell Douglas* standard).

    a.  <u>Racial Discrimination</u>

Discrimination claims brought pursuant to Title VII, as well as Sections 1981 and 1983

and the NYSHRL, all are evaluated according to the three-step burden-shifting framework set

forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[11]  *See Davis v. Oyster Bay-*

---

[9]  Title VII of the Civil Rights Act of 1964, whose enforcement provisions are codified in 42 U.S.C. §§ 2000e, *et seq.*, in relevant part, prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color," and from "limit[ing], segregat[ing], or classify[ing] [its] employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race [or] color."  42 U.S.C. § 2000e-2.

[10] The primary doctrinal differences between Title VII claims and employment discrimination claims pursuant to Sections 1981 and 1983 regard (1) the statute of limitations, (2) the requirement that Section 1981 or 1983 plaintiffs must show employment discrimination pursuant to an official policy or custom, (3) that *individuals* may be held liable under Sections 1981 and 1983, but not under Title VII, and (4) a Title VII claim *may* be established through proof of negligence, whereas Section 1981 and 1983 claims must be supported by evidence of intentional discrimination.  *See Patterson*, 375 F.3d at 225–227.

[11]  Plaintiff's claim under the NYCHRL (codified at NYC Admin. Code § 8-107), however, is evaluated under a different, more permissive standard than Plaintiff's federal and state law claims.  *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009).  As the

*East*, 03-CV-1372, 2006 WL 657038, at \*8 n.12 (E.D.N.Y. Mar. 9, 2006), *aff'd* 220 Fed. App'x 59 (2d Cir. 2007) (noting that "discrimination claims under Title VII, 42 U.S.C. §§ 1981 and 1983, and NY[S]HRL § 296 all are analyzed together, as the same analytic framework applies to each"). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of prohibited discrimination. A prima facie case is established where plaintiff shows that "(1) []he is a member of a protected class; (2) []he is qualified for the position; (3) []he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Weinstock*, 224 F.3d at 42.

There is no dispute between the parties as to the first two prongs: Plaintiff, a black male, belongs to a protected class, and Defendants do not contend that Plaintiff is not qualified to serve as an NYPD police officer. However, the parties dispute whether the third and fourth prongs have been, or can be, satisfied.

---

Second Circuit recently noted, "[i]t is unclear, and to what extent, the *McDonnell Douglas* burden-shifting analysis has been modified for NYCHRL claims. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013). The Second Circuit in *Mihalik*, however, declined to resolve the issue:

> It is not necessary to resolve this issue. While it is unclear whether *McDonnell Douglas* continues to apply to NYCHRL claims and, if so, to what extent it applies, the question is also less important because the NYCHRL simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that "discrimination play[ed] *no* role" in its actions. *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 872 N.Y.S.2d 27, 38, 40 n.27 (1st Dep't 2009); *see also Furfero v. St. John's Univ.*, 94 A.D.3d 695, 941 N.Y.S.2d 639, 642 (2d Dep't 2012).

*Id.* Plaintiff's NYCHRL claims are addressed fully, *infra*, at 14.

i.    <u>Adverse Employment Actions</u>

"A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citing *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 446 (2d Cir. 1999)).  To establish an adverse employment action, plaintiff must present evidence that the employment action deprived plaintiff of some "tangible job benefits such as compensation, terms, conditions, or privileges of employment." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotations omitted).  Any change in the terms of employment, however, must be "more disruptive than a mere inconvenience or an alteration of job responsibilities" to constitute an adverse employment action.  *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (citing *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).  Some examples of materially adverse changes in employment include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.")  *Ashcroft*, 336 F.3d at 138 (citing *Galabya*, 202 F.3d at 640).

It is undisputed that Plaintiff was placed on modified duty following the party incident at his home.  This constitutes an adverse employment action.  *See, e.g.*, *Payne v. New York City Police Dep't*, 863 F. Supp. 2d 169, 180–81 (E.D.N.Y. 2012) (finding placement on modified duty was adverse employment action); *Henderson v. City of New York*, 818 F. Supp. 2d 573, 579

n.4 (E.D.N.Y. 2011) (same). Accordingly, Plaintiff has established that he suffered an adverse employment action.[12]

ii.  Inference of Discrimination

Plaintiff also must show that he was placed on modified duty under circumstances giving rise to an inference of racially discriminatory intent. *See, e.g.*, *Vaughn v. City of New York*, 06-CV-6547(ILG), 2010 WL 2076926, at *9 (E.D.N.Y. May 24, 2010) (citing *Paulino v. New York Printing Pressman's Union, Local Two*, 301 Fed. App'x 34, 37 (2d Cir. 2008) (summary order)). "Although the standard to establish a prima facie case is not high, conclusory allegations alone are insufficient to support an inference of discrimination." *Id.* (citing *Sharif v. Buck*, 152 Fed. App'x 43, 44 (2d Cir. 2005) (summary order)).

Here, Plaintiff admits that he has no direct or tangible evidence of discrimination. (Def. St. ¶ 41; Dkt. 57-4 at 123–24.)[13] Plaintiff's allegations regarding racial discrimination against him in his employment amounts to a "gut feeling." This is not sufficient to create an inference of

---

[12] Plaintiff also claims that he suffered an adverse employment action because he "was treated vastly different due to his race" and due to the "overall treatment he received as an off-duty police officer seeking police assistance that led to his home being violated, he being falsely arrested and assaulted as well as his family and friends too." (Dkt. 60-19 at 4.) However, Plaintiff cites no authority, and the Court finds none, for Plaintiff's position. Plaintiff claims that he suffered an adverse employment action through the "overall treatment" he experienced during the incident. This treatment, however egregious it may have been, cannot constitute a "materially adverse change" in the terms of Plaintiff's employment. Likewise, that conduct did not operate to deprive Plaintiff of some "tangible job benefits," so as to rise to the level of an adverse employment action. Accordingly, Plaintiff has established an adverse employment action only with respect to his placement on modified duty. However, evidence regarding Plaintiff's "overall treatment" as an off-duty officer during the party incident may still be relevant to his employment discrimination claims in that it may serve as evidence of discriminatory intent.

