UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
LARRY JACKSON,

                Plaintiff,

         - against -

JESUS TELLADO, STANLEY MACNEAR,
JOHN CZULADA, JAMES T. GHERARDI,
RYANN DUNN, ROBERT J. DEFERRARI,
KENNETH BRAUMANN, BEN KURIAN,
PETER BONETA, THOMAS E. REO,
MICHAEL FAILLA, AND BRIAN E.
HEEREY,

               Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**

11-CV-3028 (PKC)

PAMELA K. CHEN, United States District Judge:

On February 3, 2016, after a seven-day trial, the jury returned a verdict on Plaintiff Larry

Jackson's claims under 42 U.S.C. § 1983 against New York City Police Department Officers

Jesus Tellado, Stanley MacNear, John Czulada, James Gherardi, Ryann Dunn, Robert Deferrari,

Kenneth Braumann, Ben Kurian, Peter Boneta, Thomas Reo, Michael Failla, and Brian Heerey

(collectively, "Individual Defendants"). The jury determined that Jackson had been falsely

arrested and subjected to excessive force, and awarded Jackson $12,500,000 in compensatory

damages, as well as punitive damages against each Defendant in varying amounts.[1]

---

[1] The jury awarded $300,000 in punitive damages against Tellado; $300,000 against
MacNear; $275,000 against Czulada; $150,000 against Gherardi; $150,000 against Dunn;
$250,000 against Deferrari; $50,000 against Braumann; $400,000 against Kurian; $125,000
against Boneta; $275,000 against Reo; $350,000 against Failla; and $50,000 against Heerey, for
a total of $2,675,000 in punitive damages. (Dkt. 95 ("Verdict Sheet").)

Individual Defendants now move for qualified immunity as to each Defendant and each claim. For the reasons set forth below, Defendants' motion is GRANTED in part and DENIED in part.[2]

## BACKGROUND

The Court assumes the parties' familiarity with the procedural history of this case and the trial record, and discusses them only to the extent they are relevant to the resolution of the instant motions.

## I.    PROCEDURAL HISTORY

On June 24, 2011, Jackson filed his complaint against the City of New York and 20 John Doe defendants. (Dkt. 1.) After some initial discovery, Jackson filed his Amended Complaint on March 1, 2013, naming Individual Defendants, as well as Officers Patrick D'Onofrio and Robert E. Russo. (Dkt. 30.)[3] Defendants moved for summary judgment on August 20, 2013 (Dkt. 56), and the Court granted that motion in part on March 17, 2014, dismissing Defendant D'Onofrio and the City of New York. (Dkt 67.) The parties proceeded to trial on January 25, 2016, but during trial, stipulated to the dismissal of Defendant Russo on February 1, 2016 (dkt. 92), which the Court so ordered the next day.

## II.    FACTUAL OVERVIEW[4]

---

[2] Following the issuance of this Memorandum and Order, judgment will issue, and Defendants will have 28 days in which to file their proposed motion for judgment as a matter of law under Federal Rule of Civil Procedure ("FRCP") 50 and/or for a new trial under FRCP 59. (*See* 2/4/16 Dkt. Order.)

[3] Both in his original and amended complaints, Jackson named multiple John Doe defendants, but Plaintiff's counsel affirmed at the beginning of the trial that no such defendants remained in the case. (1/25/16 Tr. at 61.)

[4] When a defendant seeks judgment as a matter of law after trial on the basis of qualified immunity, the Court "must view all disputed facts in the light most favorable to…the prevailing

## A. Testimony of Plaintiff and Several of His Witnesses[5]

On August 21, 2010, Plaintiff, an off-duty police officer, hosted a party for his daughter's twenty-first birthday at his home. (1/27/16 Tr. 17–18, Jackson.) Late in the evening, partygoers congregating in front of Plaintiff's house were approached by a group of people, including a man who appeared to have a gun. (*Id.* at 23–24; 1/26/16 Tr. 92–93, Strong.) Plaintiff came out of his house to move the group away from his home, but at some point, there was at least one call to the police, placed by Plaintiff's fiancée Charlene Strong, informing them that a man with a gun was outside of their home. (1/26/16 Tr. 14–15, Strong; 1/27/16 Tr. 24, Jackson.)

As Plaintiff returned to his house, two police officers—Defendants Czulada and MacNear—arrived at the home in response to the 911 call. (1/27/16 Tr. 29–31, Jackson.) Plaintiff approached Czulada and MacNear and said to MacNear, "hey, Sarge, I'm MOS" meaning he was a member of the police service. (*Id.* at 36.) While Plaintiff, Czulada, and MacNear were talking outside, Plaintiff's niece, Tiffanie Johnson, ran out from Plaintiff's home and stated that there were people fighting inside, at which point Plaintiff, Czulada, and MacNear all entered the home. (*Id.* at 39; 1/28/16 Tr. 78–79, MacNear.)

When Plaintiff got inside, he saw two of the male party guests, Taimar Bonaparte and Jason Wilkinson, on the floor. (1/27/16 Tr. 39–40, Jackson.) After Plaintiff walked into the kitchen to determine what was going on, he turned around to see Czulada "standing there with

---

party." *O'Hara v. City of New York*, 570 Fed. App'x 21, 23 (2d Cir. 2014) (summary order). *See also Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir. 2007) (explaining that the district court "*must draw all reasonable inferences in favor of the nonmoving party . . . and . . . must disregard all evidence favorable to the moving party that the jury is not required to believe*") (quoting *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150–51 (2000)).

[5] Plaintiff's trial testimony was substantially corroborated by the testimony of his friends and family members—Taimar Bonaparte, Derrick Collins, Charlene Strong, Quinton Thomas, Tiffanie Johnson, Marilyn Murphy, and Marcus Johnson.

[an] ASP baton held in both hands." (*Id.* at 41.) Czulada told Plaintiff to "back the fuck up," to which Plaintiff responded by "put[ting] [his] hands up" and telling Czulada that he (Plaintiff) was a police officer and that it was his house. (*Id.*) According to Plaintiff, Czulada responded by pushing him back with the baton. (*Id.*) Plaintiff lost his balance. (*Id.* at 42.) When he got back up, Plaintiff asked Czulada what he was doing, saying "I'm a cop, too." (*Id.* at 42.) In response, Czulada punched him in the face. (*Id.*) When Czulada hit him a second time, Plaintiff "grabbed him by his shoulders" to prevent Czulada from hitting him again. (*Id.* at 43.) When Plaintiff let go, Czulada stepped back and tripped over a cooler. (*Id.* at 44.) Plaintiff tried to help him up, at which point Czulada "took another swing" at him. (*Id.* at 45.)

Someone Plaintiff could not see then lifted him up with an ASP baton around his neck. (*Id.* at 46.) Plaintiff later learned that the person was Defendant Kurian. (*Id.* at 105.) Kurian kept telling Plaintiff to relax, and Plaintiff kept responding that he was relaxed, but that he couldn't breathe. (*Id.* at 47.) Plaintiff and Kurian fell over the arm of the couch onto the couch and onto Iris Strong, Plaintiff's 79-year-old mother-in-law who was sitting on the couch at that moment and who "passed out." (1/27/16 Tr. 48-49, 51, Jackson.) While Plaintiff and Kurian were on the couch, Plaintiff felt another officer trying to grab Plaintiff's hands. (*Id.* at 49.)

Charlene Strong, testified that when she entered the house, she saw Jackson being choked with a baton, and that Jackson's "eyes [were] rolling to the back of his head." (1/26/16 Tr. 107–08, Strong.) She testified that people were yelling, "He's an officer," "He's an officer," "get off of Larry", and "Why are you choking him?" (*Id.* at 108–09.) Strong observed that none of the officers in the house were trying to intervene, and were "allowing this process to happen." (*Id.* 112.) Tiffanie Johnson, Plaintiff's niece, testified that the cops inside were "yoking [Plaintiff] up," and "attacking him." (1/29/16 Tr. 18–20, T. Johnson). She testified that one officer

"grabbed his right side, another one grabbed [Plaintiff's] left side," and "[a]nother one came behind and choke[d] him." (*Id.* at 20.) Marcus Johnson, Plaintiff's nephew, testified that an officer, presumably Kurian, ran in during Plaintiff's altercation with Czulada, "jumped up and threw his baton around [Plaintiff's] neck and pretty much choked him with it to bring him down." (1/29/16 Tr. 85–86, M. Johnson.)

The officers let Plaintiff go, at which point he saw two other officers taking Bonaparte out of the house and slamming him against the trunk of a car. (1/27/16 Tr. 53, Jackson.) Plaintiff went to the front door of his house and, from the doorway, said, "Wait a minute, guys". Plaintiff was "then…hit in the back of the head with something" by someone he could not see. (*Id.* at 54–55.) In response to being struck in the head, Plaintiff ran out of his house and to the street curb. (*Id.*) He ran past six or seven officers, and knelt down near the curb. (*Id.* at 56.) As Plaintiff went to reach into his pocket to get his ID, officers started hitting him with batons in the back of his legs and on his back, hitting him "upward of 20, 30 times." (*Id.* at 56–57.) Bonaparte observed "more than ten" officers around Plaintiff in the street, "swinging and hitting [him]." (1/25/16 Tr. 26–27, Bonaparte.) Plaintiff could tell by the pants and shoes of the people hitting him that they were officers. (1/27/16 Tr. 57, Jackson.) Plaintiff lay on his stomach in the street while a semicircle of officers proceeded to hit him with batons and to roll the batons over the back of his ankles. (*Id.* at 58–60.) Two officers were positioned with their knees on his back, while the officers tried to get his arms. (*Id.* at 60.) One officer was poking him in the side with a baton and kicking him, saying "give me your arm, stop resisting me, give me your arm." (*Id.*) Plaintiff told the officer that he could not give him his arms because they were underneath him and there was too much weight on his back. (*Id.* at 61.)

Strong testified that she saw the officers in a circle around Plaintiff, with their hands linked together, and that they were hitting him in the head, back, and side with their batons. (1/26/16 Tr. 128–29, Strong.)  Marilyn Murphy, Plaintiff's sister-in-law, testified that a "whole swarm of police officers . . . were beating [Plaintiff] down" and "wouldn't stop beating on [him]" with billy clubs.  (1/29/16 Tr. 57–58, Murphy.)  She also testified that she saw the officers use a taser on him.  (*Id.* at 65.)  Marcus Johnson testified that the officers pulled Plaintiff outside in handcuffs and started beating him.  (1/29/16 Tr. 91, M. Johnson.)

When the officers got off of him, Plaintiff "stuck [his] arm out" and "let them put the cuffs" on because he "figured it would be over" and they could "straighten this out."  (1/27/16 Tr. 62, Jackson.)

After he was handcuffed, Plaintiff "looked up to one of the officers" and said "Guys, this was unnecessary….I'm a fellow cop, too."  In response, they pepper sprayed him.  (*Id.* at 62.) The officers proceeded to search Plaintiff, at which point Czulada ran over to Plaintiff, called him a "fucking dirt bag", and said, "If you're really a cop, where's your ID?"  (*Id.* at 64.)  After Plaintiff told Czulada that the ID was in his right front pocket, an officer pulled it out of Plaintiff's pocket.  (*Id.* at 64.)  As the officer was retrieving the ID, Plaintiff looked up and noticed Defendant Tellado, a captain, standing there, with between seven and nine officers standing around.  (*Id.* at 64–65.)  Plaintiff testified that when Captain Tellado looked at the ID, he made a "facial gesture" like "oh, shit."  (*Id.* at 66–67.)  Plaintiff then heard Captain Tellado tell one of the officers to get Plaintiff up and take the handcuffs off.  (*Id.* at 67.)  At that point, all of the officers left except Captain Tellado and the officer Captain Tellado had told to take the handcuffs off, presumably MacNear.  (*Id.* at 68.)  MacNear did not remove Plaintiff's handcuffs,

and Tellado again told him to do so. (*Id.* at 68–70.) Tellado then left, saying that he would be back, but was going to check on the lady that needed assistance. (*Id.* at 70.)