[13] "Q: Do you have any evidence or tangible proof that they discriminated against you; did anyone say anything? A: No, there were no verbal words said, but I've lived in the neighborhood seven years and just on being a member of the community and observing, seeing how they treat everyone, so I keep my distance. I'm a fellow officer but I keep my distance." (Dkt. 57-4 at 123–24.)

discrimination. *See Bobb v. Potter*, 2007 WL 1300975, at *3 (E.D.N.Y. May 3, 2007); *Taylor v. Polygram Records*, 1999 WL 124456, at *16 (S.D.N.Y. 1999) ("[Plaintiff's] belief, based on no evidence other than gut instinct . . . cannot justifiably support an inference of discrimination when nothing in the record remotely links [the employer's] treatment of her to her race."); *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("[A] plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn."). Plaintiff fails to identify anything in the record to support an inference that he was placed on modified duty because of his race, and instead blanketly points to the entire record as support for his claim. (*See* Dkt. 60-19 at 4 (citing all of Plaintiff's exhibits).)

Plaintiff also argues that Defendants' discriminatory intent can be inferred based on disparate treatment. Plaintiff claims that, because he was an employee in "Good Standing," he should not have been treated as he was during the party incident and thereafter. (Dkt. 60-19 at 4.) Plaintiff also claims that Defendants Tellado, MacNear, and other police supervisors should have referred the matter to the Office of Equal Employment Opportunity for investigation. (Dkt. 60-19 at 4.) Based on these assertions, Plaintiff argues that he was treated differently than similarly situated individuals outside his protected class, thereby permitting an inference of racial discrimination. *See Graham*, 230 F.3d at 39–40.

Plaintiff, however, fails to identify any similarly situated employees who were not comparably disciplined for substantially the same conduct that Plaintiff engaged in, or was accused of engaging in, by the NYPD. Instead, Plaintiff argues that he was discriminated against because, while he sustained injuries and was placed on modified duty, "not one police officer

[was] held accountable for their outrageous conduct." (Dkt. 60-19 at 5.) [14] This argument misses the point entirely. The other police involved in the incident are not the proper comparators for purposes of a disparate treatment analysis.

To establish disparate treatment, a plaintiff must demonstrate that he was treated materially differently than similarly situated colleagues outside his protected class.[15] "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) engaged in comparable conduct.'" *Ruiz v. Cnty of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (citing *Graham*, 230 F.3d at 40). Here, Plaintiff's conduct is distinguishable from that of the Individual Defendants.

Under this test, the proper similarly situated comparator in this case would be an off-duty police officer not in Plaintiff's protected class who was accused of the same misconduct, *i.e.* failing to identify himself as a police officer, assaulting an officer, and resisting arrest, but who was not placed on modified duty pending his or her investigation. The proper comparator to Plaintiff is *not* the Individual Defendants, who were on-duty officers responding to a report of a man with a gun at a house. Plaintiff simply fails to identify an appropriately comparable officer who received more favorable treatment by the NYPD. Consequently, Plaintiff offers no evidence to support a finding of disparate treatment from which discriminatory intent could be

---

[14] Officers Czulada and Captain Tellado, in fact, were disciplined for their involvement in the incident. (Def. St. ¶ 38.) They were not, however, placed on modified duty.

[15] Whether a plaintiff is similarly situated to his or her colleagues *generally* is a question of fact to be determined by the factfinder, *see Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citing *Taylor v. Brentwood Union Free Sch. Dist.*, 143 F.3d 679, 684 (2d Cir. 1998)), but is amenable to summary judgment nonetheless. *See Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

inferred.[16]  Plaintiff, therefore, cannot establish a prima facie case of discrimination, and his claims alleging discrimination under Sections 1981 and 1983, and the NYSHRL, *i.e.*, Counts 1, 2, and 14, must be dismissed.

## II.  Count 15:  Discrimination under the NYCHRL

"NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims." *Mihalik*, 715 F.3d at 113 (citing *Hernandez v. Kaisman*, 103 A.D.3d 106, 113 (1st Dep't 2012)).  Although for many years the NYCHRL was deemed to mirror federal and state anti-discrimination statutes, the New York City Council passed the Local Civil Rights Restoration Act of 2005, which made clear that an independent analysis of a Plaintiff's claims under the NYCHRL was required.  *Id.* at 108–109.  Accordingly, "claims under the [NYCHRL] must be given 'an independent liberal construction.'" *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 66 (1st Dep't 2009)).  Pursuant to that liberal construction, a NYCHRL plaintiff need not establish that he sustained an adverse employment action.  *Noel v. BNY-Mellon Corp.*, 514 Fed. App'x 9, 11 (2d Cir. 2013) (summary order).  Under the NYCHRL, a plaintiff need only show "differential treatment—that []he is treated 'less well'—because of a discriminatory intent." *Mihalik*, 715 F.3d at 110.  However, the NYCHRL is not a "'general civility code'," and a plaintiff "still bears the burden of showing that the conduct is caused by a discriminatory motive." *Id.* at 110 (citing *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 79–80 (1st Dep't 2009)).