Two additional non-defendant officers arrived at the scene, and the officer with Plaintiff asked them to put Plaintiff in the police car. (*Id.* at 70.) Plaintiff told the two officers that Captain Tellado had directed the other officer to take off the handcuffs, but the two officers responded that they had not been told that. (*Id.* at 71.) The two officers put Plaintiff in the back of the police car without removing the handcuffs. (*Id.*)

Plaintiff was taken to the police station, where he remained for several hours before being released. (*Id.* at 96.)

### B. Defendant MacNear's Testimony

Defendant MacNear testified that he responded to Plaintiff's house with Czulada after receiving a dispatch call for a man with a gun, followed by a call stating that an officer needed assistance. (1/28/16 Tr. 67, 73, 77, MacNear) MacNear heard screams coming from inside the house and followed Czulada inside. (*Id.* at 78–79.) As MacNear entered the home, he observed ten to fifteen people inside, including three different individuals "pushing and shoving" each other, and Czulada trying to break things up. (*Id.* at 84, 90.) Having decided that the scene was "getting out of hand," MacNear requested that additional units come to the location. (*Id.* at 84–85.) MacNear observed Plaintiff standing between the two individuals who were fighting—the same men Czulada was trying to separate. (*Id.* at 92.) MacNear did not know whether Plaintiff was trying to break up the fight. (*Id.*) MacNear, who was trying to break up a different fight, did not "continuously" observe Czulada and Plaintiff. (*Id.* at 94.) When he next saw Czulada, Czulada was "on the ground," with Plaintiff "standing above him" "swinging his arms" with his "fists cocked." (*Id.* at 95–97, 99.) MacNear then saw Plaintiff strike Czulada in the head while

7

Czulada was on the floor. (*Id.* at 100, 115.) MacNear did not know what had happened before he saw Plaintiff strike Czulada. (*Id.* at 104.)

The next time MacNear saw Plaintiff, he was outside of the house in handcuffs. (*Id.* at 103, 106; 2/1/16 Tr. 134, Czulada.) Czulada told MacNear he had been struck in the head and pointed to Plaintiff as the person who had hit him. (*Id.* at 104, 105.) MacNear assumed Plaintiff was in handcuffs for hitting Czulada. (*Id.* at 106.) MacNear told Captain Tellado that Plaintiff had struck Czulada, at which time Tellado explained that Plaintiff was an off-duty officer. (*Id.* at 111.) Tellado told MacNear to remove Plaintiff's handcuffs, but MacNear "didn't have the key" on him. (*Id.* at 113.) Tellado also ordered MacNear to move the police vehicles so that the ambulances could pull up, and MacNear moved the vehicles, leaving Plaintiff in handcuffs. (*Id.* at 113–14.)

### C. Defendant Czulada's Testimony

Defendant Czulada arrived at Plaintiff's home with MacNear, in response to a radio transmission of a man with a gun, which turned into a report of an officer in need of assistance. (2/1/16 Tr. 79–80, Czulada). He heard someone calling for help inside the house and ran inside. (*Id.* at 85–86.) Once inside, Czulada saw people "pushing, yelling, screaming" at each other, and "got in between [Plaintiff] and the pile of people that were fighting." (*Id.* at 90, 92.) Czulada "kind of pushed [Plaintiff] back a little bit," at which time Plaintiff "turned toward [him] and "pushed [him] with both hands." (*Id.* at 90.) After Czulada "nudged" Plaintiff back from the crowd, Plaintiff "pushed" Czulada. (*Id.* at 95–96.) Czulada's back was against a wall and Plaintiff, appearing to be angry, approached "in a threatening manner". (*Id.* at 95–96.) Czulada responded by punching Plaintiff in the face. (*Id.* at 96–97.) Plaintiff then punched Czulada in

the head multiple times, and Czulada fell and hit the back of his head on a doorknob. (*Id.* at 100.) Plaintiff continued to punch Czulada while he was on the floor. (*Id.* at 100–01.)

Czulada then went outside and told MacNear that he had been assaulted, and identified Plaintiff, who, at that point, was lying in the street in handcuffs, as the person who had assaulted him. (*Id.* at 134.) Czulada admitted on cross-examination that the reason he didn't tell anyone that he had punched Plaintiff in the face was because he "knew that [he had] operated outside the [police] department guidelines." (*Id.* at 109.) When Czulada saw Plaintiff handcuffed in the street, Czulada called him a "liar." (*Id.* at 112.)

**D. Defendant Gherardi's Testimony**

Defendant Gherardi arrived at Plaintiff's home with his partner Defendant Dunn in response to a radio call of a man with a firearm. (2/2/16 Tr. 184, Gherardi.) Before they arrived, he heard MacNear yelling over the radio for additional units. (*Id.* at 185.) After arriving at the scene and entering the house, Gherardi saw a "large group" of people inside, and Plaintiff "holding Officer Czulada up against the wall with his left hand." (*Id.* at 187.) He saw Plaintiff "striking" Czulada "in the face" with "hard" force. (*Id.* at 188, 196.) Gherardi "placed [his] hand" on Plaintiff's shoulder to get him to move away from Czulada. (*Id.* at 191.) Gherardi then turned away, in an effort to "set a perimeter" around Plaintiff and Czulada, but "one of the civilians from the home grabbed [him] from behind and threw [him] to the floor." (*Id.* at 193.) Gherardi then got up and helped clear the house. (*Id.* at 194.)

**E. Defendant Dunn's Testimony**

Defendant Dunn arrived with Gherardi in response to radio transmissions about a man with a gun, shots fired, and an officer in need of assistance. (2/1/16 Tr. 26, Dunn.) When Dunn arrived, he heard an officer inside the house call for assistance. (*Id.* at 28.) While standing at the

doorway, he saw a "big fight" in the house, "people pushing, cursing at each other, some people throwing punches." (*Id.* at 30.) Once he entered the house, he saw Plaintiff punching Czulada against a wall. (*Id.* at 30, 33.) He also saw Plaintiff "[t]hrowing punches while Czulada was in the fetal position." (*Id.* at 36.) He made his way to Czulada and Plaintiff, "got behind [Plaintiff][,] . . . put [his] arms around [Plaintiff's]. . . waistline and just leaned backwards, to try to get him off Officer Czulada." (*Id.* at 36.) Dunn and Plaintiff "fell over the couch." (*Id.* at 37.) At that point, Dunn "scurried out from underneath" Plaintiff, and "that was that." (*Id.* at 42.) That was the last time Dunn saw Plaintiff. (*Id.* at 44.)

### F. Defendant Braumann's Testimony

Defendant Braumann arrived at Plaintiff's home with his partner, Kurian, in response to a radio dispatch that started out as a dispute with a firearm, and then switched to officer in need of assistance. (2/2/16 Tr. 10, Braumann.) When Braumann and Kurian were a block or two from the location, Braumann "heard an on-duty officer, which was either Sergeant MacNear or Officer Czulada[,] scream over the radio for additional units." (*Id.* at 11.) When they arrived, Braumann and Kurian ran to the front door. (*Id.* at 13.) Braumann testified that he saw a "giant fight inside the house", and observed both MacNear and Czulada inside. (*Id.* at 14.) Braumann did not see Plaintiff inside the house, and did not know if Plaintiff was inside when Braumann entered. (*Id.* at 17–18.) Braumann testified that he had his ASP baton in his hand when he walked into the house, because he "felt there was a threat of some sort in the house," but when he saw the large crowd, he put it back in his holster because he "didn't want [it] to be taken out of [his] hands." (*Id.* at 20.) Soon after Braumann entered the house, a "pile of people fell down on top of [him]", causing him to fall to the ground. (*Id.* at 14.) Captain Tellado then entered the living room, and told everyone to leave the house. (*Id.* at 22.)

### G. Defendant Kurian's Testimony

Defendant Kurian entered the house with Braumann. (2/2/16 Tr. 47, Kurian.) The first thing Kurian saw when he entered was MacNear on top of a broken coffee table. (*Id.* at 47–48.) He also saw Czulada "pinned" up against the wall by Plaintiff. (*Id.* at 50.)[6] Kurian saw Plaintiff "striking" Czulada "[u]p above the face or the neck/chest area." (*Id.* at 52.) Kurian ran over and "grabbed [Plaintiff's] right arm," "wrapped both [his] hands around [Plaintiff][,] and . . . was trying to pull [Plaintiff] [to] prevent him from striking Officer Czulada." (*Id.* at 53.) Kurian grabbed Plaintiff "with both . . . hands, as if in a bear hug around [Plaintiff's] right arm." (*Id.* at 54.) Kurian had his ASP baton with him, but did not have it out. (*Id.* at 55.) As Kurian was wrapped around Plaintiff's arm, Dunn "had come around to the other side and grabbed [Plaintiff] either by his hand, his other arm or the other part of his body . . . and was trying to pull him off [of Czulada]." (*Id.* at 58.) Then Kurian, Dunn, and Plaintiff all fell back onto the sofa. (*Id.*) Kurian did not recall if Plaintiff was saying that he was an officer. (*Id.* at 62.)

Kurian's attention was diverted by a teenage girl who assaulted him and started clawing at his face. (*Id.* at 63–65.) After he attempted to arrest her, Captain Tellado arrived and told everyone to get out of the house. (*Id.* at 69–70.) Kurian met up with Braumann, and they got in their duty car and left the scene. (*Id.* at 73–74.)

### H. Defendant Reo's Testimony

Defendant Reo arrived at Plaintiff's house in response to a call for additional units from someone he thought was MacNear. (1/29/16 Tr. 179, Reo). He arrived to see four police cars and about twenty to thirty people outside. (*Id.* at 179–80.) In order to protect the officers inside

---

[6] Kurian admitted that he might have missed some of the interaction between Plaintiff and Czulada. (*Id.* at 50–51.)

the house, Reo placed himself in the entrance to the house and blocked people from entering. (*Id.*)  Plaintiff approached Reo in the doorway and tried to enter the house, but Reo would not let him through.  (*Id.* at 182.)[7]  Suddenly, Reo heard Jackson yelling, while looking past Reo, "You all can't fucking do that, you all can't do that," in the direction of two officers who were taking a shirtless man in handcuffs out of the house.  (*Id.*)  Reo told Plaintiff, who was trying to push past him, "You're not getting by me."  (*Id.* at 182–83.)  Plaintiff "g[ave] [Reo] a two-handed shove to [his] chest."  (*Id.*)  At that point, "two, maybe three officers grabbed [Plaintiff] and tried to place him in handcuffs."  (*Id.* at 185.)  When Reo regained his footing, he attempted to arrest Plaintiff for having shoved him.  (*Id.* at 185–86.)  He approached and "tried to grab [Plaintiff's] arm" and "tried to grab a leg."  (*Id.* at 190.)  Plaintiff "went down to the ground."  (*Id.* at 190–91.) "[M]aybe four, five, six officers were trying to pull [Plaintiff's] arms [to] get them behind his back to handcuff him," and "[e]ventually, he was handcuffed."  (*Id.* at 191.)  Reo was the arresting officer.  (*Id.* at 196–97.)  Captain Tellado arrived and gave an order to un-handcuff Plaintiff.  (*Id.* at 192.)

Reo did not see any ASP batons out, and did not see any officers strike Plaintiff.  (*Id.* at 191.)  However, he did not have an "unobstructed view" of Plaintiff while Plaintiff was in the street and he "[didn't] know what everybody else was doing."  (*Id.* at 192–93.)