---

[16] Likewise, Plaintiff's attempt to create an issue of fact with respect to his prior complaints of racial discrimination within the department fails to present any admissible evidence regarding those complaints, instead relying exclusively on his *ipse dixit* statements.  (*See* Pl. St. ¶ 41; Dkt. 59 at 4.)  Indeed, Plaintiff testified at deposition that he never before complained of discrimination and always "got along" with his Caucasian colleagues.  (*See* Pl. St. ¶¶ 44–48.)

Even under the NYCHRL's liberal construction, Plaintiff has failed to submit any evidence other than his generalized "gut feeling" regarding discrimination. Plaintiff has submitted no evidence that he was treated "less well" than other similarly situated police officers or that such poorer treatment, had it occurred, was on the basis of his race. Accordingly, Plaintiff's employment discrimination claim under the NYCHRL, Count 15, is dismissed.

### III.     Count 3:  Abuse of Authority

Defendants do not move for summary judgment with respect to Plaintiff's abuse of authority claim. Accordingly, it is not dismissed.

### IV.     Count 4:  Unlawful Entry

Plaintiff claims that Defendants committed an "illegal search of the residence" in violation of the Fourth Amendment when they entered his home without a warrant. (Dkt. 30 at 25.)[17] Defendants move for summary judgment on the basis that their entry into Plaintiff's home was justified by exigency, and therefore no warrant was necessary. (Dkt. 58 at 7–8.) Plaintiff argues Defendants entered his home without a warrant and without exigent circumstances justifying the warrantless entry. (Dkt. 60-19 at 6–7.)

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend IV. A warrant is not required in all situations, however. Under the exigent circumstances exception, warrantless entry into a dwelling is permitted where "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is

---

[17] Defendants construe this claim as an "unlawful entry claim." (Dkt. 58 at 7.) Plaintiff does not dispute this characterization.

objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (internal quotation marks omitted). Whether exigent circumstances existed at the time of the warrantless entry is evaluated on an objective basis, and "must be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Tierney v. Davidson*, 133 F.3d 189, 196–97 (2d Cir. 1998) (citation omitted). The Supreme Court has identified numerous exigencies that may justify a warrantless entry into a home. Pertinent here is the "emergency aid" exception, which allows "officers [to] enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Kentucky v. King*, 131 S. Ct. 1849, 1856 (U.S. 2011) (citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)); *Kerman v. City of New York*, 261 F.3d 229, 235 (2d Cir. 2001) ("police officers may enter a dwelling without a warrant to render . . . assistance to a person whom they reasonably believe to be in distress") (citation omitted). Courts are particularly sensitive to domestic situations, recognizing "the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger." *Tierney*, 133 F.3d at 197.

An analysis of pertinent case law is instructive. In *Anthony v. City of New York*, 339 F.3d 129, 135–136 (2d Cir. 2003), which involved an unlawful entry claim, police officers responded to a 911 call in which the caller reported an ongoing attack on her by her husband, and that the husband had in his possession a knife, a gun, and other unknown weapons. *Id.* at 133.[18] The

---

[18] Although the Second Circuit could not discern from the record whether the police officers actually entered the subject home without consent of a resident, the Court assumed that there was no consent, and analyzed the facts under the exigent circumstances exception. *See id.* at 135–

16

Second Circuit affirmed the district court's grant of summary judgment in favor of the defendant municipality. The Second Circuit held that exigent circumstances justified the police officers' warrantless entry into the home because "the caller expressed an immediate risk of harm to herself, and the address from which the call was placed was verified." The panel held that, under those circumstances, "the substance of [the] 911 call thus created exigent circumstances justifying warrantless entry[.]" *Id.* at 136.

In *Brigham City*, police officers responded to a call regarding a loud party at a home at about 3 a.m. 547 U.S. at 400–01. Upon arriving at the home, the officers heard shouting, observed two juveniles drinking alcohol in the backyard of the house, and saw through a screen door an altercation taking place in the kitchen. *Id.* at 401. Inside, several adults were attempting to restrain a juvenile, who broke free and hit one of the adults in the face. *Id.* As the altercation continued to escalate, one of the officers opened the screen door, announced his presence, and entered the kitchen. *Id.* When the partygoers noticed the police officer's presence, the altercation ceased. *Id.* Two individuals at the party were arrested, charged, and convicted of corruption of a minor. On appeal, they challenged the admission of evidence obtained after the officers entered the home on the basis of the warrantless entry. *Id.* The Supreme Court held that the officer's entry into the home fell under the exigent circumstances exception to the Fourth Amendment's warrant requirement. *Id.* at 407. The Court reasoned that "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Id.* at 403. The Court found the officers' entry into the home to be "plainly reasonable under the circumstances" because the officers were responding to an early

---

136.

morning call regarding a loud party, and they observed a violent altercation and minors consuming alcohol. *Id.* at 406.

The present case is similar to the circumstances of both *Anthony* and *Brigham City*. Defendants arrived at Plaintiff's residence in response to a 911 call from that address reporting a man with a gun. (Def. St. ¶¶ 21, 23.) Upon arrival at the scene, Defendants heard Plaintiff's niece yell, "they are fighting." The officers also heard screams and shouting from inside the home. (Dkt. 60-2 at ECF 70.) At least one of the responding officers, Officer Czulada, "heard a commotion going on inside [the] house, people were calling for help, screaming." (Dkt. 60-2 at ECF 62.) Sergeant MacNear likewise heard screaming and yelling coming from within the house, and was told about a fight. (Dkt. 60-5 at ECF 4).[19] The combination of the report of a gun on the scene, the niece's distress call, and the sounds of yelling and screaming from inside the home created exigent circumstances justifying Defendants' entry into Plaintiff's home. *See Hogan v. Buttofocco*, 2009 WL 3165765 (N.D.N.Y. Sept. 28, 2009), *aff'd* 379 Fed. App'x 35 (2d Cir. 2010) (summary order) (911 call regarding a domestic dispute inside the home, a report that someone had brandished a hammer, and reason to believe that a crime had been committed constitute exigent circumstances justifying warrantless entry into the home).