## I. Defendant Boneta's Testimony

Defendant Boneta arrived at the scene as an officer was bringing a shirtless man out of the house in what Boneta assumed were handcuffs.  (2/1/16 Tr. 10, 13, Boneta).  Boneta heard someone say, "you can't do that, I'm on the job."  (*Id.* at 10.)  He turned and saw a person he

---

[7] Reo's testimony, placing Plaintiff *outside* the house at that moment, is contradicted by all of the other testimony and evidence introduced at trial.

later came to believe was Plaintiff[8] "push[]" Reo "right in front of me." (*Id.* at 10–11.) Before Boneta could confront Plaintiff, other officers did so, "box[ing] [Boneta] out". (*Id.* at 10, 14.) Thinking that the other officers "got this", Boneta "turned around and . . . exercised crowd control." (*Id.* at 10, 14.) Boneta did not look to see what was happening between the officers and Plaintiff. (*Id.* at 14.) After a few minutes, Captain Tellado advised the officers to resume patrol, and Boneta left the scene with his partner. (*Id.* at 13, 16–17.)

### J. Defendant Tellado's Testimony

Defendant Tellado, the duty captain present at the scene, testified that when he arrived at the house, he saw upward of 50 people outside. (2/1/16 Tr. 171–72, Tellado.) When he entered the house, he saw people lying on the floor handcuffed with police officers next to them, and heard yelling and screaming. (*Id.* at 173–75.) He did not see Plaintiff inside the house. (*Id.* at 178.) Tellado ordered officers to take the two handcuffed individuals out of the house. (*Id.*) Tellado then realized that an ambulance was needed for two individuals inside the house—the elderly woman and an individual who might have been injured. (*Id.* at 178.) Tellado then left the house because the situation was "calming down." (*Id.* at 180.)

Once outside, Tellado walked to the street because he saw "a certain commotion" with three or four officers struggling with somebody. (*Id.* at 183.) He saw three or four officers standing around an individual lying on the ground handcuffed. (*Id.* at 183–84.) At some point, an officer told Tellado that "the reason [Plaintiff] was in handcuffs is because he hit a police officer." (*Id.* at 187.) At that time, none of the officers had weapons in their hands. (*Id.* at 184.) After Plaintiff told Tellado that Plaintiff was a police officer, and that the other officers had pulled his badge out of his pants, Tellado "asked the officers to assist [Plaintiff] and lift him up

---

[8] Boneta's belief was based on seeing Plaintiff's photograph subsequently in the newspaper. (2/1/16 Tr. 11, Boneta.)

on his own two feet", and "asked them to remove the cuffs." (*Id.* at 190.) After giving that order, Tellado did not stay there to see if anyone removed the handcuffs because he heard screaming from inside the house and "went [to] the person that needed medical attention . . . ." (*Id.* at 196–97.)

### K. Defendant Deferrari's Testimony

Defendant Deferrari testified that while en route to the scene, he heard over the radio that there was "possibly an MOS" at the location, as well as an officer screaming for assistance. (2/2/16 Tr. 109–11, Deferrari.) When Deferrari arrived, he ran toward the house. (*Id.* at 113.) From the doorway, he saw people "fighting, pushing, shoving, [and] throwing people to the ground" inside. (*Id.*) He briefly entered the house, and then was "pulled from the house by an unknown person" and "punched in the face," after which he "barricaded [him]self at the doorway." (*Id.* at 113–14.) Deferrari could not see exactly what was going on inside the house and "wasn't able to see any officers inside the house." (*Id.* at 119.)

Later, Deferrari saw Plaintiff exiting the house with an officer following him and pointing at him, yelling, "he's under . . . arrest, he's a collar, he's a collar." (*Id.* at 121.) Plaintiff kept walking, and "officers approached [Plaintiff] to place him in handcuffs. (*Id.* at 124.) Plaintiff "pulled his arms away from them, [and] swung his arms to keep them from arresting him." (*Id.* at 124–25.)

Deferrari saw "about five or 10" officers surround Plaintiff, "grabbing at his arms trying to pull them behind his back," and "[s]ome had their ASPs out hitting him in the legs trying to get him down to the ground." (*Id.* at 131–32.) Deferrari did not see the officers striking Plaintiff on other parts of his body. (*Id.* at 132.) Deferrari did not tell the officers to stop "because it wouldn't have made a difference" since Plaintiff was resisting arrest. (*Id.* at 134–35.)

**L. Defendant Failla's Testimony**

When Defendant Failla arrived on the scene, he saw Plaintiff standing in the middle of the street with a circle of police officers around him. (1/29/16 Tr. 156–58, Failla.) He saw Plaintiff "flailing and punching with closed fists at the other officers." (*Id.*) Failla was trying to "assess the whole situation". (*Id.* at 159.) He did not see "anybody with anything in their hands." (*Id.*) He saw Plaintiff "punch at a police officer." (*Id.* at 160.) At some point thereafter, Defendant Heerey, Detective Russo, and a "couple of other police officers" brought Plaintiff to the ground. (*Id.* at 160–61.) Plaintiff was still "rolling and flailing his arms," so Failla, rather than help to restrain Plaintiff, "thought it better to spray [Plaintiff] in the face with pepper spray" in order to stop Plaintiff from "resisting arrest." (*Id.* at 161.) Failla testified that after he pepper-sprayed Plaintiff, "miraculously . . . [Plaintiff] put his hands behind his back." (*Id.* at 162.) At that point, "they were able to get [Plaintiff] handcuffed and then he [lay] . . . on the ground for a minute." (*Id.* at 163.)

Although Failla had been trained that when he pepper-sprayed someone, he was supposed to give them water to wash out their eyes, he did not give Plaintiff any water, because he "didn't have [it] at the scene" and because he knew an ambulance would be going to the stationhouse. (*Id.* at 167.) He walked away "shaking [his] head in disgust" because he had "never seen an individual who calls himself a police officer act that way to on-duty police officers." (*Id.*)

**M. Defendant Heerey's Testimony**

Defendant Heerey arrived at the scene with Failla. (1/29/16 Tr. 121, Heerey.) Heerey saw a group of officers "trying to apprehend" Plaintiff, and Plaintiff was "waving his arms and indicating that he was not going to be apprehended. (*Id.* at 122.) Heerey did not know what had transpired before he arrived. (*Id.* at 123.) He "ran up . . . [and] grabbed one arm," another

officer[9] "had the other arm", and they "took [Plaintiff] to the ground and . . . attempted to . . . handcuff[] him." (*Id.*) Heerey attempted to arrest Plaintiff because he "appeared to be irrational, not compliant." (*Id.* at 123–24.) Plaintiff "was face first and his hands were underneath him and [Heerey and Russo] were instructing him to give [them] his hands behind his back and he would not do so." (*Id.* at 125.) Heerey grabbed and struggled with Plaintiff for a while, attempting to handcuff him. (*Id.* at 128.) Once Plaintiff was handcuffed, Heerey frisked him for weapons, and discovered his ID, which identified Plaintiff as an officer. (*Id.* at 136–38.) Czulada arrived and yelled angrily at Plaintiff. (*Id.* at 138.) Heerey helped lift Plaintiff up, and turned Plaintiff and his property over to another officer, who "knew what was going on." (*Id.* at 139–40.)

## III.    THE JURY'S VERDICT

### A.    Liability and Damages

After seven days of trial, the jury returned a verdict finding that three Defendants— Deferrari, Reo, and Heerey—were personally involved in falsely arresting Jackson,[10] that four

---

[9] Heerey identified the other officer as Detective Russo, who was originally named as a defendant in this action, *see supra* at 2, but was later dismissed, by stipulation. (Dkt. 92.)

[10] As to both the false arrest and excessive force verdicts, Defendants argue that it was "not clear what the jury's final conclusions were," because the verdict sheet asked the jury to indicate which defendants "were personally involved in falsely arresting Plaintiff" and "subjecting [him] to excessive force," yet "the Court never charged the jury with respect to personal involvement." (Dkt. 106 (Def. Mem.) at 21 & n.30; *see also id.* at 26.) The Court rejects this argument. To the extent Defendants are asserting that there was an error in the jury instructions and/or verdict sheet, they failed to preserve that objection, and it has therefore been waived. *See Latsis v. Chandris*, 20 F.3d 45, 49 (2d Cir. 1994) (Second Circuit "will not consider a challenge to a jury charge if a party failed to object at trial."); *see also* Fed. R. Civ. Proc. 51 (parties may assign error to a jury instruction only "if that party properly objected," meaning "on the record" and "at the opportunity provided" by the court "before the instructions and arguments are delivered"). While the Court "may consider a plain error in the instructions that has not been preserved . . . if the error affects substantial rights," Fed. R. Civ. Proc. 51(d)(2), the Court finds no such error here. The Court is persuaded that the common sense meaning of the term "personal involvement" was readily comprehensible to the jurors without the aid of an additional definition, particularly one that was never requested by Defendants. This conclusion is further

Defendants—Tellado, MacNear, Boneta, and Failla—failed to intervene to prevent Jackson's false arrest, and that one Defendant—MacNear—was liable as a supervisory officer for Plaintiff's false arrest. (Dkt. 95 ("Verdict Sheet"), at 1–2.)

On excessive force, the jury found that four Defendants—Czulada, Kurian, Reo, and Failla—were personally involved in subjecting Plaintiff to excessive force, that eight—Tellado, MacNear, Gherardi, Dunn, Deferrari, Braumann, Boneta, and Heerey—had failed to intervene to prevent Jackson from being subjected to excessive force, and that one—MacNear—was liable as a supervisory officer for Plaintiff having been subjected to excessive force. (*Id*. at 3–4.)

The jury awarded compensatory damages in a lump-sum amount of $12,500,000, and found each Defendant liable for punitive damages, awarding specific amounts as to each Defendant. *See supra* n.1.

**B.     Qualified Immunity & the Special Verdict Sheet**

Following the procedure outlined by the Second Circuit in *Stephenson v. Doe*, 332 F.3d 68 (2d Cir. 2003), the Court presented the questions of liability to the jury, and reserved the question of qualified immunity for the Court to decide post-trial if there was a verdict in Plaintiff's favor. *See id.* at 80 ("The court should charge the jury on [plaintiff's § 1983 claim], but not on qualified immunity.  If the jury returns a verdict . . . against [defendant], the court should then decide the issue of qualified immunity.").  Following the verdict in Plaintiff's favor on two counts, the Court presented the jury with a series of factual questions, known as special

---

supported by the verdict sheet's use of the contrasting terms "personally involved" versus "failed to intervene" and "liable as supervisory officers," (Verdict Sheet, at 1–2), which were defined in the jury charges as "alternative" theories to Plaintiff's claims that Defendants personally committed the alleged false arrest and use of excessive force.  (Dkt. 97 (jury instructions), at 11.)

interrogatories ("Special Verdict Sheet")[11], to aid the Court in its determination of the qualified immunity issue. *See Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (explaining that when material facts pertaining to immunity are in dispute, the appropriate procedure is to allow the jury to resolve any disputed facts that are material to the qualified immunity issue). The jury was asked, as to each Defendant, whether that Defendant believed, even if mistakenly, that: (1) Plaintiff had assaulted Czulada; (2) Plaintiff had shoved Reo; (3) Plaintiff was "throwing punches at police officers while out in the street"; and (4) Plaintiff was "resisting arrest while out in the street". (Dkt. 99 ("Special Verdict Sheet").) The jury answered in the affirmative as to at least one of these questions for each Defendant, except for Tellado and Braumann. (*Id.*) The specific responses are discussed below where relevant to a particular Defendant's entitlement to qualified immunity.