---

[19] Notably, Plaintiff does not dispute these accounts. In addition, although, as discussed below, the Court finds that Defendants' entry into Plaintiff's home was justified by exigency, the facts also suggest that Defendants may have entered upon consent from Plaintiff's niece and/or domestic partner. Plaintiff fails to point to any evidence indicating that Defendants entered the house without consent.

In sum, there is no genuine dispute that exigent circumstances justified Defendants' warrantless entry into the home.[20]  Accordingly, Defendants' motion is granted with respect to Plaintiff's claim of illegal entry and search of his home, and Count 4 is dismissed.

V.    False Arrest Counts

Plaintiff claims he was falsely arrested as a result of the party incident.  (Dkt. 60-19 at 8–9.)[21]  "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citation omitted).  Under New York law, to prove the elements of false arrest, a plaintiff must show "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).

In typical false arrest cases, "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is

---

[20] Searches and seizures conducted without warrants are presumptively unreasonable. *See Ruggiero v. Krzeminski*, 928 F.2d 558, 563 (2d Cir. 1991) (citing *Payton v. New York*, 445 U.S. 573, 587 (1976)).  But that presumption does not shift the burden of persuasion to defendants, but rather "may cast upon the defendant the duty of producing evidence of consent or search incident to an arrest or other exceptions of the warrant requirement." *Id.*  In other words, a defendant need only satisfy its burden of production to submit evidence demonstrating the existence of exigent circumstances thereby making the entry into the home reasonable.  Here, Plaintiff has not submitted competent evidence to create a genuine issue as to whether Defendants' entry into his home was unreasonable.

[21] Plaintiff also asserts a claim for "unlawful detention," which Defendants treat as synonymous with Plaintiff's false arrest claim.  (Dkt. 58 at 2 n.1.)  However, as discussed *infra*, certain circumstances can give rise to a claim of "unreasonable detention," which is separate and distinct from a claim of false arrest.  *See Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007).  Although the complaint does not appear to properly allege an unreasonable detention claim, the Court nonetheless addresses Plaintiff's false arrest and unlawful detention claims separately.

brought under state law or under § 1983." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir.

2007) (citing *Weyant*, 101 F.3d at 852). "[P]robable cause to arrest exists when the officers have

knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to

warrant a person of reasonable caution in the belief that the person to be arrested has committed

or is committing a crime." *Id.* at 84–85 (citing *Weyant*, 101 F.3d at 852); *see also Dickerson v.*

*Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010). "A finding of probable cause can be made based

on the 'totality of the circumstances.'" *Bernard*, 25 F.3d at 102 (citing *Illinois v. Gates*, 462 U.S.

213, 230 (1982)). Probable cause is evaluated based on the facts available to the officer or

officers at the time of the arrest. *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 1995).[22]

Here, there is a genuine issue of fact with respect to whether there was probable cause to

arrest and detain Plaintiff. Defendants assert that the arresting officers had probable cause to

believe that Plaintiff had failed to identify himself as a police officer, had assaulted police

officers, and had resisted arrest. (Dkt. 58 at 10; Dkt. 60-3 (Ex. C) at ECF 55–56 (Officer

Czulada testifying that Plaintiff did not identify himself and punched him multiple times); Dkt.

57-4 at 96.) However, Plaintiff testified that he identified himself as a police officer numerous

times prior to being arrested and that he did not strike police officers or resist arrest. (*See, e.g.*,

---

[22] It is not well established in the Second Circuit which party in a false arrest case bears the
burden with respect to the existence of probable cause. Some courts have held that a plaintiff
bears the burden to prove the absence of probable cause. *See Khan v. Ryan*, 145 F. Supp. 2d
280, 284 (E.D.N.Y. 2001) ("In the context of section 1983 claims, federal courts have held that
the plaintiff bears the burden of establishing the absence of probable cause.") (citing *Campbell v.*
*Giuliani*, 2000 WL 194815, at *2 (E.D.N.Y. Feb. 16, 2000)). This makes sense, given that lack
of privilege is an element of the claim. *See Weyant*, 101 F.3d at 853 (setting forth the elements
of a false arrest claim). However, the Second Circuit has recently reaffirmed that "[w]hen an
arrest is not made pursuant to a judicial warrant, the defendant in a false arrest case bears the
burden of proving probable cause as an affirmative defense." *Dickerson v. Napolitano*, 604 F.3d
732, 751 (2d Cir. 2010). Accordingly, given that this case involves a warrantless arrest, the
Court finds that it is Defendants' burden to prove probable cause supporting Plaintiff's arrest.
*See Dickerson*, 604 F.3d at 751.

Dkt. 60-19 at 8; Dkt. 60-3 at ECF 10, ECF 17.)[23]  Plaintiff's domestic partner, Strong, and other witnesses corroborated Plaintiff's claim that he identified himself as a police officer.  (*See* Dkt. 60-3 at ECF 49; Dkt. 60-3 (Ex. B) at 68; Dkt. 60-7 at ECF 63.)  Even Officer Czulada acknowledged that he heard Plaintiff identify himself as an officer, although not until Plaintiff was lying on his stomach, handcuffed, in the street.  (Dkt. 60-3 at ECF 58.)  Consequently, there is a genuine issue as to whether Defendants, at the time they arrested Plaintiff, had probable cause to believe that Plaintiff had failed to identify himself as a police officer, or that he had fought with the police officers who entered his home.