## DISCUSSION

Defendants argue that they are all entitled to qualified immunity as to both Plaintiff's false arrest and excessive force claims. As a preliminary matter, the Court notes that it has, where possible, adopted a view of the jury's findings that reconcile apparent inconsistencies between the jury's verdict and its answers on the Special Verdict Sheet. *See Harris v. Niagara Mohawk Pwr. Corp.*, 252 F.3d 592, 598 (2d Cir. 2001) (instructing courts faced "with seemingly inconsistent verdicts" that they "must adopt a view of the case, if there is one, that resolves any seeming inconsistency"); *see also Gallick v. Baltimore & Ohio RR Co.*, 372 U.S. 108, 119 (1963) (stating that, when dealing with special interrogatories, "it is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them," and explaining

---

[11] The Court allowed the parties ample opportunity to submit and discuss the proposed special interrogatories, and both sides did so. Notably, Defendants proposed, and certainly did not object to, the questions that were ultimately included in the Special Verdict Sheet provided to the jury. (Dkt. 94.)

that "[w]here there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way").[12]

## I. LEGAL STANDARDS

Qualified immunity protects government officials from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

To determine whether the relevant law was clearly established, a court considers "the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014), *cert. denied sub nom. Torresso v. Terebesi*, 135 S. Ct. 1842 (2015). "Even if this Court has not explicitly held a course of conduct to be unconstitutional, we may nonetheless treat the law as clearly established if decisions from this or other circuits 'clearly foreshadow a particular ruling on the issue.'" *Id.* (quoting *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010)).

"Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact." *Zellner*, 494 F.3d at 367. The ultimate question of qualified immunity, *i.e.,* whether it was objectively reasonable for an officer to believe that his conduct did not violate a clearly established right, is to be decided by the court. *Id.* However, whether it was objectively

---

[12] Defendants are, of course, free to make arguments regarding the inconsistency of the Special Verdict Sheet and the verdict in their forthcoming Rule 50/59 Motion. The Court finds it necessary, however, to determine what facts would be consistent with both the Special Verdict Sheet and the verdict for purposes of its qualified immunity analysis. *See Zellner*, 494 F.3d at 368 (instructing courts to allow the jury to resolve any disputed facts material to the qualified immunity issue, so that the court may make the "ultimate determination of whether the officer's conduct was objectively reasonable. . . .").

reasonable for an officer to believe that his acts did not violate the plaintiff's clearly established rights "has its principal focus on the particular facts of the case." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) (quoting *Hurlman v. Rice*, 927 F.2d 74, 78–79 (2d Cir. 1991)). Therefore, as noted above, where facts are in dispute, those "factual questions must be resolved by the factfinder." *Id.*

A court should review the facts that are material to the qualified immunity issue, as resolved by the jury, to determine whether the officer's conduct was objectively reasonable. *Zellner*, 494 F.3d at 368; *see also, e.g., Stephenson*, 332 F.3d at 81 (after the district court receives the jury's decision as to "what the facts were that the officer faced or perceived," the court then may "make the ultimate legal determination of whether qualified immunity attaches on those facts") (citation and quotation marks omitted); *Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir. 1995) (the ultimate question of entitlement to qualified immunity is one of law for the court to decide once disputed factual issues are resolved) (quotation marks omitted); *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990) ("If there are unresolved factual issues which prevent an early disposition of the defense, the jury should decide these issues on special interrogatories . . . . The ultimate legal determination whether . . . a reasonable police officer should have known he acted unlawfully" should be made by the court "on the facts found" by the jury).

Qualified immunity is an affirmative defense that a defendant bears the burden of proving. *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012). "To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question." *Zellner*, 494 F.3d at 368. *See also Thomas v. Kelly*, 903 F. Supp. 2d 237, 254 (S.D.N.Y. 2012) ("Because qualified immunity is an affirmative defense, the defendant

bears both the burden of proof and the obligation to request the *specific* factual interrogatories that would be necessary to enable the court to make the appropriate legal determination," such that "[t]o the extent [] a *particular* finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked *the pertinent question*.") (emphasis in original) (quotation marks and citations omitted). "If the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding." *Zellner*, 494 F.3d at 368.

## II.    FALSE ARREST

Defendants argue that they are all entitled to qualified immunity because no reasonable police officer in their position would have believed that arresting Jackson would violate his Fourth Amendment rights. The Court finds that five of the seven officers found liable for false arrest—Deferrari, Reo, Heerey, MacNear, and Boneta—are entitled to qualified immunity. Failla and Tellado are not.

### A.    Legal Standards

#### 1.    False Arrest Standard

A claim for false arrest "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Morris v. Silvestre*, 604 Fed. App'x 22, 24 (2d Cir. 2015) (summary order) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). Probable cause to arrest exists where the arresting officers have "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jenkins v. City of New York*, 478 F.3d 76, 84–85 (2d Cir. 2007) (quoting *Weyant*, 101 F.3d at 852); *see also Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010)

(same).  Probable cause must be evaluated based on the "totality of the circumstances," *United States v. Thomas*, 788 F.3d 345, 350 (2d Cir. 2015), including on the facts available to the officer or officers at the time of the arrest, *Jenkins*, 478 F.3d at 87.  Under the collective or imputed knowledge doctrine, "an arrest . . . is permissible where the actual arresting . . . officer lacks the specific information to form the basis for probable cause . . . but sufficient information to justify the arrest . . . was known by other law enforcement officials initiating . . . the investigation, and the other officers have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold."  *Brown v. City of New York*, 798 F.3d 94, 99 (2d Cir. 2015) (internal citations and quotations omitted).[13]

"Liability may attach where an officer fails to intervene, but observes or has reason to know . . . that a citizen has been unjustifiably arrested," if the officer "had a reasonable opportunity to intervene to prevent the violation from happening."  *Sanabria v. Tezlof*, 11-CV-6578, 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016); *see also Morris v. City of New York*, 14-CV-1749, 2015 WL 1914906, at *5 (E.D.N.Y. 2015) (describing the "affirmative duty [of law enforcement officials] to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence" if there was a realistic opportunity to intervene).

Additionally, a supervisor may be held liable if he is a "direct participant" in a constitutional violation such as a false arrest, meaning that he "authorizes, orders, or helps others

---

[13]  The Second Circuit has "decline[d] to extend the collective knowledge doctrine to cases where . . . there is no evidence that an officer has communicated his suspicions with the officer conducting the search, even when the officers are working closely together at a scene." *United States v. Hussain*, 835 F.3d 307, 317 n.8 (2d Cir. 2016).

to do the unlawful acts, even if he . . . does not commit the acts personally." *Terebesi*, 764 F.3d at 234.[14]

### 2. False Arrest and Qualified Immunity

Even if probable cause is lacking in a given case, an officer "will still be entitled to qualified immunity . . . if he can establish that there was 'arguable probable cause' to arrest." *Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013); *see also Jenkins*, 478 F.3d at 84–85 ("An officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of arrest—that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.'") (quoting *Lennon*, 66 F.3d at 423–24)). In other words, "[a]rguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in . . . light of well established law." *Zellner*, 494 F.3d at 369 (quoting *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (internal quotation omitted). *See also Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) (explaining that the doctrine of qualified immunity "aims to give officials room to act with confidence in gray areas by absolving from personal liability 'all but the plainly incompetent or those who knowingly violate the law.'") (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)); *Mesa v. City of N.Y.*, 09-Civ.-10464, 2013 WL 31002, at *9 (S.D.N.Y. Jan. 3, 2013) ("[S]o long as an officer's actions are objectively reasonable in light of the factual circumstances at hand, he will remain immune from suit, whether or not probable cause *actually* existed.") (emphasis in original). In the context of a

---

[14] Although supervisors may also be liable under other theories, such as "gross[] negligen[ce] in supervising subordinates who committed the wrongful acts or "deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring," *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), Plaintiff only requested that the jury be instructed on the theory that Defendants Tellado and MacNear "approved, assisted, condoned, or purposely ignored" Plaintiff's false arrest. (Dkt. 80, at 14.)

failure to intervene claim, "[a] police officer cannot be held liable for failure to intervene unless such a failure permitted fellow officers to 'violate a suspect's clearly established statutory or constitutional rights' and was under circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." *Morris*, 2015 WL 1914906, at *6.

### B. Five Defendants—Deferrari, Heerey, Reo, Boneta, and MacNear—Are Entitled to Qualified Immunity on the False Arrest Claims; Two Defendants—Failla and Tellado—Are Not

#### 1. Defendants Found Liable for Personally Participating in the False Arrest

All three Defendants found to have personally participated in the false arrest of Plaintiff—Deferrari, Reo, and Heerey—are entitled to qualified immunity on the basis of arguable probable cause to believe that Plaintiff had committed a crime. The jury found that Deferrari, Reo, and Heerey all believed, even if mistakenly, that Jackson was throwing punches at police officers while out in the street, and that Reo also believed, even if mistakenly, that Jackson shoved him. (Special Verdict Sheet, at 4, 6, 7) Based on these beliefs, even if mistaken, these three Defendants had at least arguable probable cause to arrest Plaintiff, *i.e.*, for attempted assault in the third degree, harassment in the second degree, and/or resisting arrest.[15] Although the Special Verdict Sheet did not ask if Defendants' beliefs were reasonable, the Court finds that because the jury found that four Defendants believed Plaintiff was throwing punches at police

---

[15] As the jury was instructed, a person is guilty of: assault in the third degree when, with intent to cause physical injury to another person, a person causes such injury to that person or a third person, or he recklessly causes physical injury to another person, N.Y. Penal Law § 120.00; and harassment in the second degree when, with intent to harass, annoy, or alarm another person, a person strikes, shoves, kicks, or otherwise subjects such other person to physical contact, or attempts or threatens to do the same, *id*. § 240.26. Although the jury was not instructed on resisting arrest, a person is guilty of that offense when he "use[s] physical force to resist an arrest, whether authorized or unauthorized, which is being effected or attempted by a police officer or peace officer", *id*. § 35.27.

officers in the street, those beliefs were sufficiently reasonable to establish "arguable" probable cause, at a minimum, that Plaintiff resisted arrest.[16]  *See Zellner*, 494 F.3d at 369 ("[A]n officer's 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause,' . . . an arrest is not unlawful so long as the officer has knowledge of, or reasonably trustworthy information as to, facts and circumstances sufficient to provide probable cause to believe that the person arrested has committed *any* crime.") (citations omitted) (emphasis added); *see also Mesa*, 2013 WL 31002, at *11–12 (where plaintiff made "forcible contact" with defendant police officer's body, "inadvertent or not," and where plaintiff and defendant had an "altercation over [a] camera and [an] exchange of words," this was enough to warrant qualified immunity, as "a reasonable officer could have believed that probable cause existed to arrest [plaintiff] for at least one of the misdemeanor offenses" of "harassment, resisting arrest, and disorderly conduct," even where all three were ultimately dismissed against plaintiff).

The Second Circuit has made clear that "the tests for probable cause and arguable probable cause are . . . not congruent." *Zellner*, 494 F.3d at 370.  Thus, it is possible for a jury to find that officers did not have probable cause for an arrest, and yet for a court to find after the fact that an "officer[] of reasonable competence" could have found probable cause in light of the facts.  *Id.* at 369–70  While it is not clear why the jury concluded that the three officers who believed they saw Plaintiff throwing punches at other officers did not have probable cause to arrest him, the Court concludes that those beliefs provide at least arguable probable cause that entitles Deferrari, Reo, and Heerey to qualified immunity on the false arrest claims.

---

[16] Only two officers—Reo and Boneta—believed that Plaintiff "shoved" Reo.  (Special Verdict Sheet, at 5–6.)  The Court need not reach the question of whether this belief was reasonable, because the Court finds that there was arguable probable cause to arrest Plaintiff for punching officers in the street.