Furthermore, even if it were undisputed that Plaintiff resisted arrest by fighting with the officers, an arrest on this charge is only lawful if the arrest that prompted the resistance was itself lawful.  *See Murphy v. Lynn*, 118 F.3d 938, 948 (2d Cir. 1997) (citing *Weyant*, 101 F.3d at 855) ("[A]s a matter of law, an arrest for resisting arrest is not lawful unless the arrest that was supposedly resisted was itself authorized, either by way of an arrest warrant or by the existence of probable cause.").  Thus, the existence of a factual dispute about whether Defendants had probable cause to arrest Plaintiff for failing to identify himself as police precludes summary judgment on Plaintiff's claim that he was improperly arrested for resisting arrest.

Perhaps tellingly, Defendants make no argument that there was probable cause to arrest Plaintiff.  (Dkt. 58 at 9–10.)  Rather, Defendants argue that they were entitled to arrest Plaintiff without probable cause because Plaintiff, as a police officer, has a diminished expectation of

---

[23] Although Plaintiff's testimony regarding his self-identification is inconsistent at times, these inconsistencies go to Plaintiff's credibility and the accuracy of his testimony, which are matters to be decided by the jury.  (*Compare, e.g.*, Dkt. 57-4 at ECF 26 (did not identify himself as an officer until he was faced down in the street and handcuffed) *with* Dkt. 60-2 (Ex. A) at 71 ("But when I walked up, I said, hey, how are you doing, sarge, I'm MOS [Member of Service].  I'm a police officer.  This is my house.  So he said what's going on and before I could tell him what had happened, I observed Officer Czulada run up into the house.")).

privacy and freedom as compared to a civilian. (*See* Dkt. 58 at 9 (citing *Davis v. City of New York*, 2007 WL 2973695, at *6 (E.D.N.Y. Sept. 28, 2007)) ("Plaintiff, as a police officer, is not entitled to the same privacy rights as the average citizen.").) Thus, Defendants argue they were entitled to "take" Plaintiff to the precinct "so that the incident could be investigated." (Dkt. 58 at 10.) Defendants further assert that "Plaintiff was not processed as an arrest, but [was] informed by Investigations Division personnel and members of the Internal Affairs Bureau to wait at the Precinct." (Dkt. 58 at 10.)

This argument, however, conveniently elides the circumstances of the arrest and detention. While, under the reasoning of *Gonzalez v. City of New York*, 2000 WL 1678036 (S.D.N.Y. Nov. 8, 2000), *aff'd* 38 Fed. App'x 62 (2d Cir. 2002) (summary order), Defendants may be entitled to arrest and detain one of their officers to determine his or her fitness, *id.* at 64, here, there is a factual dispute as to whether Defendants knew or believed that Plaintiff was an officer at the time they arrested him. *See supra* at 21.[24] Thus, the principle about a police officer's diminished expectation of privacy cannot justify summary judgment in this case because of the factual dispute about Plaintiff's self-identification as an officer.

Accordingly, Defendants are denied summary judgment as to Plaintiff's false arrest claim (consolidated Counts 5, 6, 7, 9, 21, and 22).

---

[24] Defendants seem to suggest that police would have been entitled to detain Plaintiff to investigate his fitness even if they did not know whether Plaintiff was a police officer. (Dkt. 58 at 10) (characterizing *Gonzalez* as holding that "it *would have been* reasonable for the officers to detain Gonzalez as part of an internal investigation into the fitness of one of its officers") (emphasis added). However, nothing in *Gonzalez* suggests that a police officer may be detained to investigate his fitness even if the arresting officers are unaware of his status as a police officer. Notably, in *Gonzalez*, the plaintiff immediately announced to the arresting officers that he was himself an officer. 2000 WL 1678036, at *1.

VI.     Count 8:  Unlawful Detention

Although false arrest and unlawful detention claims generally may be considered together, *see, e.g.*, *Little v. City of New York*, 487 F. Supp. 2d 426, 437 (S.D.N.Y. 2007) ("False arrest is simply an unlawful detention or confinement brought about by means of an arrest rather than in some other way and is in all other respects synonymous with false imprisonment,") the two claims have grown to be distinct in the Second Circuit, under certain circumstances.  *See Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007).   In *Russo*, the Second Circuit recognized a separate claim of "unreasonably prolonged detention," the elements of which are (i) the plaintiff was incarcerated for an unreasonable length of time; (ii) the defendant, by expending reasonable cost and effort, could have conclusively established the plaintiff's innocence; (iii) the defendant failed to do so; and (iv) the defendant unlawfully detained the plaintiff, either intentionally or with deliberate indifference to his constitutional rights.  *Thompson v. City of New York*, 603 F. Supp. 2d 650, 656 (S.D.N.Y. 2009) (citing *Russo*, 479 F. 3d at 210–211); *Russo*, 479 F.3d at 205 (defining the elements of the claim as (1) plaintiff  "has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) the actions of the officers violated that right, and (3) the officers' conduct 'shocks the conscience.'") (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

Plaintiff does not set out a *Russo* claim because *Russo* has been narrowly construed to involve situations where a law enforcement official has mishandled or suppressed readily available exculpatory evidence, which resulted in the plaintiff's unreasonably long incarceration.  *See Thompson*, 603 F. Supp. 2d at 656; *Russo*, 479 F.3d at 205.  To the extent that Plaintiff sets forth a claim under an unreasonable detention theory, that claim fails because Plaintiff does not

allege either that he was detained for an unreasonable length of time or that there was exculpatory evidence available to the officers that they withheld or failed to obtain. *See Russo*, 479 F.3d at 205.

Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's "unlawful detention" claim (Count 8), which the Court construes as a claim separate from his false arrest claim, as to which summary judgment was denied.