2.    Defendants Found Liable Based on Failure to Intervene and Supervisory Liability

The jury found that Tellado, MacNear, Boneta, and Failla were liable for failure to intervene to prevent Jackson's false arrest, and that MacNear was also liable for false arrest as a supervisory officer.  (Verdict Sheet, at 2.)

a)    Defendants' Theory of Derivative Qualified Immunity for Non-Intervening Defendants

The Court addresses, as an initial matter, Defendants' assertion, made without elaboration, that "a finding of qualified immunity [for the Defendants who personally participated in the false arrest] would extinguish the liability [as to all other officers] for failure to intervene and supervisory liability."  (Dkt. 106, at 24.)  Although there is no definitive case law on this issue, the Court rejects what amounts to a theory of derivative qualified immunity for the non-intervening officers, *i.e.*, that because the officers who arrested Plainitff had arguable probable cause and are entitled to qualified immunity as to that arrest, the officers and supervisors who failed to intervene are automatically, or in effect, derivatively, entitled to qualified immunity as well.  The Court instead finds that, under the facts of this case, the grant of qualified immunity to the three arresting Defendants does not preclude the denial of qualified immunity as to other Defendants for failure to intervene as to the arrest.

In *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997), the Second Circuit held that "[a] police officer cannot be held liable in damages for failure to intercede unless such failure permitted fellow officers to violate a suspect's 'clearly established statutory or constitutional rights' of which a reasonable person would have known[.]"  *Id*. at 129.  On its face, this standard would seem to support Defendants' argument, in that it suggests that if the incident in which the officers failed to intervene did not violate a suspect's "'clearly established statutory or constitutional rights'"—which ordinarily would entitle the arresting officers to

qualified immunity—the non-intervening officers cannot be held liable for the failure to intervene. However, the Court finds that the qualifying phrase "of which a reasonable person would have known" is best read as applying to what the non-intervening officer would have known, not to what the arresting officer would have known. As a result, an arresting officer could violate a suspect's rights (i.e. arrest him without probable cause) while objectively having arguable probable cause, while a non-intervening officer with additional information available to him could or should have known there was no arguable probable cause.

The language of *Ricciuti* itself corroborates this interpretation. *See id.* at 129 (stating that "the failure to intercede must be under circumstances making it objectively unreasonable for [the non-intervening officer] to believe that his fellow officers' conduct did not violate those rights"); *id.* ("To obtain summary judgment on qualified immunity grounds in connection with a claim of failure to intercede to prevent an illegal arrest, a defendant must show that the only result a fair jury could reach is that reasonably competent police officers, faced with the information available to the *non-intervening officer at the time of the arrest, could disagree about the legality of the arrest*.") (emphasis added).

Consistent with this analysis, this oft-quoted language from *Ricciuti* does not appear to have been applied to the situation presented here, where the jury has found that there was an arrest without probable cause, but also found facts that support a grant of qualified immunity to the arresting officers, as well as facts that warrant denying qualified immunity to the non-intervening officers.[17] The Court does not construe *Ricciuti* as precluding the denial of qualified

---

[17] Instead, this principle generally has been applied to preclude failure to intervene liability when *no* constitutional violation was found, as opposed to when a constitutional violation is found, but qualified immunity is granted to those who personally committed the violation. *See Lewis v. Fischer*, 08-CV-3027, 2009 WL 689803 (E.D.N.Y. 2009) (stating, in discussing *Ricciuti*, that "[w]hen no constitutional violation has taken place, bystanding officers

immunity to the non-intervening officers under these unusual circumstances.  *See Harris*, 252 F.3d at 598 (courts faced "with seemingly inconsistent verdicts" "must adopt a view of the case, if there is one, that resolves any seeming inconsistency"); *Gallick*, 372 U.S. at 119 ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."). And neither *Ricciuti* nor its progeny expressly provides that officers who fail to intervene in an unlawful arrest are entitled to qualified immunity simply because the arresting officers are entitled to qualified immunity for the arrest itself.  Thus, the Court finds that the grant of qualified immunity to the arresting officers does not preclude a denial of qualified immunity to the non-intervening officers.

As this case illustrates, the different treatment of the arresting and non-intervening officers is justified by the differences in what the two sets of officers reasonably believed about the existence or non-existence of probable cause for the arrest.    Indeed, the jury's Special Verdict findings in this case bear out this critical distinction.  Here, the jury found that the three officers who were personally involved in the arrest believed, even if mistakenly, that Plaintiff had committed a crime by assaulting Czulada or other officers in the street; whereas it found that some of the non-intervening Defendants did *not* believe that Plaintiff had committed a crime. (Special Verdict Sheet, at 1, 4, 6, 7)  Given the difference in what the two sets of officers— arresting versus non-intervening—knew or believed about the circumstances giving rise to the

---

cannot be held liable." Id. at *6, n.3 (emphasis added); *Holland v. City of New York*, 14-Civ.-5517, 2016 WL 3636249, at *12 (S.D.N.Y. June 24, 2016) (stating that, "'If the Court determines that the officer's conduct did not violate a constitutional right, however, the analysis ends." (quotation omitted); *Usavage v. Port Auth. of New York & New Jersey*, 932 F. Supp. 2d 575, 599 (S.D.N.Y. 2013) (stating that failure to intervene claims are "contingent upon the disposition of the primary claims underlying the failure to intervene claim," explaining that when "the record does not disclose an underlying excessive force violation, and does not suggest that an officer who observed the incident could have been aware of the use of excessive force, summary judgment on a duty to intercede claim is appropriate").

arrest, it is entirely consistent with *Riciutti* to grant qualified immunity to the arresting officers, who believed their actions were lawful, while denying qualified immunity to the non-intervening officers who did not believe the arrest was lawful, yet failed to intervene. *See Robinson v. Via*, 821 F.2d 913, 921 (2d Cir. 1987) (noting that "it has long been clearly established that an arrest without probable cause is a constitutional violation," even though qualified immunity might be appropriate where there is arguable probable cause).[18] Therefore, the Court finds that *Ricciuti* permits a situation like this one, where the observing officer would not reasonably believe an arrest is lawful, despite the fact that the arresting officers are entitled to qualified immunity based on their belief that there was a proper basis for the arrest.[19]

> b) Defendants MacNear and Boneta Are Entitled to Qualified
> Immunity as to the False Arrest

Notwithstanding the Court's rejection of Defendants' theory of derivative qualified immunity for all of the non-intervening officers, the Court finds that MacNear and Boneta are entitled to qualified immunity for their false arrest verdicts. The jury's responses to the special interrogatories on qualified immunity indicate that MacNear and Boneta reasonably, even if mistakenly, believed they saw Plaintiff committing crimes, and/or relied upon the allegations of

---

[18] *Curley v. Village of Suffern*, 268 F.3d 65 (2d Cir. 2001) is not to the contrary. There, the Circuit held that when a jury returned a verdict in favor of the officers accused of personally using excessive force, other officers could not be held liable for failure to intervene. *Id.* at 72. *Curley* explicitly distinguished a situation where the officer who allegedly engaged in the excessive force is found not liable because of qualified immunity, at least in the context of municipal liability. *Id.* at 71.

[19] Again, the Court recognizes the seeming inconsistency in the jury's verdict and the Special Verdict Sheet findings, but believes that applying *Ricciuti* in this manner appropriately reconciles this conflict. *See Harris*, 252 F.3d at 598 (courts faced "with seemingly inconsistent verdicts" "must adopt a view of the case, if there is one, that resolves any seeming inconsistency"); *Gallick*, 372 U.S. at 119 ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.")

fellow police officers in concluding that the arresting officers' conduct was lawful. *See Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("'When making a probable cause determination, police officers are 'entitled to rely on the allegations of fellow police officers.'") (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)).

The jury found that MacNear believed, even if mistakenly, that Jackson assaulted Czulada. (Special Verdict Sheet, at 2.) As noted, the jury found that Czulada, Gherardi, Dunn, and Kurian also believed that Jackson assaulted Czulada, leading the Court to conclude that this belief was reasonable. MacNear's reasonable belief that he saw Plaintiff assault Czulada provides arguable probable cause to arrest for assault in the third degree, and thus entitles him to qualified immunity for his failure to intervene. (*Id*.) For the same reason, MacNear is entitled to qualified immunity with respect to the jury's finding of supervisory liability for the arrest as well.

Boneta is similarly entitled to qualified immunity for his false arrest verdict. As to Boneta, the jury found that he believed, even if mistakenly, that Plaintiff had shoved Reo, and was throwing punches at police officers in the street. These reasonable beliefs provide arguable probable cause for Plaintiff's arrest and, in turn, provide qualified immunity to Boneta for his failure to intervene. (*Id*.)

c)      Defendants Failla and Tellado

With respect to Failla and Tellado, however, the Court denies qualified immunity on the false arrest claims.

(1)      Failla

As to Failla, the jury's verdict reflects a finding that Failla failed to intervene to prevent Plaintiff's false arrest, despite having reason to know that it was not supported by probable

cause, and despite having a reasonable opportunity to intervene. On the Special Verdict Sheet, the jury did not find that Failla believed that Plaintiff had committed any of the specified illegal acts, except resisting arrest. However, the arrest that Plaintiff was resisting was an arrest that the jury found Failla believed or had reason to believe was unlawful.[20] The Second Circuit, in *Curry v. City of Syracuse*, 316 F.3d 324 (2d Cir. 2003), made clear that under New York law, there must be probable cause to arrest someone for an *independent* crime apart from "resisting arrest" in order to defeat a false arrest verdict. *Id.* at 336. The *Curry* court noted that under New York law, "'[a] person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer or peace officer from effecting an *authorized arrest* of himself or another person.'" *Id.* at 336 (quoting N.Y. Penal Law § 205.30). It is "well established in New York that 'probable cause to arrest is a prerequisite for making an authorized arrest,' and if there is no probable cause to arrest a person, that person 'cannot be guilty of resisting arrest.'" *Id.* (quoting *People v. Mohamadou,* 698 N.Y.S.2d 445, 447–48 (N.Y. Crim. Ct. 1999)); *see also People v. Stevenson*, 335 N.Y.S. 2d 52, 56 (1972) (explaining that "the crime of resisting arrest does not occur if the arrest is illegal or unlawful"). Based on the jury's answers on the Special Verdict Sheet, Failla did not have knowledge of probable cause to arrest Plaintiff for the independent crimes of assault in the third degree or aggravated harassment in the second degree. *See* Special Verdict Sheet, at 6 (showing that the jury did not believe that Failla believed that Plaintiff had assaulted Czulada, shoved Reo, or thrown punches at officers in the street).

---

[20] The Court notes, however, that its ruling on the qualified immunity issue, which is based on the jury's explicit Special Verdict Sheet findings, does not resolve any challenge Defendants might raise in their Rule 50/59 motion as to whether the evidence was sufficient to support the jury's failure to intervene verdict against Failla. Indeed, based on the evidence showing that Failla arrived at the scene late, just in time to observe Plaintiff being arrested, there is reason to question whether he knew or thought that there was no probable cause for the arrest.