VII.    Count 11:  Malicious Prosecution

Plaintiff, in his opposition to the motion, admits that he cannot maintain a claim for malicious prosecution and voluntarily withdraws the claim.  (Dkt. 60-19 at 9.)  That claim (Count 11) accordingly is dismissed.

VIII.   Claims against Officer Patrick D'Onofrio

Defendants move for summary judgment with respect to Officer D'Onofrio on the basis that he was not involved in the incident giving rise to this action.  (Dkt. 58 at 11–12.)  "It is well settled in [the Second Circuit] that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under 42 U.S.C. § 1983."  *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006).  Plaintiff sets forth no factual basis to show that Officer D'Onofrio can be held liable under Section 1983 for his involvement in the alleged conduct giving rise to Plaintiff's lawsuit.  Plaintiff acknowledges that personal involvement is a necessary element of a cause of action against individual police officers.  (Dkt. 60-19 at 9.)  The only basis Plaintiff sets forth for maintaining D'Onofrio as a defendant in this case is that (1) he entered Plaintiff's home, (2) he "unlawfully subdued Non-Party Witness Taimar Bonaparte leading to his and Non-Party Witnesses Marcus Johnson and Derrick Collins's arrests being dismissed," and (3) "[Officer] D'Onofrio was present throughout the whole incident including plaintiff's assault

yet, never tried to intervene or control the situation." (Dkt. 60-19 at 9.) Defendants maintain that Officer D'Onofrio's "only involvement that night was to help Sergeant MacNear place an individual under arrest" and that Officer D'Onofrio "never even saw Plaintiff that night." (Def. St. ¶¶ 27, 28; Dkt. 58 at 11.) Plaintiff sets forth no evidence to dispute this testimony. Indeed, the exhibits cited by Plaintiff in this regard are inapposite to Plaintiff's point. If anything, Plaintiff's evidence supports Officer D'Onofrio's contention that he did not see Plaintiff that night and was not involved in his arrest. (*See* Dkt. 60-16 (Ex. 33) (transcript of NYPD hearing in which Officer D'Onofrio confirmed he assisted Sergeant MacNear in arresting Mr. Bonaparte, after which he returned to the police station without seeing Plaintiff).) Officer D'Onofrio's arrest of Bonaparte is unrelated to Plaintiff's claims, and Bonaparte is not a party to this action. Therefore, Plaintiff provides no basis to find that Officer D'Onofrio's conduct resulted in a deprivation of Plaintiff's rights, and thus has failed to raise a triable issue of fact with respect to Officer D'Onofrio's liability.[25]

To the extent that Plaintiff contends that Officer D'Onofrio may be held liable for his failure to intervene in Plaintiff's arrest (Dkt. 60-19 at 9–10), this claim also fails. A law enforcement official may be held liable for an alleged Section 1983 violation if the officer "observes or has reason to know that: (1) excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement officer." *Smith v. P.O. Canine Dog Chase*, 2004 WL 2202564, at *9 (S.D.N.Y. Sept. 28, 2004) (Report & Recommendation) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (itself citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988)). To establish

---

[25] To the extent that Plaintiff could have a claim against Officer D'Onofrio for unlawful entry into Plaintiff's home, that claim already has been dismissed in its entirety.

that Officer D'Onofrio failed to intervene, Plaintiff also must show that the officer had "a realistic opportunity to intervene to prevent the harm from occurring" but failed to do so. *See Cerbelli v. City of New York*, 2008 WL 4449634, at *11 (E.D.N.Y. Oct. 1, 2008) (citing cases).

Plaintiff sets forth no evidence to show that Officer D'Onofrio had the opportunity to intervene but failed to prevent the deprivation of Plaintiff's rights.[26] Plaintiff therefore has failed to raise a triable issue of fact with respect to Officer D'Onofrio's knowledge or reason to know that Plaintiff's constitutional rights were being violated and with respect to Officer D'Onofrio's opportunity and failure to intervene.

Accordingly, all claims against Officer D'Onofrio are dismissed with prejudice.[27]

IX. Counts 19, 20, and 23:  State Law Claims of Assault, Battery and Intentional Infliction of Emotional Distress against the City and Individual Defendants

a. Plaintiff's Failure to Comply with the State Law Notice Requirement

Plaintiff asserts New York State law claims of assault, battery and intentional infliction of emotional distress ("IIED") against the City and Individual Defendants.  (Dkt. 30 at 48–53; Dkt. 60-19 at 13.)  Defendants argue that Plaintiff failed to serve a proper notice of claim upon the Individual Defendants as required by New York State law.  (Dkt. 58 at 15; Dkt. 59 at 8.) Plaintiff acknowledges that his notice of claim was deficient, but maintains that the defective notice of claim may be cured.  (Dkt. 60 at 11–12.)

---

[26] Officer D'Onofrio testified at the NYPD hearing and on deposition that he did not see Plaintiff that night and soon left the area to return arrestee Bonaparte to the station house.  (Dkt. 60-16 (Ex. 33) at 1; Dkt. 57-6 at 20.)  None of the evidence to which Plaintiff cites raises a genuine issue as to those facts.

[27] Defendants also argue that the claims against Officer D'Onofrio should be dismissed on the basis of qualified immunity.  (*See* Dkt. 58 at 12 n.5.)  In light of the dismissal of all claims against Officer D'Onofrio, it is unnecessary for the Court to address this issue.