The Court also considers whether the jury's finding that Failla believed Plaintiff was "resisting arrest" could provide "arguable probable cause" for an arrest for disorderly conduct. Disorderly conduct is when, *inter alia*, someone engages in fighting or in violent, tumultuous or threatening behavior with intent to cause public inconvenience, annoyance, or alarm, or recklessly creates a risk thereof, N.Y. Penal Law § 240.20. In light of the fact that Defendants did not request that the jury be instructed on the elements of resisting arrest, the jury's finding that Failla believed Plaintiff was "resisting arrest" cannot be treated as a legal conclusion; instead, it could mean a range of behavior that literally means resisting being arrested. Plaintiff testified that while he was in the street, officers were sitting on his back holding him down, which made it impossible for him to pull his arm out from under him despite orders to do so. (1/27/16 Tr. 60–61, Jackson.) (testifying that an officer was "poking me in the side with the ASP and kicking me telling me, Give me your arm, stop resisting me, give me your arm . . . I said I can't. It's too much weight on my back"). The jury's finding that Failla believed Plaintiff was resisting arrest could have been referring to Plaintiff's inability to pull his arm out from under him, which officers could have interpreted as a refusal to do so. The Court therefore does not find that this conduct supplies arguable probable cause to arrest Plaintiff for disorderly conduct, which consists of "engaging in fighting or in violent, tumultuous, or threatening behavior". N.Y. Penal Law § 240.20.[21]

### (2)     Tellado

The jury also found Tellado liable for failing to intervene in Plaintiff's false arrest. This means that the jury found that Tellado knew or had reason to know that the arrest was without

---

[21] This conclusion is reinforced by the jury's finding that Failla did not believe that Plaintiff was "throwing punches at police officers while out in the street." (Special Verdict Sheet, at 6.) This would suggest that the "resisting arrest" that Failla saw was non-violent.

probable cause.  (Dkt. 97 ("Jury Instructions") at 16.)  The jury also found, in the Special Verdict Sheet, that Tellado did not believe that Plaintiff had assaulted Czulada, shoved Reo, thrown punches at officers in the street, or resisted arrest.  (Special Verdict Sheet, at 1.)  Based on these findings by the jury, the Court is compelled to deny Tellado qualified immunity.[22]

(3)    <u>Collective Knowledge Doctrine Does Not Benefit Failla or Tellado</u>

The collective knowledge doctrine does not help either Failla or Tellado, because as noted, collective knowledge requires that the relevant knowledge actually have been communicated.  Here, the jury's finding that Failla and Tellado did not believe that Plaintiff had committed a crime necessarily means that the arresting officers' knowledge about Plaintiff's arguable crimes was not communicated to Failla and Tellado, or if it was, they did not believe it.

In sum, with respect to the jury's false arrest verdicts, qualified immunity is granted as to Defendants Deferrari, Heerey, Reo, Boneta, and MacNear, and denied as to Defendants Failla and Tellado.

## III.    EXCESSIVE FORCE

Defendants argue that they are entitled to qualified immunity as to the jury's excessive force verdicts, because Defendants used reasonable force under the circumstances.

---

[22] As with Failla, this ruling does not resolve the question of whether the evidence was sufficient to support the jury's failure to intervene verdict as to Tellado.  Indeed, the Court notes that the evidence supporting Tellado's liability is thin—Plaintiff did not testify to seeing Tellado in the house, stating that he first noticed Tellado standing outside the house after Plaintiff was being searched, which occurred after Plaintiff had been handcuffed and pepper-sprayed. (1/27/16 Tr. 62–65.), Plaintiff further testified that Tellado looked at Plaintiff's ID, and then ordered that he be released.  (*Id.* at 66–67).  Tellado's testimony matches with Plaintiff's—he testified that he entered the house after Plaintiff left, and that he first saw Plaintiff after he was restrained. (2/1/16 Tr. 178, 183–84, Tellado.)

### A. Legal Standards

#### 1. Excessive Force Standard

Fourth Amendment jurisprudence contemplates that law enforcement has a "right to use some degree of physical coercion or threat thereof" as part and parcel of the "right to make an arrest or investigatory stop." *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015). This right is limited, however, by the requirement that the use of such force be objectively reasonable "in light of the facts and circumstances confronting" the law enforcement officers effecting the arrest, under penalty of violating the Fourth Amendment. *Id*. "Whether the force used to effect an arrest is 'reasonable' or 'excessive' turns on 'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake.'" *Figueroa v. Mazza*, 825 F.3d 89, 105 (2d Cir. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted)). This balancing contemplates a number of factors, including "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id*. (citing *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251–52 (2d Cir. 2001)).

Just as in the false arrest context, "[l]iability may attach where an officer fails to intervene, but observes or has reason to know . . . that excessive force is being used," if the officer "had a realistic opportunity to intervene to prevent the violation from happening." *Sanabria*, 2016 WL 4371750, at *5. And as with false arrest, a supervisor may be liable for excessive force if he "authorizes, orders, or helps others" to carry out the excessive force. *Terebesi*, 764 F.3d at 234.

#### 2. Excessive Force and Qualified Immunity

Even if a defendant is found liable for using excessive force, that defendant may nonetheless be entitled to qualified immunity if it was not objectively unreasonable for him or her to believe that his use of such force was nevertheless lawful. Thus, while both the excessive force inquiry and the qualified immunity inquiry ask whether the officer's actions were "objectively reasonable," the qualified immunity inquiry goes on to ask whether any constitutional violation was clearly established. *Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("stating that "the qualified immunity inquiry . . . has a further dimension" and acknowledges that "reasonable mistakes can be made as to the legal constraints on particular police conduct"), *receded from by Pearson v. Callahan*, 555 U.S. 223 (2009), *on other grounds*.

Put differently, if an officer makes reasonable mistakes of *fact* in applying force, liability itself will be defeated. *See id.* at 205 (explaining that objective mistakes of fact, such as a reasonable belief that a suspect was likely to fight back, can justify "more force than in fact was needed" under *Graham*). However, if a jury returns a verdict finding excessive force, having been properly instructed on the law, the jury is essentially saying that the officer has not made a reasonable mistake of fact, and that the use of force was not objectively reasonable. (Jury Instructions, at 15.) Nonetheless, in that event, a court may still grant qualified immunity if an officer has made a reasonable mistake of *law*; *i.e.*, if the constitutional violation he has committed was not a "clearly established" violation. *See id.* "It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts," [and] "[a]n officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances." *Id.* "If the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense." *Id. See also Brown v. City of*

*New York*, 13-CV-1018, 2016 WL 1611502, at *4 (S.D.N.Y. April 20, 2016) ("Qualified immunity attaches if 'officers of reasonable competence could disagree' on the legality of the defendant's actions.") (quoting *Lennon*, 66 F.3d at 420)).

"Although it is not the case that an official action is 'protected by qualified immunity unless the very action in question has previously been held unlawful . . . it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Brown*, 2016 WL 1611502, at *4 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Additionally, there is a narrow set of cases in which a constitutional violation is so "obvious," that the *Graham* standard itself gives fair warning that a violation is clearly established. *See Brosseau v. Haugen*, 543 U.S. 194, 599 (2004) ("Of course, in an obvious case, these standards [articulated in *Graham* and in *Tennessee v. Garner*, 471 U.S. 1 (1985)] can 'clearly establish' the answer, even without a body of relevant case law."); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (finding in a case where an Eighth Amendment violation—using a hitching post—was "obvious" that "general statements of the law are not inherently incapable of giving fair and clear warning," and explaining that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful,'") (citing *Anderson*, 483 U.S. at 640)). *See also Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251 (2d Cir. 2001) (explaining that "it stands to reason that in many instances the absence of a reported case with similar facts demonstrates nothing more than widespread compliance with the well-recognized applications of the right at issue on the part of government actors") (quotation omitted)).

**B. No Defendant is Entitled to Qualified Immunity on the Excessive Force Claim**

The Court takes as its starting point the jury's findings that Defendants Czulada, Kurian, Reo, and Failla personally subjected Plaintiff to objectively unreasonable force under the circumstances, that Defendants Tellado, MacNear, Gherardi, Dunn, Deferrari, Braumann, Boneta, and Heerey failed to intervene to prevent Plaintiff from being subjected to excessive force, and that Defendant MacNear additionally authorized, ordered, or helped the Defendants who used excessive force against Plaintiff. As discussed above, when a jury finds that a defendant is liable for excessive force, thus having determined that the defendant used objectively unreasonable force, the qualified immunity inquiry focuses on the question of whether the constitutional violation was "clearly established."[23] *See Saucier*, 533 U.S. at 205.

1.     Defendants Who Personally Subjected Plaintiff to Excessive Force

a)     Defendant Czulada

Defendant Czulada is not entitled to qualified immunity regarding the jury's finding that he personally used excessive, or objectively unreasonable force, against Plaintiff. Construing the evidence in the light most favorable to Plaintiff, yet still accounting for the jury's finding that Czulada reasonably believed that Plaintiff assaulted him,[24] the Court finds that the jury found

---

[23] The Court also notes that the Special Verdict Sheet questions were designed to assist the Court in its qualified immunity analysis for the false arrest claim, and do not provide definitive information regarding the excessive force claim. As the Court will discuss *infra*, the jury's Special Verdict Sheet answers are insufficient to undermine the jury's verdict finding Defendants liable for excessive force, because the Special Verdict Sheet does not provide any information about the chronology of events. The jury's finding that a defendant believed that Plaintiff assaulted Czulada, for example, does not provide any information about whether this assault occurred before or after any excessive force was used by Czulada, or whether the assault was of a magnitude that merited the actions Czulada took thereafter.

[24] Although the Special Verdict Sheet did not ask if Czulada's belief was reasonable, in light of the fact that the jury found that four other officers also believed it, the Court finds that this belief was reasonable.

that the following sequence of events had occurred: Czulada told Plaintiff to "back the fuck up," and "push[ed] [him] back with the ASP"; Plaintiff "lost [his] balance" and then "stood back up and . . . asked [Czulada], What are you doing? I just told you this is my house. I'm a cop too,"; then Czulada "punched [Plaintiff] in the face." (1/27/16 Tr. 40–42, Jackson.) *Then*, Plaintiff assaulted him. (2/1/16 Tr. 100–05, Czulada.) Czulada himself testified that Plaintiff "pushe[d]" him, then he punched Plaintiff in the face, and *then*, Plaintiff punched him in the head multiple times, and then continued to punch him after he was on the floor. (2/1/16 Tr. 96–97, 100–05, Czulada.) Therefore, although it is possible that the jury found that Plaintiff "pushed" Czulada and that this was an "assault," it is far more likely that the "assault" they found referred to Plaintiff punching Czulada multiple times *after* Czulada punched Plaintiff in the face.

It is clearly established that an officer punching someone in the face unprovoked violates that person's rights. *See, e.g.*, *O'Hara v. City of New York*, 570 Fed. App'x 21, 23–24 (2d Cir. 2014) (summary order) (concluding that, where officers were arresting plaintiff for a "relatively minor matter," "no reasonable officer . . . could have thought that the law authorized him repeatedly to punch an unarmed, non-menacing 17-year-old in effecting an arrest"); *see also Davis v. Clifford*, 825 F.3d 1131, 1137 (10th Cir. 2016) ("[I]t is . . . clearly established law that the use of disproportionate force to arrest an individual who has not committed a serious crime and who poses no threat to herself or others constitutes excessive force."); *Hung v. Watford*, 2002 WL 31689328, at *6 (E.D. Pa. 2002) (finding that "an unprovoked grab, punch, kick and handcuffing of an individual who is not resisting arrest or even being arrested, not fleeing the scene of a crime and not engaging in any threatening activity to an officer or others, was clearly established as a violation of a constitutional right at the time of the incident"). Accepting Plaintiff's testimony about the encounter, he had not committed any crime, not even a

misdemeanor, at the time Czulada punched him, and was not posing any type of threat. *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) (explaining that "it is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public."). Finally, the Court notes that, although it has no need to rely on the *Pelzer*[25] rule here, it is "obvious" that punching someone in the face who poses no threat is "excessive" force, because in such a situation *no* force is necessary or justified.