New York Municipal Law Section 50-e requires a plaintiff to serve notice of a tort claim upon a municipality within 90 days after the claim arises. N.Y. Gen. Mun. Law § 50-e(1). A notice of claim must identify any individual officers the plaintiff intends to name in the lawsuit in addition to the municipality. *See Schafer v. Hicksville Union Free Sch. Dist.*, 2011 WL 1322903, at *11 (E.D.N.Y. Mar. 31, 2011) (citing *Tannenbaum v. City of New York*, 30 A.D.3d 357, 358 (1st Dep't 2006)) ("In New York, General Municipal Law Section 50-e [] requires plaintiffs to name their defendants in their notice of claim prior to commencing a lawsuit."). Plaintiff's notice of claim failed to identify any of the Individual Defendants, either by their particular names or as "Doe" defendants, and only named the City of New York. (*See* Dkt. 57-1.) Plaintiff argues that this failure should be excused because only through discovery did Plaintiff learn the identities of the Individual Defendants. (Dkt. 60-19 at 12.) However, Plaintiff failed to provide notice of suit against even unnamed individual "John Doe" defendants, and consequently the City of New York and the Individual Defendants were not on notice of these claims. *See Humphrey*, 2009 WL 875534, at *20; *Schafer*, 2011 WL 1322903, at *11 ("Plaintiffs may not file a notice of claim naming a municipal entity and then commence an action against a roster of individual municipal employees.") (citation and quotation omitted). This failure is fatal to Plaintiff's tort claims against the Individual Defendants, *unless* Plaintiff can cure this deficiency. *See Humphrey v. Cnty. of Nassau*, 2009 WL 875534, at *20 (E.D.N.Y. Mar. 30, 2009) ("Notice of claim requirements are construed strictly by New York state courts. Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action.") (quoting *Hardy v. New York City Health & Hosps. Corp.*, 164 F.3d 789, 793–94 (2d Cir. 1999)).[28]

---

[28] "The purpose of the notice-of-claim requirement is to afford the municipality an adequate

This Court cannot grant leave to Plaintiff to cure his deficient notice of claim. First, whether the Court has the authority to extend the time to file a notice of claim is unsettled in this circuit. *See Berry v. Village of Millbrook*, 815 F. Supp. 2d 711, 725 (S.D.N.Y. 2011) ("The Second Circuit has not definitively ruled on whether a federal district court may grant a request to extend time to serve the notice of claim.") (citing *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 540 (2d Cir. 1999)); N.Y. Gen. Mun. Law § 50-e(5) ("All applications under this section shall be made to the *supreme court* or to the *county court*.") (emphases added). In the absence of clear authority to do so, district courts in this circuit routinely have found a lack of jurisdiction to consider such an application. *See Berry*, 815 F. Supp. 2d at 725 (collecting cases). The Court finds no basis to depart from this general principle.

Second, and more conclusively, no extension of time to file a late notice of claim may exceed the limitation period for bringing an action against the public corporation. N.Y. Gen. Mun. Law § 50-e(5) ("The extension shall not exceed the time limited [sic] for the commencement of an action by the claimant against the public corporation."). In New York, the limitation period for an intentional tort is one year. N.Y.C.P.L.R. § 215(3). Adding to that limitation period the 90 days within which a plaintiff suing a municipality must file a notice of claim, the limitation period for an intentional tort against a municipality is one year and 90 days. N.Y. Gen. Mun. Law § 50-i(1). Here, Plaintiff's claim arose on or about August 21, 2010. Plaintiff initiated this lawsuit on June 24, 2011. As far as the record reveals, Plaintiff first suggested the possibility of remedying his deficient notice of claim in his response to the present motion, which was submitted to the Court on August 21, 2013. Consequently, the one-year-and-

---

opportunity to investigate the claim in a timely and efficient manner and, where appropriate, to settle claims without the expense and risks of litigation." *Hardy*, 164 F.3d at 794 (citation omitted).

90-day limitation period for the commencement of an action alleging an intentional tort by the Individual Defendants has long since passed. Thus, even if the Court had jurisdiction to grant such an extension, no such extension could be granted.

Accordingly, Plaintiff is unable to cure the deficient notice of claim, and Plaintiff's state law tort claims against the Individual Defendants must be dismissed for failure to state a claim. Even if not procedurally barred, Plaintiff's IIED claim fails on the merits, as discussed below. Furthermore, although Plaintiff provided the requisite notice of his state law tort claims as to the City, as discussed *infra*, Section X(a), these *Monell* claims against the City also fail on the merits.

> b. Intentional Infliction of Emotional Distress ("IIED")

To maintain a claim for IIED under New York law, a plaintiff must prove "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996); *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993). New York law sets a high bar for conduct that is "extreme and outrageous" rising to constitute intentional infliction of emotional distress. *See Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (1983) ("so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society") (citations and quotation marks omitted). The question of whether the conduct alleged by a plaintiff may rise, as a matter of law, to the level of "extreme and outrageous" conduct is a question left to the district court in the first instance. *See Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (affirming dismissal of emotional distress claim, and holding that "[w]hether the

conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance").

The New York Court of Appeals has cautioned strongly against permitting emotional distress claims where the alleged conduct falls within the ambit of other tort remedies:

> In New York, "intentional infliction of emotional distress is a theory of recovery that is to be invoked only as a last resort," when traditional tort remedies are unavailable. *See EEOC v. Die Fliedermaus,* L.L.C., 77 F. Supp. 2d 460, 472 (S.D.N.Y. 1999) (quoting *McIntyre v. Manhattan Ford, Lincoln–Mercury, Inc.,* 256 A.D.2d 269, 682 N.Y.S.2d 167, 169 (1st Dep't 1998)). Accordingly, "[n]o intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability." *Hansel v. Sheridan*, 991 F. Supp. 69, 75 (N.D.N.Y. 1998). In the instant case, since the conduct complained of are encompassed in plaintiff's claims for assault and battery and malicious prosecution, plaintiff's claim for intentional infliction of emotional distress must be dismissed.