The Court further finds that no reasonable officer would have found that Plaintiff's action in getting up from the ground after Czulada pushed him, unprovoked, constituted a threat that justified Czulada punching Plaintiff in the face. Plaintiff did not testify that Czulada told him to stay down or any words to that effect, that Plaintiff appeared angry or menacing when he stood up and spoke to Czulada, or that Plaintiff had not done anything at that point to justify a belief that he had committed a crime or posed any danger to anyone. Moreover, Plaintiff's testimony that he told Czulada that he was an officer further undermines any justification for Czulada's use of force against Plaintiff at that moment. Accordingly, the Court finds that Czulada is not entitled to qualified immunity as to the excessive force verdict.

b)      Defendant Kurian

Defendant Kurian, whom the jury found also personally used excessive force against Plaintiff, is not entitled to qualified immunity either. The jury could have believed Plaintiff's testimony that Kurian lifted Plaintiff up with an ASP baton around his neck inside the house, and "choked" him. (1/27/16 Tr. 46, 105, Jackson.) They also could have believed Plaintiff's

---

[25] As noted, in *Pelzer*, 536 U.S. 730, the Supreme Court stated that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Id*. at 741 (internal quotation marks omitted).

testimony that at the time he was placed in the chokehold, Plaintiff was simply trying to help Czulada up, even as Czulada was taking swings at him. (*Id.* at 45.) Kurian's testimony places him in the middle of the altercation between Czulada and Plaintiff, although he testified that he merely "bear hug[ged]" Plaintiff's arm. (2/2/16 Tr. 54, Kurian.) The jury could have disbelieved Kurian's testimony about the "bear hug," but found that his testimony otherwise corroborated Plaintiff's statement that it was Kurian who choked him.

Accepting the facts in the light most favorable to Plaintiff and assuming that Kurian placed Plaintiff in a chokehold *before* Plaintiff punched Czulada, the Court concludes that the chokehold violated clearly established law.[26] It is clearly established that a police officer cannot use a chokehold on someone who does not pose a threat of any kind. *United States v. Livoti*, 196 F.3d 322, 327 (2d Cir. 1999) (upholding criminal conviction for excessive force when officer put man in a chokehold which lasted for one minute and rendered him unconscious, when the evidence showed that the New York City Police Department ("NYPD") prohibited chokeholds under any circumstances); *see also Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 540 (6th Cir. 2015) (finding that an officer violated a plaintiff's constitutional rights when he choked him after plaintiff had been placed on the bed, handcuffed to it, and was surrounded by multiple officers, and stating that "[t]he use of a chokehold on an unresisting—and even an initially resistant— detainee violates the Fourteenth Amendment") (citing *Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993)); *Hamilton v. City of Jackson,* 261 Fed. App'x 182, 186–87 (11th Cir. 2008) (denying qualified immunity to officer who pressed plaintiff up against a door and grabbed his

---

[26] It is not clear whether the jury found that Kurian personally used excessive force against Plaintiff before or after Plaintiff assaulted Czulada. At this stage, the Court adopts the view of the case "that makes the jury's answers to the special interrogatories consistent." *Gallick*, 372 U.S. at 119.

throat, squeezing for 30-40 seconds, given that plaintiff had arrived at the police department of his own volition, and had turned to leave the room when the officer grabbed him); *Davis v. City of San Jose*, 69 F. Supp. 3d 1001, 1006–07 (N.D. Ca. 2014) (finding that "it was clearly established that police officers should not . . . place a suspect in a chokehold so as to render him unconscious when he does not resist being arrested for obstructing police duties"); *Magrum v. Meinke*, 332 F. Supp. 2d 1071, 1082 (N.D. Ohio 2004) (stating that an officer who "flipped [plaintiff] to the ground and choked him two times, the second time while [plaintiff] was not resisting . . . violat[ed] . . . clearly established law"); *cf. Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) (finding that it "need[ed] no federal case directly on point to establish that kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law, and that reasonable officers would have been aware that such was the case").[27]

---

[27] To the extent the sequence of events is relevant to Defendants' claims of qualified immunity, it was incumbent on them to request that the jury resolve those factual issues in the Special Verdict Sheet. *See Zellner*, 494 F.3d at 368 ("To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question . . . . If the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding.")  However, even if the jury had found that Plaintiff assaulted Czulada before Kurian placed Plaintiff in a chokehold, Kurian still might *not* be entitled to qualified immunity. It is clearly established that even if someone posed a threat at the time force was initiated on them, an officer cannot continue to apply deadly or serious force when the threat has subsided. *See Alicea v. Thomas*, 815 F.3d 283, 288 (7th Cir. 2016) (stating that use of force "is only reasonable when it is proportional to the threat posed. If an officer's threat perception changes, so too should her force calculus."); *Lamont v. New Jersey*, 637 F.3d 177, 184 (3d Cir. 2011) ("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished."); *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 413 (5th Cir. 2009) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased"); *Keeney v. City of New London*, 196 F. Supp. 2d 190, 200 (D. Ct. 2002) (explaining that "once an individual is restrained by handcuffs and unable to defend

c) <u>Defendant Reo</u>

Defendant Reo is also not entitled to qualified immunity for personally using excessive force against Plaintiff. The jury could have found that he struck Plaintiff in the back of the head while Plaintiff was standing in the doorway of the house protesting the officers' treatment of Bonaparte. (1/27/16 Tr. 54, Jackson) ("I was like, wait a minute, guys . . .", and then he was struck in the back of the head). Although Plaintiff he did not see who struck him, (*id.* at 55), Reo placed himself[28] in the doorway of the house at the time Bonaparte was brought outside, and also testified about hearing Plaintiff's protest of the officers' treatment of Bonaparte.

Therefore, it is reasonable to infer that the jury's determination that Reo personally used excessive force against Plaintiff was based on a finding that Reo was the officer who hit Plaintiff in the back of the head. A jury is permitted to infer a defendant's involvement in use of

---

himself, there is little legitimate government interest in continued use of force"). Here, Plaintiff testified that while Kurian held the baton to his neck, Kurian "was telling [him] to relax, and [Plaintiff] was telling him, I am relaxed. I can't breathe. Then [Plaintiff] noticed after [he] said that, [he] felt like [the baton] was being pulled tighter and [he] heard the word 'relax' again." (1/27/16 Tr. 47, Jackson.). This testimony suggests that even if Kurian was initially justified in using a chokehold on Plaintiff, Kurian continued to apply it after the justification disappeared, thereby violating clearly established law. In addition, Plaintiff testified that the NYPD provided training that officers should not do "anything related to the neck or choking in the police department" because "[i]t can run the risk of asphyxiation. You could kill somebody." (1/27/16 Tr. 47, Jackson.) MacNear also testified that the NYPD did not allow chokeholds. (1/28/16 Tr. 12, MacNear). It is therefore reasonable to infer that Kurian knew that he should not use a chokehold under any circumstances. *See Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008) ("[T]he reasonableness of an officer's actions must be assessed in light of the officer's training."). However, the absence of the necessary factual findings precludes the Court's consideration of this alternate scenario.

[28] Reo testified that while he was guarding the door of the house to make sure nobody else entered, Plaintiff approached and tried to get into the house. (1/29/16 Tr. 182, Reo.) Then he heard Plaintiff yelling, "You all can't fucking do that, you all can't do that", while looking at two officers taking a black, shirtless man out of the house. *Id.* Reo testified that Plaintiff tried to push past Reo again, and finally "g[ave] [him] a two-handed shove to [his] chest", which made Reo stumble back. *Id.* at 182–83. Bonaparte's testimony that he was not wearing a shirt on the night of the incident tended to corroborate his identity as the man being removed by the two officers. (1/25/16 Tr. 24, Bonaparte).

excessive force based on circumstantial evidence. *See Medina v. Donaldson*, 10-CV-5922, 2014 WL 1010951, at *7 (E.D.N.Y. March 14, 2014) ("Absent direct evidence, a jury may still find for the plaintiff on a theory of direct participation if 'there is sufficient circumstantial evidence from which the trier of fact could make reasonable conclusions concerning who, if anyone, struck [the plaintiff].'") (quoting *Lasher v. City of Schenectady*, 02-CV-1395, 2004 WL 1732006, at *6–7 (N.D.N.Y. Aug. 3, 2004)); *Campbell v. City of New York*, 06-CV-5743, 2010 WL 2720589, at *9 (S.D.N.Y. June 30, 2010) (finding plaintiff's testimony that defendant-detective was with the officer who transported plaintiff to the place where plaintiff was interrogated and assaulted was sufficient to survive summary judgment and allow jury to determine that the detective failed to intercede or was personally involved in the alleged constitutional violation); *Vesterhalt v. City of New York*, 667 F. Supp. 2d 292, 298 (S.D.N.Y. 2009) (finding that, although plaintiff could not identify who threw her to the floor and held her there with his boot, defendants' testimony showed that "all of the individual defendants were present [when plaintiff was thrown to the floor,]….and [t]herefore it is possible that all of the officers…failed to intervene on her behalf").

The jury also found in the Special Verdict Sheet that Reo believed, even if mistakenly, that Plaintiff had shoved him. The jury could either have found that Plaintiff shoved Reo, and in response Reo used excessive force by hitting Plaintiff on the back of the head, *or* that Reo hit Plaintiff in the back of the head and then Plaintiff shoved Reo. As with Czulada, the answers to the Special Verdict Sheet provide no information about the chronology of the events, and therefore do not provide definitive answers regarding the excessive force claims.

Because the Court construes the facts in the light most favorable to Plaintiff, it considers only whether Reo's striking Plaintiff on the back of the head in response to Plaintiff protesting

the officers' treatment of Bonaparte violates clearly established law, and finds that it does. It is clearly established that an officer cannot strike someone on the back of the head when that person poses no physical threat or resistance. *Belanger v. City of Hartford*, 578 F. Supp. 2d 360, 362–63 (D. Conn. 2008) (finding that "[a] reasonable police officer should know that swinging a baton at an individual's face while [he is] facing away from the officer without prior warning would constitute a violation of that individual's right to be free from excessive force"); *see also Davis*, 825 F.3d at 1137 ("[I]t is . . . clearly established law that the use of disproportionate force to arrest an individual who has not committed a serious crime and who poses no threat to herself or others constitutes excessive force."); *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) ("Our cases hold that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force."); *Hung*, 2002 WL 31689328, at *6 (finding that "an unprovoked grab, punch, kick and handcuffing of an individual who is not resisting arrest or even being arrested, not fleeing the scene of a crime and not engaging in any threatening activity to an officer or others, was clearly established as a violation of a constitutional right at the time of the incident").

The fact that Plaintiff was verbally objecting to other officers' treatment of Bonaparte does not change the Court's conclusion, as it is clearly established that verbal objections to police actions do not warrant use of physical force. *See Lustig v. Mondeau*, 211 Fed. App'x 364, 371–72 (6th Cir. 2006) (finding that passive resistance and yelling while detained did not justify arm twisting and jerking that caused injury, and thus amounted to a clearly established constitutional violation); *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (finding a clearly established violation when an agent grabbed a woman by her arms, forcibly threw her to the ground, and, twisting her arms, handcuffed her, after she "loudly asked several times to see a

search warrant"); *Aldrich v. City of Columbus*, 2016 WL 6084570 (S.D. Oh. 2016) (stating that "[a] simple refusal by an unthreatening suspect to comply with an officer's commands does not warrant the use of significant force"); *Aubert v. Elijah*, 2009 WL 1516438 (E.D. Ca. 2009) (finding that plaintiff stated a claim of excessive force under the Eighth Amendment when, after Plaintiff verbally objected to corrections officers' insults, one officer ordered another one to "just kick [Plaintiff's] ass and do what you want with him so I can kick him out of my building with his smart ass mouth," and another officer, after Plaintiff protested further, began to choke him); *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 342 (E.D.N.Y. 2006) (finding that, assuming that "an officer struck plaintiff first, following her protestations regarding [the officers' actions]," the court could not hold that defendant officers' conduct was objectively reasonable use of force as a matter of law); *Thomas v. Frederick*, 766 F. Supp. 540, 554 (W.D. La. 1991) (finding a clearly established excessive force violation when an officer threw a woman forcefully against his car after she verbally protested her husband's arrest and tried to show the arresting officer documents); *see also Piper v. Elmira*, 12 F. Supp. 3d 577, 595 (W.D.N.Y. 2014) (stating, in the context of a Fourteenth Amendment claim, that an officer who threw a woman to the floor when she protested him entering a house was not entitled to qualified immunity because "a jury could conceivably find that no force was appropriate" under the circumstances); *Webster v. City of New York*, 333 F. Supp. 2d 184, 201 (S.D.N.Y. 2004) (finding that plaintiff's comments criticizing police officers' actions against another person were "protected speech" and denying defendants' summary judgment on plaintiff's first amendment retaliation claim). *See generally City of Houston, Tex. v. Hill*, 482 U.S. 451, 471–72 (1987) (discussing, in the context of invalidating an ordinance that made it unlawful to interrupt a police officer, the "constitutional requirement that, in the face of verbal challenges to police action, officers and municipalities

must respond with restraint" and stating that "a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive")[29]