*Naccarato v. Scarselli*, 124 F.Supp.2d 36 (N.D.N.Y. 2000); *see Moore v. City of New York*, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002) (citing *Fischer v. Maloney*, 43 N.Y.2d 553 (1978)). In New York, the tort of IIED is "extremely disfavored." *Hogan v. J.P. Morgan Chase Bank*, 05-CV-5342(JS), 2008 WL 4185875, at *4 (E.D.N.Y. Sept. 4, 2008).

First, Plaintiff's IIED claim must be dismissed because it overlaps with his claims of assault, battery, and false arrest. *See Leonard v. Reinhardt*, 20 A.D. 3d 510, 510 (2d Dep't 2005) ("the cause of action alleging intentional infliction of emotional distress should have been dismissed as duplicative of the causes of action alleging malicious prosecution and assault and battery") (citing cases).

Second, the facts contained in the record before the Court do not permit a rational jury to conclude that Defendants' conduct constitutes the type of "extreme and outrageous" conduct necessary to sustain a claim for intentional infliction of emotional distress. Although New York's law of IIED does not proscribe specific types of conduct, the conduct must be so extreme

and outrageous as to be utterly intolerable in a civilized community.  *See Murphy*, 58 N.Y.2d at

303.  The evidence offered by Plaintiff establishes, at most, that he was arrested by NYPD

officers despite having identified himself as an officer, and that he was injured during the arrest.

However, Plaintiff offers no evidence to show that the arresting officers acted willfully, or that

they intentionally injured him.  In sum, Plaintiff has set forth no basis to conclude that the

Defendant-officers' conduct was extreme and outrageous as a matter of law.

Accordingly, Defendants' motion for summary judgment is granted with respect to

Plaintiff's claim for intentional infliction of emotional distress against the Individual Defendants.

X.      Counts 12–13 and 16–23:  *Monell* Claims against Defendant City of New York

Plaintiff has alleged constitutional violations by the City, pursuant to Sections 1981 and

1983, on a variety of bases: (1) improper training and discipline of the Individual Defendant

officers (Counts 12–13)[29]; (2) negligent hiring, supervision and retention of the Individual

Defendants (Counts 16–18); and (3) assault, battery, false arrest, false imprisonment, and IIED

(Counts 19–23).  For the reasons discussed below, all claims against the City are dismissed.

a.      *Monell* Claims

Section 1981 claims cannot be asserted against a municipal entity on the basis of

vicarious liability.  *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736 (1989) ("we have

rejected *respondeat superior* as a basis for holding a state actor liable under § 1983 for violation

of the rights enumerated in § 1981").  Section 1981 liability may only be asserted against a

municipal entity pursuant to Section 1983 and only in accordance with the principles established

by *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  *See Jett*, 491 U.S. at

---

[29] The complaint actually does not name the City as a defendant in either Count 12 or 13. However, since the City is the only party that could be responsible for a claim of improper training or discipline, the Court assumes that it was one of the intended defendants for purposes of this motion.

735 ("We hold that the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.").  In order to hold a municipal entity liable, a plaintiff must establish that "action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell*, 436 U.S. at 691.

To "prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).  There must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (plaintiff asserting *Monell* claim must prove that action taken pursuant to official municipal policy caused the alleged injury ).  "Official municipal policy [] includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (U.S. 2011) (citing *Monell*, 436 U.S. at 691).  "[P]laintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury."  *Roe v. City of Waterbury*, 542 F.3d at 37 (quoting *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).

b.     Counts 12–13 and 19–23

With respect to his claims of improper training and discipline, false arrest and imprisonment, and IIED, Plaintiff makes no attempt to show that his alleged constitutional injuries relating to these claims were caused by any official municipal policy. Plaintiff points to *no* evidence of official municipal policy, either as a formally promulgated policy or as a pattern or practice. Nor has Plaintiff proffered any evidence that his constitutional injuries were caused by an official City policy. Furthermore, Plaintiff cannot demonstrate that, even if he was constitutionally injured because of the City's inaction, that such "inaction was the result of 'conscious choice' and not 'mere negligence.'" *Collins v. City of New York*, 923 F. Supp. 2d 462, 476 (E.D.N.Y. 2013 (citing *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011)). Accordingly, Plaintiff's *Monell* claims against the City set forth in Counts 12–13 and 19–23 are dismissed.

c.     Counts 16–18

In his opposition to Defendant's motion, Plaintiff, appears to withdraw his claims for negligent hiring, supervision, and retention (Counts 16–18). Plaintiff's opposition contains a heading entitled "Plaintiff cannot establish claims for negligent hiring, supervision and retention," but under that heading, it reads "Plaintiff cannot maintain claims for malicious prosecution [and], therefore, voluntarily withdraws these claims." (*See* Dkt. 60-19 at 14.) The Court presumes that the heading, as opposed to the text, is correct and that Plaintiff intended to withdraw his *Monell* claims against the City for negligent hiring, supervision and retention. Furthermore, even if Plaintiff is not withdrawing these claims, they would have to be dismissed because, as with Plaintiff's other claims against the City, he has failed to offer any evidence of

the City's allegedly negligent hiring, supervision, and retention policies.  Accordingly, Counts

16–18 of the complaint are dismissed.

*CONCLUSION*

For the reasons stated above, Defendants' motion is granted in part and denied in part.

Counts 1, 2, 4, 8, 11–20, and 23 are dismissed with prejudice.  All counts are dismissed as to

Defendant Patrick D'Onofrio with prejudice.  Counts 3 and 10 remain.  Counts 5, 6, 7, 9, 21, and

22 also remain, but are consolidated into a single count for false arrest.


SO ORDERED:


  /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge


Dated: March 17, 2014
       Brooklyn, New York