### d) Defendant Failla

Defendant Failla is also not entitled to qualified immunity. The jury found that Defendant Failla personally subjected Plaintiff to excessive force, presumably based on Failla's own testimony, in which he admitted to pepper-spraying Plaintiff, as well as Plaintiff's testimony that he was pepper-sprayed *after* being handcuffed. (1/29/16 Tr. 161, Failla) (stating that, rather than helping to interact with or restrain Plaintiff when he was resisting arrest, "I thought it better to spray him in the face with pepper spray"); (1/27/16 Tr. 62, Jackson) (stating that after he was handcuffed, he said "Guys, this was unnecessary . . . I'm a fellow cop, too" and "then they pepper sprayed me").) Plaintiff also testified that he willingly allowed himself to be handcuffed, and was not resisting the officers at that point. (1/27/16 Tr. 62:1–5, Jackson) (stating that he "stuck [his] arm out" and "let them put the cuffs [on] because "I figured it would be over and we can straighten this out"). The evidence also shows that no officer, including Failla, attempted to wipe away the pepper spray from Plaintiff's eyes or face. Construing the facts in the light most favorable to Plaintiff, the Court assumes that the jury found that Failla gratuitously pepper sprayed Plaintiff after Plaintiff had allowed himself to be handcuffed, and in response to Plaintiff's comment about the arrest being unnecessary. Even though the jury found on the Special Verdict Sheet that Failla believed that Plaintiff was resisting arrest, the jury could have

---

[29] The Court once again finds that, although it is not necessary to rely on *Pelzer* here, it is obvious that hitting someone on the back of the head for verbally objecting to a police officer's conduct is a clearly established violation of the right to be free from excessive force. *Pelzer*, 536 U.S. at 741.

found that Failla observed, or thought he observed, Plaintiff resisting arrest *before* he was

handcuffed, and before he pepper sprayed him.[30]

It is clearly established that the use of pepper spray against a restrained and cooperative

person constitutes excessive force. *See Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010)

(stating that "we presume that no reasonable officer could have believed that he was entitled to

use pepper spray gratuitously against a restrained and unresisting arrestee") (citing *Asociacion de*

*Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 60–62 (1st Cir. 2008) and *Vinyard v. Wilson*,

311 F.3d 1340, 1355 (11th Cir. 2002)); *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002)

(stating that "Courts have consistently concluded that using pepper spray is excessive force in

cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting

violently, and there is no threat to the officers or anyone else.") (citing 4th, 6th, and 9th Circuit

precedent)); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000) (finding excessive

force when officers left pepper spray on plaintiff's face and in his eyes for 20 to 30 minutes after

he had surrendered, and stating that the use of pepper spray "may be reasonable as a general

policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is

rendered helpless, any reasonable officer would know that a continued use of [pepper spray] or a

refusal without cause to alleviate its harmful effects constitutes excessive force"); *see also*

*Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002), *as amended*

(Jan. 30, 2002) (finding that officers' repeated use of pepper spray on protesters who had locked

themselves together in a congressman's office was "clearly unreasonable" (quoting *LaLonde*,

---

[30] Again, because the Special Verdict Sheet did not seek to have the jury clarify the
timing of events, and because the jury found that Failla's use of force was unreasonable, the
Court cannot find that the jury concluded that Failla pepper-sprayed Plaintiff believing that
Plaintiff was resisting arrest at that moment.

204 F.3d at 961)).  Once Plaintiff was handcuffed and restrained, any additional use of force was plainly unnecessary and thus violated clearly established law.

### 2. Defendants Found Liable for Failure to Intervene and Supervisory Liability

#### a) Defendants MacNear, Gherardi, and Dunn

The court denies qualified immunity to Defendants MacNear, Gherardi, and Dunn.  The jury found that MacNear, Gherardi, and Dunn were liable for failing to intervene in another Defendant's use of excessive force against Plaintiff.  Based on their testimony, these three Defendants appear to have been in the house during the altercation between Plaintiff, Czulada, and Kurian.  It is a reasonable inference, then, that the jury found them liable for failing to intervene in Czulada's use of excessive force against Plaintiff.  It is reasonable to infer as well that the jury found that these three Defendants also observed Defendant Kurian choking Plaintiff with his baton and failed to intervene.  Regarding MacNear, the jury found that he was also liable for authorizing, ordering, or helping Czulada, Kurian, Reo, and/or Failla to use excessive force against Plaintiff.

The Court credits the jury's determination that there was a reasonable opportunity for MacNear, Gherardi, and Dunn to intervene, as that is an element reflected in their verdict.  *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").  While it may be difficult to conclude that there was a chance to intervene to prevent one punch, in the case of Czulada's use of excessive force, the Court cannot conclude that the jury was incorrect as a matter of law in finding that there was an opportunity to intervene in at least one of the excessive force incidents that the jury determined took place inside the

house, especially because Plaintiff testified that Kurian held the baton to his throat long enough for Kurian to tell Plaintiff to relax multiple times. (1/27/16 Tr. 46–48, Jackson.) Similarly, assuming at this stage that there is sufficient evidence to support the jury's finding of supervisory liability as to MacNear, he is not entitled to qualified immunity for ordering, helping, or authorizing a use of force that violated clearly established law.

b)   Defendant Braumann

The Court also denies qualified immunity to Defendant Braumann. The evidence shows that he arrived with Kurian, and placed himself in the house around the time of the Czulada-Plaintiff-Kurian incident. (2/2/16 Tr. 11–13, Braumann.) Braumann testified that entered the house with Kurian and that he saw Czulada inside the house. (2/2/16 Tr. 13–14, Braumann.) The jury's finding that he failed to intervene in the use of excessive force by at least one Defendant could be premised on a finding that Braumann lied about seeing the Plaintiff-Czulada-Kurian incident while inside the house. If Braumann did see either Czulada or Kurian use excessive force on Plaintiff and failed to intervene, despite having the opportunity to do so—findings that are reflected in the jury's verdict—then he would not be entitled to qualified immunity. Defendants, therefore, have failed to meet their burden of demonstrating that Braumann is entitled to qualified immunity.[31]

---

[31] This conclusion leaves open the question of whether there was sufficient evidence of Braumann's liability for excessive force. Braumann testified that he did not see Plaintiff inside the house, (2/2/16 Tr. 17–18, Braumann), and Plaintiff admitted that he did not remember Braumann from the scene (and only sued him after finding out that Braumann was at the scene). (1/27/16 Tr. 142–43, Jackson). In the Special Verdict Sheet, the jury found that Braumann did not believe that Plaintiff had committed any of the four criminal acts that the jury found other Defendants believed or saw. (Special Verdict Sheet, at 4.)

### c) Defendant Boneta

Defendant Boneta is not entitled to qualified immunity as well. Based on Boneta's own testimony, he was in a position to have seen Reo hit Plaintiff in the back of the head. (2/1/16 Tr. 10–11, Boneta.) The jury's finding that Boneta believed he saw Plaintiff shove Reo supports a finding that Boneta was present when Reo subjected Plaintiff to excessive force. Since it is a reasonable inference that the jury found that Boneta observed Reo hit Plaintiff unprovoked in the back of the head, which was, as discussed, a clearly established constitutional violation, Boneta is not entitled to qualified immunity. Once again, the Court credits the jury's determination that Boneta had an opportunity to intervene and did not do so, because the evidence does not negate such a finding.

### d) Defendants Deferrari and Heerey

The Court also denies qualified immunity to Defendants Deferrari and Heerey. The jury found that Deferrari and Heerey failed to intervene to prevent the use of excessive force against Plaintiff. Deferrari testified to seeing several officers with "their ASPs out hitting [Plaintiff] in the legs trying to get him down to the ground." (2/2/16 Tr. 131–32, Deferrari.) Heerey testified that he jumped in to physically assist in restraining and handcuffing Plaintiff. (1/29/16 Tr. 125–28, Heerey.) Thus, it is reasonable to infer that the jury found that both officers either observed Plaintiff being beaten with batons while he was not resisting, and/or observed Failla use pepper spray on Plaintiff after he was handcuffed—either of which, as previously discussed, would have been a clearly established constitutional violation that Deferrari and Heerey failed to intervene in, despite having the opportunity to do so. Accordingly, neither Deferrari nor Heerey are entitled to qualified immunity.

e)     Defendant Tellado

The Court does not find that Tellado is entitled to qualified immunity as a matter of law.[32]  The jury found that he failed to intervene to prevent the use of excessive force against Plaintiff.  This verdict could have been based on a finding that Tellado arrived in the street in time to observe officers beating Plaintiff with their batons, or that he arrived in time to observe Failla pepper spray Plaintiff, and did not intervene with respect to either conduct.  At a minimum, if Tellado observed Failla pepper-spraying Plaintiff while Plaintiff was handcuffed, and as the jury found, had an opportunity to prevent it, he would not be entitled to qualified immunity.[33]

**CONCLUSION**

For the foregoing reasons, Defendants Deferrari, Reo, Heerey, MacNear, and Boneta are entitled to qualified immunity regarding the false arrest verdicts against them, and those verdicts, both for liability and for damages, must be overturned.  However, Defendants Failla and Tellado

---

[32] This ruling leaves open the possibility that Tellado will be able to successfully challenge the sufficiency of the evidence with respect to the findings of liability against him.

[33] As a final consideration, the Court takes notice of the fact that courts in this district have observed that when a jury has awarded punitive damages, an assertion of qualified immunity "seem[s] especially hollow."  *Harewood v. Braithwaite*, 64 F. Supp. 3d 384, 401 (E.D.N.Y. 2014), *appeal withdrawn* (April 2, 2015) (quoting *Adedeji v. Hoder*, 935 F. Supp. 2d 557, 571 (E.D.N.Y. 2013)).  "The jury having found that [the defendant's] conduct was malicious or wanton cuts deeply against [the defendant's] argument that the Court should find him immune on the ground that he acted in [an] objectively reasonable manner."  *Id.  See also Robertson v. Sullivan*, 07-CV-1416, 2010 WL 1930658, at *4 (E.D.N.Y. 2010) ("The jury having found that each defendant deserved to be punished for engaging in such behavior, it is difficult to fathom the defendants' post-verdict claim that [the Court] should find them immune on the ground that [they] acted in an objectively reasonable manner.").  The verdict sheet in this case did not specify whether punitive damages were for Defendants' false arrest or excessive force liability, or both.  Although the Court, in light of the special verdict sheet, is compelled to grant qualified immunity to some Defendants on the false arrest claim notwithstanding the jury's punitive damages award, the Court finds that that award reinforces the Court's denial of qualified immunity on the excessive force claim.

are not entitled to qualified immunity for the false arrest verdict against them, and none of the Defendants who were found liable for excessive force are entitled to qualified immunity for the excessive force verdicts against them. Defendants shall have 28 days after the issuance of this Order in which to file their motion for judgment as a matter of law under FRCP Rule 50, or alternatively for a new trial under FRCP Rule 59, as to the remaining Defendants.

SO ORDERED.

*/s/ Pamela K. Chen* _____
Pamela K. Chen
United States District Judge

Dated: February 15, 2017
       Brooklyn, New York