UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
LARRY JACKSON,

                              Plaintiff,

                 - against -

JESUS TELLADO, STANLEY MACNEAR,
JOHN CZULADA, JAMES T. GHERARDI,
RYANN DUNN, ROBERT J. DEFERRARI,
KENNETH BRAUMANN, BEN KURIAN,
PETER BONETA, THOMAS E. REO,
MICHAEL FAILLA, AND BRIAN E.
HEEREY,

                              Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
11-CV-3028 (PKC) (SMG)

PAMELA K. CHEN, United States District Judge:

On February 3, 2016, after a seven-day trial, the jury returned a verdict in favor of Plaintiff

Larry Jackson, a New York City Police Department ("NYPD") officer, on his claims under 42

U.S.C. § 1983 against fellow NYPD Officers Jesus Tellado, Stanley MacNear, John Czulada,

James Gherardi, Ryann Dunn, Robert Deferrari, Kenneth Braumann, Ben Kurian, Peter Boneta,

Thomas Reo, Michael Failla, and Brian Heerey (collectively, "Defendants"). The jury determined

that Plaintiff had been falsely arrested and subjected to excessive force, and awarded Plaintiff

$12,500,000 in compensatory damages and a total of $2,675,000 in punitive damages, comprised

of varying amounts against each of the Defendants. At the request of defense counsel, the parties

were permitted to brief Defendants' post-trial motions in two phases, first for qualified immunity

and then for judgment as a matter of law or a new trial. On February 15, 2017, the Court issued

its decision on Defendants' qualified immunity motion, which resulted in the granting of qualified

immunity as to certain Defendants on the false arrest verdicts. (*See* Dkt. 111.)

Pending before the Court is Defendants' motion seeking judgment as a matter of law under Federal Rule of Civil Procedure 50 ("Rule 50") as to ten of the twelve Defendants and a new trial as to the two other Defendants under Federal Rule of Civil Procedure Rule 59 ("Rule 59") ("Rule 50/59 motion"). For the reasons set forth below, the Court grants in part and denies in part Defendants' motions. The Court also directs the parties to submit briefing, pursuant to the schedule set forth *infra*, on whether the Court should grant remittitur with respect to the jury's compensatory and punitive damages awards.

## BACKGROUND

### I.     PROCEDURAL HISTORY

On June 24, 2011, Plaintiff filed his complaint against the City of New York and twenty John Doe defendants. (Dkt. 1.) After initial discovery, Plaintiff filed an Amended Complaint on March 1, 2013, naming the Defendants, and adding Officer Patrick D'Onofrio and Detective Robert Russo. (Dkt. 30.) Defendants moved for summary judgment on August 20, 2013 (Dkt. 55), and the Court granted that motion in part on March 17, 2014, dismissing Officer D'Onofrio and the City of New York, (Dkt 67). The parties proceeded to trial on January 25, 2016, but during trial, stipulated to the dismissal of Detective Russo (Dkt. 92), which the Court so ordered the next day.

After seven days of trial, the jury returned a verdict finding that three Defendants—Deferrari, Reo, and Heerey—were personally involved in falsely arresting Jackson, that four Defendants—Tellado, MacNear, Boneta, and Failla—failed to intervene to prevent Plaintiff Jackson's false arrest, and that one Defendant—MacNear—was liable as a supervisory officer for Plaintiff's false arrest. (Verdict Sheet, Dkt. 95, at 1-2.)

With respect to the excessive force claim, the jury found that four Defendants—Czulada, Kurian, Reo, and Failla—were personally involved in subjecting Plaintiff to excessive force, that eight Defendants—Tellado, MacNear, Gherardi, Dunn, Deferrari, Braumann, Boneta, and Heerey—had failed to intervene to prevent Jackson from being subjected to excessive force, and that one Defendant—MacNear—was liable as a supervisory officer based on Plaintiff having been subjected to excessive force. (*Id.* at 3-4.) Every Defendant who went to trial was found liable on at least one claim. The jury awarded compensatory damages in a lump-sum amount of $12,500,000, as to which all Defendants are jointly and severally liable, and found Defendants liable for a total of $2,675,000 in punitive damages, with specific amounts of punitive damages being assessed against each liable Defendant.[1]

On February 15, 2017, the Court issued a Memorandum & Opinion ("February 15 Decision") holding that Defendants Deferrari, Reo, Heerey, MacNear, and Boneta were entitled to qualified immunity regarding the false arrest verdicts against them. (Dkt. 111.) The Court also found that Defendants Failla and Tellado were not entitled to qualified immunity for the false arrest verdicts against them[2], and that none of the Defendants who were found liable for excessive force were entitled to qualified immunity for the excessive force verdicts against them. (*Id.*)

---

[1] The jury awarded $300,000 in punitive damages against Tellado; $300,000 against MacNear; $275,000 against Czulada; $150,000 against Gherardi; $150,000 against Dunn; $250,000 against Deferrari; $50,000 against Braumann; $400,000 against Kurian; $125,000 against Boneta; $275,000 against Reo; $350,000 against Failla; and $50,000 against Heerey, for a total of $2,675,000 in punitive damages. (Verdict Sheet, Dkt. 95.)

[2] However, the Court suggested that the false arrest verdicts against Failla and Tellado nonetheless might not withstand a Rule 50 motion. (*See* Dkt. 111, at 33, n.22.) ("As with Failla, this ruling does not resolve the question of whether the evidence was sufficient to support the jury's failure to intervene verdict as to Tellado. Indeed, the Court notes that the evidence supporting Tellado's liability is thin . . .").)

On March 31, 2017, Defendants filed their Rule 50/59 motion. (Defs.' Rule 50/59 Mot. ("Defs.' Mot."), Dkt. 113.) Plaintiff filed his opposition on May 13, 2017 (Pl. Opp'n., Dkt. 117), and Defendants replied on May 24, 2017, (Defs.' Reply, Dkt. 118).

## II. RELEVANT FACTS

The Court assumes the parties' familiarity with the trial record and also incorporates herein the Relevant Facts section from its February 15 Decision on qualified immunity. (*See* Dkt. 111, at 2–15.)

## DISCUSSION

## I. JUDGMENT AS A MATTER OF LAW UNDER RULE 50

### A. Legal Standard

Rule 50 "generally imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting Fed. R. Civ. P. 50(a)). In making this determination, the court should review the record as a whole but "must draw all reasonable inferences in favor of the nonmoving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).

In addition, where, as here, "the jury has deliberated in the case and actually returned its verdict in favor of the non-movant," the moving party's burden is especially heavy. *Cash*, 654 F.3d at 333 (internal citations and quotations omitted). The court must, in these circumstances, "give deference to all credibility determinations and reasonable inferences of the jury" and may set aside a verdict only if there is "such a complete absence of evidence supporting the verdict that

the jury's findings could only have been the result of sheer surmise or conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008) (internal quotation marks and citation omitted); *see also Claudio v. Mattituck–Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118, 132 (E.D.N.Y. 2013) ("Generally, a court reviewing such a motion must defer to all credibility determinations and reasonable inferences that the jury may have drawn at trial."). Put another way, a court may grant a Rule 50 motion only if, after "viewing the evidence in the light most favorable to the non-movant, [it] concludes that a reasonable juror would have been compelled to accept the view of the moving party." *Cash*, 654 F.3d at 333 (quotation marks and citation omitted).

### B. Defendants Failla and Tellado Are Entitled to Judgment as a Matter of Law With Respect to Their Verdicts for Failure to Intervene in Plaintiff's False Arrest

Defendants argue that Failla and Tellado are entitled to judgment as a matter of law with respect to the jury's verdicts finding them liable for failing to intervene in Plaintiff's arrest. Defendants maintain, *inter alia*, that because both officers arrived at the scene late, they had no knowledge or reason to believe that probable cause to arrest Plaintiff was lacking, and that therefore, these officers could not have been found liable for failing to intervene. (Defs.' Mot., Dkt. 115, at 11-12.) The Court agrees.

A claim for false arrest "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Morris v. Silvestre*, 604 Fed. App'x 22, 24 (2d Cir. 2015) (summary order) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). Probable cause to arrest exists where the arresting officers have "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is

committing a crime." *Jenkins v. City of New York*, 478 F.3d 76, 84–85 (2d Cir. 2007) (quoting *Weyant*, 101 F.3d at 852). Probable cause must be evaluated based on the "totality of the circumstances," *United States v. Thomas*, 788 F.3d 345, 350 (2d Cir. 2015), including the facts available to the officer or officers at the time of the arrest, *Jenkins*, 478 F.3d at 87.

"Liability may attach where an officer fails to intervene, but observes or has reason to know . . . that a citizen has been unjustifiably arrested," provided that the officer "had a reasonable opportunity to intervene to prevent the violation from happening." *Sanabria v. Tezlof*, 11-CV-6578, 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016); *see also Morris v. City of New York*, 14-CV-1749, 2015 WL 1914906, at *5 (E.D.N.Y. Apr. 27, 2015) (describing the "affirmative duty [of law enforcement officials] to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence" if there was a realistic opportunity to intervene). Additionally, a supervisor may be held liable if he is a "direct participant" in a constitutional violation such as a false arrest, meaning that he "authorizes, orders, or helps others to do the unlawful acts, even if he . . . does not commit the acts personally." *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014).

### 1. Defendant Failla – Failure to Intervene in Plaintiff's False Arrest

The Court finds that Defendant Failla is entitled to judgment as a matter of law. It is undisputed that Failla arrived after the incident had spilled out into the street. At that time, Failla saw Plaintiff standing in the middle of the street with a circle of police officers around him. (1/29/16 Tr. 156–58, Failla.)[3] He saw Plaintiff "flailing and punching with closed fists at the other officers." (*Id.*) Failla was trying to "assess the whole situation." (*Id.* at 159.) He did not see "anybody with anything in their hand." (*Id.*) At some point thereafter, Defendant Heerey,

---

[3] The pages cited in the transcripts refer to internal pagination.

Detective Russo, and a "couple of other police officers" brought Plaintiff to the ground. (*Id.* at 160–61.) Plaintiff was still "rolling and flailing his arms," so Failla, rather than help restrain Plaintiff, "thought it better to spray [Plaintiff] in the face with pepper spray" in order to stop Plaintiff from "resisting arrest." (*Id.* at 161.) At that point, "they were able to get [Plaintiff] handcuffed and then he [lay] . . . on the ground for a minute." (*Id.* at 163.)

Even though there was sufficient evidence for the jury to find that Failla was guilty of excessive force, as discussed in Section C, *infra*, the evidence was insufficient to find that Failla knew or had reason to know that there was no probable cause to arrest Plaintiff. Because of his late arrival to the scene, Failla missed the entire interaction between Plaintiff and the officers inside the house, which led to Plaintiff being arrested and escorted outside by the officers in custody. Failla testified that he did not know what had happened before he arrived, *id.* at 159, and did not know why Plaintiff was being arrested, *id.* at 161 ("I can't testify to arrest because . . . I don't know exactly what happened on the scene[.]"); (*id.* at 164) ("Again, like I previously testified, I didn't know at the time what he was being apprehended for.").) Relatedly, there was no evidence at trial that the other officers said anything to Failla suggesting that there was no probable cause for Plaintiff's arrest. Furthermore, the jury's answers in the Special Verdict Sheet contradict its verdict finding that Failla was liable for false arrest. (Special Verdict Sheet, Dkt. 99, at 6.) Although the jury found that Failla did not believe that Plaintiff had assaulted Czulada, shoved Reo, or thrown punches at officers in the street, it did find that Failla believed that Plaintiff was resisting arrest while out in the street. (*Id.*)

Here, in light of the evidence presented at the trial and the jury's finding that Failla believed that Plaintiff was resisting arrest, a "reasonable juror" would have been compelled to accept Defendants' view that Failla: (1) had no knowledge or reason to know that the Defendant officers

lacked probable cause to arrest Plaintiff; and (2) knew or believed, at a minimum, that Plaintiff was resisting arrest while outside the house and that Plaintiff's arrest was, therefore, legal, *i.e.*, supported by probable cause. *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (citing *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir.1993)). Accordingly, the Court finds that there was insufficient evidence for the jury to find Failla liable for failing to intervene to prevent Plaintiff's false arrest.

### 2. **Defendant Tellado – Failure to Intervene in Plaintiff's False Arrest**

The Court also finds that Tellado is entitled to judgment as a matter of law. The evidence introduced at trial established that Tellado arrived at the scene at the end of the altercation. Tellado testified that, upon his arrival, he entered the house and observed two handcuffed individuals, but did not see Plaintiff inside. (2/1/16 Tr. 178, Tellado.) Tellado then left the house because the situation was "calming down." (*Id.* at 180.) When Tellado walked outside, he saw "a certain commotion" with three or four officers struggling with somebody who was lying on the ground handcuffed. (*Id.* at 183–84.) That was the first time he saw Plaintiff at the scene. (*Id.* 178, 183-84.) At some point, an officer told Tellado that "the reason [Plaintiff] was in handcuffs is because he hit a police officer." (*Id.* at 187.) After Plaintiff told Tellado that he (Plaintiff) was a police officer, Tellado "asked the officers to assist [Plaintiff] and lift him up on his own two feet", and "asked them to remove the cuffs." (*Id.* at 190.) Plaintiff's testimony partially corroborates Tellado's testimony: Plaintiff testified that the first time he saw Tellado was after Plaintiff had been handcuffed and pepper-sprayed, and that after Tellado saw Plaintiff's police identification, he ordered that Plaintiff be released. (1/27/16 Tr. 64-67, Jackson.) There was no testimony or other evidence indicating that Tellado witnessed anything that happened inside the house or Plaintiff's arrest and handcuffing outside the house, or that Tellado was informed of circumstances negating probable cause to arrest Plaintiff.

Based on the evidence adduced at trial, no reasonable jury could have concluded that Tellado knew or had reason to believe that Plaintiff's arrest lacked probable cause and that he (Tellado), therefore, should have intervened to prevent the arrest.[4]  Nor could a reasonable juror have found that Tellado was liable in his supervisory capacity for the arrest, given the absence of evidence that Tellado was a "direct or indirect participant" in the arrest.  *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (holding that an officer committing false arrest must have direct participation, such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts").

In sum, the Court finds that Defendants Failla and Tellado are entitled to judgment as a matter of law in their favor with respect to Plaintiff's claims of failure to intervene to prevent false arrest.

### C. Defendants Reo and Failla Are Not Entitled to Judgment as a Matter of Law With Respect to Their Verdicts for Use of Excessive Force

Defendants argue that there is insufficient evidence in the record to sustain a verdict against Defendants Reo and Failla for excessive force.  (Defs.' Mot., at 13.)  The Court disagrees.

---

[4] Although, as indicated in the Special Verdict Sheet, the jury found that Tellado did not believe that Plaintiff had assaulted Czulada, shoved Reo, thrown punches at officers in the street, or resisted arrest (Special Verdict Sheet, at 1), these findings do not equal a finding that Tellado knew, or even should have known, that there was *no* probable cause to arrest Plaintiff.  Indeed, the jury's findings are consistent with the conclusion that Tellado, having arrived on the scene late, simply had no idea if there was probable cause to arrest Plaintiff—which is not the same as Tellado knowing that, in fact, there was no probable cause, as required to trigger a duty to intervene.  *Sanabria*, 2016 WL 4371750, at *5 ("Liability may attach where an officer fails to intervene, but observes or has reason to know . . . that a citizen has been unjustifiably arrested[.]").  Furthermore, even though the jury's finding that Tellado did not believe that Plaintiff had assaulted Czulada suggests that it did not credit Tellado's testimony that he was told that Plaintiff had punched an officer, this finding does not eliminate the possibility that the jury credited Tellado's testimony, but concluded that Tellado did not know or believe that the officer whom Plaintiff had allegedly punched was Czulada.

To prevail on a § 1983 claim of excessive force, a plaintiff must show that the defendant used physical force against him that was objectively unreasonable in the circumstances. *Hayes v. Cnty. of Sullivan*, 853 F. Supp. 2d 400, 430 (S.D.N.Y. 2012) (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)). To determine whether the use of force was unreasonable, a court must consider the specific facts in each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Hayes v. N.Y.C. Police Dep't*, 212 Fed. App'x 60, 61-62 (2d Cir. 2007). When deciding whether the use of force was reasonable in a given case, a court "[must] allow[ ] for the fact that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). However, "[o]fficers may not . . . gratuitously inflict pain in a manner that is not a reasonable response to the circumstances." *Diaz v. City of N.Y.*, 00–CV–2944, 2006 WL 3833164, at *6 (E.D.N.Y. Dec. 29, 2006) (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124 (2d Cir. 2004)).

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). To establish a claim for excessive force under a failure to intervene theory, a plaintiff must prove that the officer (1) observed, or had reason to know of, the alleged violation, and (2) there was a realistic opportunity to intervene to prevent the harm from occurring. *Smith v. P.O. Canine Dog Chas*, 02-CV-6240, 2004 WL 2202564, at *9 (S.D.N.Y. Sept. 28, 2004). Whether "an officer . . . was capable of preventing the harm being caused by another officer is an issue of fact for the jury,

unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.* (quoting *Anderson*, 17 F.3d at 557).

### 1.  **Defendant Reo – Use of Excessive Force**

Defendants argue that the evidence was insufficient to support the jury's finding that Defendant Reo used excessive force as alleged by Plaintiff, namely, by striking Plaintiff in the back of the head with a baton in response to Plaintiff complaining about the officers' treatment of one of Plaintiff's party guests.  Defendants explain that Reo was outside Plaintiff's house during the entire encounter and therefore could not have hit Plaintiff in the back of his head inside the house, as alleged.  Defendants contend that the evidence shows that Reo stood on the sidewalk, by the base of the driveway, to prevent anyone from "going towards the house[,]" and that Reo's interaction with Plaintiff occurred outside on the sidewalk.  (Defs.' Mot., at 14.)

As an initial matter, the Court observes that even if Reo was outside, his testimony places him near the entrance to the house, where the excessive force occurred.  (1/29/16 Tr. 179, Reo) ("I attempted to get inside. The house was just filled with people. More people were trying to come inside, and I thought it would be better to stay outside and make sure nobody else entered.").  In fact, Reo admits that he could see into the house from the spot where he was standing.  (*Id.* at 180.) Reo's testimony suggests that even if he was standing by the driveway, he had to be close enough to the door to effectively block people from getting into the house.

Reo and Plaintiff offered differing accounts of what occurred around the time of the alleged use of excessive force, although their stories start off the same.  Reo and Plaintiff both testified about Plaintiff's reaction to one of Plaintiff's party guests, Taimar Bonaparte, being arrested and removed from the house.  Reo testified that he heard Plaintiff yelling, "You all can't fucking do that, you all can't do that," in the direction of two officers who were taking a shirtless man in

handcuffs out of the house.  (*Id.* at 182.)  Plaintiff testified that, while standing near the doorway to his home, he saw two officers taking Bonaparte out of the house and verbally protested the arrest.  (1/27/16 Tr. 54-55, Jackson.)

Plaintiff's and Reo's stories then diverge widely.  Reo testified that when Plaintiff tried to enter the house, Reo would not let him through.  (1/29/16 Tr. 182, Reo.)  Reo told Plaintiff, who was trying to push past him, "You're not getting by me."  (*Id.*)  Reo testified that Plaintiff "g[ave] [Reo] a two-handed shove to [his] chest."  (*Id.* at 182-83)  At that point, "two, maybe three officers grabbed [Plaintiff] and tried to place him in handcuffs."  (*Id.* at 185.)  When Reo regained his footing, he attempted to arrest Plaintiff for having shoved him.  (*Id.* at 185–86.)  Reo approached and "tried to grab [Plaintiff's] arm" and "tried to grab a leg."  (*Id.* at 190.)  Plaintiff "went down to the ground."  (*Id.* at 190–91.)  Reo testified that he was not inside the house and did not hit Plaintiff with his baton.  (*Id.* at 191.)

Plaintiff testified that right after he protested Bonaparte's arrest by the two officers, he was "hit in the back of the head with something" by someone he could not see.  (1/27/16 Tr. 55, Jackson.)  Plaintiff stated that he was standing outside, near the doorway to the house at the time that he was hit.  (*Id.*)  In response to being hit, Plaintiff moved in the direction of the street and knelt down on the curb.  Plaintiff testified that officers then started hitting him with batons in the back of his legs and on his back, hitting him "upward of 20, 30 times."  (*Id.* at 57.)  Plaintiff, himself an NYPD officer, could tell by the pants and shoes of the people hitting him that they were officers.  (*Id.*)  Plaintiff laid on his stomach in the street while a semicircle of officers proceeded to hit him with batons and to roll the batons over the backs of his ankles.  (*Id.* at 58–60.)  Two officers were positioned with their knees on his back, while the officers tried to get his arms.  (*Id.* at 60.)

Despite the differing accounts, the Court finds that there was sufficient evidence for the jury to find that Reo used excessive force against Plaintiff. The jury was free to accept or reject, in whole or part, either Reo's or Plaintiff's testimony. *Haywood v. Koehler,* 78 F.3d 101, 105 (2d Cir. 1996) ("[I]n most trials . . . the jurors [a]re not required to accept the entirety of either side's account, but [a]re free to accept bits of testimony from several witnesses and to make reasonable inferences from whatever testimony they credit[ ]."); *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) ("The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." ); (*see* Jury Instructions, Dkt. 97, at 5-6 (instructing jury that they may accept or reject, in whole or part, any witness's testimony)). Indeed, even if the jury credited all of Reo's testimony, except his denial about hitting Plaintiff in the head, it reasonably could have found that Reo struck Plaintiff in the back of the head after Plaintiff protested the officers' treatment of Bonaparte. Although Plaintiff did not see who struck him, Reo placed himself next to or near Plaintiff at the time Bonaparte was brought outside, and also testified about hearing Plaintiff's protest of the officers' treatment of Bonaparte.

Additionally, the jury could have found that Reo was one of the officers who beat Plaintiff with their batons after Plaintiff was on the ground in the street. Although Reo testified that he merely watched the situation in the street (1/29/16 Tr. 191, Reo)[5], the jury could have rejected that

---

[5]  As reflected in the Special Verdict Sheet, the jury found that Reo believed that Plaintiff was throwing punches at officers in the street and resisting arrest. (Special Verdict Sheet, at 6.) While this finding suggests that the jury may have credited Reo's claim that he only watched, and did not participate, in the beating of Plaintiff on the ground, it does not undermine their finding of excessive force as to Reo. The jury reasonably could have found that Reo both saw Plaintiff resisting arrest and then joined the others in beating him—the two are not mutually exclusive—or even that *because* Reo saw Plaintiff resisting arrest, Reo decided to join the beating. Although the jury could have found that Reo's belief that Plaintiff was throwing punches could have justified the degree of force used by him or others, the jury was also free to reject that conclusion based on its assessment of all of the evidence.

testimony, especially if it found that Reo had hit Plaintiff in the back of the head with his baton only moments earlier.

In sum, the evidence here was sufficient for the jury to find that Reo had used excessive force against Plaintiff.

## 2. **Defendant Failla – Use of Excessive Force**

Defendants also argue that there is insufficient evidence that Defendant Failla used excessive force on Plaintiff, given that Plaintiff could not identify the officer who pepper-sprayed him. (Defs.' Mot., at 16-17.) Defendants note that there were "many officers" trying to apprehend Plaintiff and even though "Failla is pretty distinctive in appearance," Plaintiff "did not provide any characteristics of the person who allegedly pepper-sprayed him." (*Id.* at 18.)

Defendants' argument ignores the most damning evidence: Failla *admitted* to pepper-spraying Plaintiff. Failla testified at trial that, instead of helping his fellow officers physically restrain Plaintiff, as Plaintiff was resisting arrest, Failla "thought it better to spray [Plaintiff] in the face with pepper spray." (1/29/16 Tr. 161, Failla.) Plaintiff testified that he was handcuffed at the time that he was pepper-sprayed. (1/27/16 Tr. 62, Jackson) (stating that after he was handcuffed, he said "Guys, this was unnecessary . . . I'm a fellow cop, too" and "then they pepper sprayed me"). Plaintiff also testified that he willingly allowed himself to be handcuffed, and was not resisting the officers at that point. (*Id.* at 62) (stating that he "stuck [his] arm out" and "let them put the cuffs [on] because "I figured it would be over and we can straighten this out"). Furthermore, despite being trained to provide water to persons who have been pepper-sprayed, so that they can wash out their eyes, Failla did not do so after pepper-spraying Plaintiff. This was because Failla "didn't have [it] at the scene" and he knew an ambulance would be going to the stationhouse. (1/29/16 Tr. 167, Failla.) Instead, Failla walked away from Plaintiff "shaking [his]

head in disgust" because he had "never seen an individual who calls himself a police officer act that way to on-duty police officers."  (*Id.*)

Based on the evidence introduced at trial, and notwithstanding conflicts in that evidence, it would have been reasonable for the jury to find that Failla gratuitously pepper-sprayed Plaintiff after Plaintiff had allowed himself to be handcuffed and/or in response to Plaintiff's comment about the arrest being unnecessary.  It was "fully within the jury's fact-finding discretion to credit portions" of Plaintiff's testimony, particularly those portions regarding the use of pepper spray that were corroborated by Failla.  *Hoyte v. Nat'l R.R. Passenger Corp.,* 04–CV–5297 (GEL), 2006 WL 2053383, at *3 n.2 (S.D.N.Y. July 24, 2006).  As the Second Circuit has recognized, "infliction of pepper spray" may have "a variety of incapacitating and painful effects, and as such, its use constitutes a significant degree of force" that "should not be used lightly or gratuitously" against those who are "complying with police commands or otherwise pose[ ] no immediate threat." *Tracy v. Freshwater*, 623 F.3d 90, 98–99 (2d Cir. 2010) (internal citation omitted).  Accordingly, the jury reasonably could have concluded that Failla's use of pepper spray against Plaintiff, who was already handcuffed and restrained, was an "unnecessary and wanton infliction of pain." *See Alston v. Daniels*, 15–CV–669 (CSH), 2015 WL 7257896, at *4 (D. Conn. Nov. 17, 2015).

The Court, therefore, finds that the jury's verdicts against Defendants Reo and Failla for use of excessive force stand.

### D.  Defendants MacNear, Gherardi, Dunn, Tellado, Braumann, Boneta, Heerey, and Deferrari are Not Entitled to Judgment as a Matter of Law on the Verdicts Against Them for Failing to Intervene in the Use of Excessive Force

#### 1.  The Evidence Was Sufficient for the Jury to Find that Defendants MacNear, Gherardi, and Dunn Failed to Intervene in the Use of Excessive Force

Defendants argue that there is no evidence that Defendants MacNear, Gherardi, and Dunn observed force being used against Plaintiff or that they had a real opportunity to prevent harm to

Plaintiff.  (Defs.' Mot., at 19-20.)  The Court, however, finds that there was sufficient evidence for the jury to find that MacNear, Gherardi, and Dunn failed to intervene in the use of excessive force against Plaintiff.  Based on the testimony of the three officers, they were inside the house during the general time period in which Czulada punched Plaintiff and Kurian choked Plaintiff with his baton:

- MacNear testified that he entered the house with Czulada (1/28/16, Tr. 79, MacNear), noticed an ongoing fight, requested that additional units come to the location (*Id.* at 84–85), and then observed a physical confrontation between Plaintiff and Czulada, in which Plaintiff struck Czulada in the head.  (*Id.* at 100, 115.)

- Gherardi heard MacNear yelling over the radio for additional units  (2/2/16 Tr. 185, Gherardi), arrived at the scene and entered the house at the same time as Dunn (*id.* at 187), observed Plaintiff "striking" Czulada "in the face" with "hard" force (*id.* at 196), "placed [his] hand" on Plaintiff's shoulder to get him to move away from Czulada (*id.* at 191), and then turned away from the confrontation to help clear the house,  (*id.* at 194-95.)

- Dunn entered the house with Gherardi (2/1/16 Tr. 26, 29-30, Dunn.), observed Plaintiff throw punches at Czulada (*id.* at 30, 33), and then "got behind [Plaintiff][,] . . . put [his] arms around [Plaintiff's]. . . waistline and just leaned backwards, to try to get him off Officer Czulada," (*id.* at 36.)  Dunn and Plaintiff "fell over the couch." (*Id.* at 42.)  At that point, Dunn "scurried out from underneath" Plaintiff, and "that was that."  (*Id.*)

Plaintiff, however, testified to a different account of the events, including that it was Czulada who threw the first punch at Plaintiff and that after Czulada punched Plaintiff in the face, Plaintiff "grabbed [Czulada] by his shoulders" to prevent Czulada from hitting him again.  (1/27/16 Tr. 43, Jackson.)

As previously discussed, the existence of conflicting evidence, in itself, does not make the jury's verdict unreasonable. Although the defense may have presented more witnesses who testified to their version of the facts, the jury was instructed that its verdict was not to be based on which party brought "the greater number of witnesses, or present[ed] the greater quantity of evidence." (Jury Instructions, Dkt. 97, at 4.) Rather, its verdict was to be based on the "witnesses and evidence" that "appeal[ed] to [the jury's] minds as being most accurate and trustworthy." (*Id.*) The Court cannot substitute its judgment for the jury regarding who struck whom and must defer to the jury's fact-finding determination about what took place inside the home. *Piesco*, 12 F.3d at 343 ("It was the responsibility of the jury, not the court, to determine whether . . . trial testimony should be believed."). Thus, even if the jury based its determination of what occurred inside Plaintiff's house—*e.g.*, that Czulada or any other officer used excessive force against Plaintiff—solely on Plaintiff's testimony[6], that would be sufficient to sustain its finding that Defendants MacNear, Gherardi, and Dunn had a duty to intervene to prevent the use of excessive force.

Defendants also argue that to the extent the jury found that Kurian engaged in an excessive use of force by choking Plaintiff with his baton, MacNear, Gherardi, and Dunn could not have been held liable for not intervening because the evidence was insufficient to demonstrate that they had a reasonable opportunity to do so. Yet the Court cannot conclude that the jury was incorrect, as a matter of law, in finding that these defendants had a reasonable opportunity to intervene in the choking incident, especially because Plaintiff testified that Kurian held the baton to his throat long enough for Kurian to tell Plaintiff to relax multiple times. (1/27/16 Tr. 46–48, Jackson.)

---

[6] The Court notes that other witnesses presented by Plaintiff testified that officers, presumably Czulada and Kurian, punched and choked Plaintiff with a baton inside the house, as discussed below. (*See e.g.*, 1/26/16 Tr. 108-112, Strong; 1/29/16 Tr. 54, Murphy.)

Furthermore, there was considerable evidence, including testimony and photographs, describing the confined area in which these events occurred, which resulted in individuals falling atop one another and furniture being toppled. (*See*, *e.g.*, 1/27/16 Tr. 48-50, Jackson.) The Court, therefore, finds that there was sufficient evidence upon which the jury reasonably could have concluded that MacNear, Gherardi, and Dunn had a reasonable opportunity to intervene in Kurian's use of force against Plaintiff. *See Anderson v. Branen*, 17 F.3d at 557 ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

### 2. The Evidence Was Sufficient for the Jury to Find that Defendants Tellado and Braumann Failed to Intervene in the Use of Excessive Force

Defendants argue that Defendants Tellado and Braumann did not observe any use of force against Plaintiff and, therefore, could not have failed to intervene to prevent the use of force. (Defs.' Mot., at 21-22.) The Court disagrees.

Regarding Tellado, the jury could have found that he failed to intervene to prevent the excessive force for two reasons. First, the jury could have based its verdict on a finding that Tellado arrived in the street in time to observe officers beating Plaintiff with their batons while Plaintiff was on the ground in the street. Charlene Strong, Plaintiff's wife, testified that she saw multiple officers in a circle around Plaintiff with their hands linked together, and that they were hitting him in the head, back, and side with their batons. (1/26/16 Tr. 128-29, Strong.) Similarly, Marilyn Murphy, Plaintiff's sister-in-law, testified that a "whole swarm of police officers . . . were beating [Plaintiff] down" and "wouldn't stop beating on [him]" with billy clubs. (1/29/16 Tr. 57-58, Murphy.) Tellado's own testimony, that he saw Plaintiff on the ground outside the house

handcuffed—though denying that he saw any officer beat Plaintiff—places himself in the vicinity of the beating around the time when it happened. (2/1/16 Tr. 183-84, Tellado.)

Second, the jury could have found that Tellado arrived in time to observe Failla pepper-spray Plaintiff and chose not to intervene. Plaintiff testified that immediately after he was pepper-sprayed and while one of the officers was retrieving Plaintiff's police identification, Plaintiff looked up and noticed Tellado standing there, with between seven and nine officers standing around. (1/27/16 Tr. 64-65, Jackson.) Plaintiff testified that when Tellado looked at Plaintiff's police identification, he made a "facial gesture" like "oh, shit." (*Id.* at 66–67.) This evidence was certainly sufficient to support a finding that Tellado witnessed Plaintiff being pepper-sprayed while on the ground and in restraints, and did not intervene to stop it.

Accordingly, Tellado is not entitled to judgment as a matter of law on the verdict finding him liable for failure to intervene in the use of excessive force.

There was also sufficient evidence that Defendant Braumann failed to intervene to stop the use of excessive force by other officers. Despite Braumann's claim that he did not see Plaintiff inside the house (2/2/16 Tr. 17–18, Braumann), Braumann placed himself in the house around the time that, according to Plaintiff and others, Czulada punched Plaintiff and Kurian choked Plaintiff with a baton, (*id*. at 13-14). Braumann testified that he arrived and entered the house with Kurian, and that he saw Czulada inside the house. (*Id*.) The jury reasonably could have rejected Braumann's claim that he did not see Plaintiff[7], and credited Plaintiff's and his witnesses' accounts of what occurred inside the house, to find that Braumman failed to intervene in the use of excessive force by at least one Defendant. Thus, there is no basis for the Court to disturb the jury's verdict

---

[7] Such a finding would have been supported by the close quarters in which the incident occurred.

finding Braumann liable for failing to intervene to prevent the use of excessive force. *See United States v. Landau*, 155 F.3d 93, 104–105 (2d Cir. 1998) ("[a] jury's credibility assessments are entitled to deference").

### 3. The Evidence Was Sufficient for the Jury to Find that Defendant Boneta Failed to Intervene in the Use of Excessive Force

Defendants argue that the jury's verdict cannot stand against Defendant Boneta because he did not observe any officer use force on Plaintiff and had no reasonable opportunity to intervene. (Defs.' Mot., at 22.) Defendants argue that Boneta was standing a "few feet away" from Reo near the "sidewalk/curb" and was not in a position to see Reo or other officers use excessive force on Plaintiff. (*Id.*) The Court disagrees.

Boneta testified that he arrived at the scene as an officer was bringing a shirtless man out of the house in what Boneta assumed were handcuffs. (2/1/16 Tr. 10, 13, Boneta.) Boneta testified that he saw Plaintiff react to the arrest of the shirtless man being brought out of Plaintiff's house by pushing Defendant Reo. (*Id.* at 10-11.) Boneta stated that before he could confront Plaintiff, other officers did so, "box[ing] [Boneta] out." (*Id.* at 10, 14.) Boneta testified that because he thought his fellow officers "got this", he "turned around and . . . exercised crowd control." (*Id.* at 10.)

Based on Boneta's testimony alone, it is clear that he was in a position to have seen Reo hit Plaintiff in the back of the head with a baton. In fact, Defendants argued at trial that Boneta was only a few feet away from Reo at that time. Consistent with this evidence, the jury found in the Special Verdict Sheet that Boneta believed that Plaintiff had shoved Reo. Although the jury could have found that Plaintiff's conduct toward Reo justified some use of force by Reo, the jury was also entitled to find that the force used by Reo, as testified to by Plaintiff, *i.e.*, hitting Plaintiff in the back of the head with a baton, was disproportionate and unjustified, and that Boneta

witnessed this use of excessive force and failed to intervene. *Jackson v. Tellado*, 236 F. Supp. 3d 636, 665, n.27 (E.D.N.Y. 2017) (stating that use of force "is only reasonable when it is proportional to the threat posed") (quoting *Alicea v. Thomas*, 815 F.3d 283, 288 (7th Cir. 2016)). Furthermore, while the suddenness of Reo's act of hitting Plaintiff in the head might be viewed as negating any opportunity to intervene, the Court finds that the evidence was sufficient for the jury to conclude that because Boneta was positioned so closely to Reo—one or two feet, according to the defense— Boneta had a reasonable opportunity to intervene, even with respect to a relatively sudden or spontaneous act by Reo. *See Brady*, 531 F.3d at 133 (court could not conclude, deferring, as it must, to the "credibility determinations and reasonable inferences of the jury," that there was "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]"). Lastly, given the evidence regarding Boneta's placement when Plaintiff was brought to the ground by the blow to his head by Reo, and Boneta's own testimony about being "boxed out" by the officers who surrounded Plaintiff after the Reo incident, the jury also could have reasonably concluded that Boneta observed, but failed to stop, the beating of Plaintiff by the other officers, once Plaintiff was on the ground and handcuffed. Thus, the Court finds that Reo is not entitled to judgment as a matter of law with respect to the jury's verdict finding him liable for failing to intervene to prevent the excessive use of force against Plaintiff.

### 4. The Evidence Was Sufficient for the Jury to Find that Defendants Heerey and Deferrari Failed to Intervene in the Use of Excessive Force

Defendants argue that there was insufficient evidence to find Defendants Heerey and Defferari liable for failing to intervene to prevent the use of excessive force against Plaintiff. Defendants state that Heerey arrived at the scene late and "did not know why" the officers were

attempting to apprehend Plaintiff. (Defs.' Mot., at 23.) Defendants explain that even though Deferrari observed other officers use force to restrain Plaintiff, he did not stop the officers because "they were not doing anything wrong" and "officers are trained to use an ASP baton", *i.e.*, a collapsible baton, when a suspect is resisting arrest. (*Id.* at 23-24.)

Deferrari testified that he took Plaintiff down to the ground face first. (2/2/16 Tr. 141, Deferrari.) Deferrari also stated that he saw several officers with "their ASPs out hitting [Plaintiff] in the legs trying to get him down to the ground." (*Id.* at 131-132.) Heerey testified that he jumped in to physically assist in restraining and handcuffing Plaintiff. (1/29/16 Tr. 125–28, Heerey.) Heerey stated that it was clear that Plaintiff was going to be placed under arrest, but he did not advise Plaintiff that he was under arrest. (*Id.* at 122-126.)

Based on this evidence alone, the jury reasonably could have found that both officers either observed Plaintiff being beaten with batons while he was not resisting[8], and/or observed Failla pepper-spray Plaintiff after he was handcuffed—either of which, as previously discussed, would have been a clearly established constitutional violation that Deferrari and Heerey had a duty, but failed to intervene, despite having the opportunity to do so. *Tolbert*, 242 F.3d at 70 ("[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."). Accordingly, the Court denies the motion for judgment as a matter of law as to the verdicts against Heerey and Defferari for failure to intervene in the use of excessive force.

---

[8] The Court also notes that Plaintiff introduced a photograph that showed multiple red marks on Plaintiff's back that appeared to have been caused by blows with an ASP baton.

## II.     THE NEED FOR A NEW TRIAL UNDER RULE 59

### A.  Legal Standard

Under Rule 59(a) of the Federal Rules of Civil Procedure, "[t]he court may, on motion, grant a new trial on all or some of the issues . . . to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Grounds for granting a new trial include verdicts that are against the weight of the evidence, *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003), substantial errors in the admission or rejection of evidence, *O & G Indus., Inc. v. Nat'l R.R. Passenger Corp.*, 537 F.3d 153, 166 (2d Cir. 2008), and non-harmless errors in jury instructions, *United States v. Kozeny*, 667 F.3d 122, 130 (2d Cir. 2011) and verdict sheets, *Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 136 (2d Cir. 2005).

In contrast to the standards governing a Rule 50 motion, a court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner" when considering a Rule 59 motion. *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012). The court must, however, "exercise [its] ability to weigh credibility with caution and great restraint," and "'[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.'" *Id.* (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992)). "The decision whether to grant a new trial following a jury trial under Rule 59 is 'committed to the sound discretion of the trial judge.'" *Stoma v. Miller Marine Servs., Inc.*, 271 F. Supp. 2d 429, 431 (E.D.N.Y. 2003) (quoting *Metromedia*, 983 F.2d at 363). A motion for a new trial should ordinarily be denied "'unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Atkins v. New York*

*City*, 143 F.3d 100, 102 (2d Cir. 1998) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir. 1997)).

### B. Defendants Czulada and Kurian are Not Entitled to a New Trial

Defendants seek a new trial, pursuant to Rule 59(a), for Defendants Czulada and Kurian, both of whom were found liable for using excessive force against Plaintiff.[9]  Defendants offer two grounds for a new trial.  First, they argue that the jury's Special Verdict Sheet answers are inconsistent with its award of punitive damages against all Defendants, thus invalidating the verdicts against Czulada and Kurian and requiring a new trial.[10]  (Defs.' Mot., at 25 (citing Fed. R. Civ. P. 49(b), which provides, *inter alia*, that the court may order a new trial where the jury's interrogatory answers are inconsistent with the verdict).)  Second, Defendants argue that because the compensatory and punitive damages awarded by the jury cannot be apportioned as between its verdicts on the false arrest claims versus the excessive force claims, or between claims as to which the verdicts have been vacated and the claims for which the verdicts remain, Defendants were deprived of their right to have the jury to consider their cases individually, thus requiring a new trial for Czulada and Kurian.  The Court is unpersuaded by these arguments, and addresses them in turn.

---

[9] In their motion, Defendants refer to Czulada and Kurian as the "remaining officers", seemingly based on the assumption that the Court would grant judgments as a matter of law in favor of the other ten Defendants, as to whom Defendants do not seek a new trial.  (Defs. Mot., at 24-25.)  To the extent that Defendants are also seeking a new trial as to the ten other Defendants as to whom the Court has not granted full Rule 50 relief, the Court would deny them a new trial for the same reasons discussed below.

[10] Admittedly, the Court had difficulty understanding the defense's argument, which, in essence, appears to be that because the jury got it wrong with respect to the award of punitive damages, its verdicts on the excessive force claims against Czulada and Kurian, or perhaps all Defendants, cannot be trusted.

1.  **The Jury's Special Verdict Sheet Answers Were Not Inconsistent with the Verdict**

Defendants argue that the jury's finding that "all of the defendants acted maliciously and wantonly (the finding of punitive damages) is inconsistent with the interrogatory responses where the officers were found to have acted reasonably[]", and that, therefore, Czulada and Kurian are entitled to a new trial pursuant to Rule 49(b)(3). (Defs.' Mot., at 24-26 ("The findings on the interrogatories directly contradict the finding of punitive damages.").) In support of their argument, Defendants cite certain Special Verdict answers as "inconsistent" with the jury's award of punitive damages as to each Defendant: (1) that Czulada believed that Plaintiff had assaulted him (*id*. at 27); (2) that Kurian believed that Plaintiff had assaulted Czulada (*id*. at 28); (3) that Failla believed that Plaintiff was resisting arrest[11]; and (4) that Deferrari believed that Plaintiff was throwing punches at police officers and resisting arrest. Defendants are incorrect.

Contrary to Defendants' assertion, there are no inconsistencies between the jury's Special Verdict answers and the jury's verdicts that have survived the Court's qualified immunity and Rule 50 determinations.[12] (Defs.' Mot., at 25); *see* Fed. R. Civ. P. 49(b)(3)(A) (authorizing Court to approve an appropriate judgment when the interrogatory answers are inconsistent with the verdict). For example, the jury's Special Verdict finding that Czulada and Kurian believed that Plaintiff had assaulted them is not inconsistent with the finding, in support of its excessive force verdicts, that

---

[11] As discussed *supra* at Section I(B), the Court has granted Rule 50 relief to Failla, based on the jury's Special Verdict answers, as to Plaintiff's claim that Failla failed to intervene in Plaintiff's false arrest.

[12] Far from leaving a "confusing hodgepodge of speculation about why the jury answered the special verdict form in the way that it did" (Defs.' Mot., at 29), the jury's interrogatory answers worked just as they were supposed to, and enabled the Court to apply Rule 50 and the qualified immunity doctrine to Plaintiff's false arrest claims, while leaving undisturbed the jury's excessive force verdicts against all Defendants.

Czulada and Kurian used force against Plaintiff first—as Plaintiff testified (1/27/16 Tr. 42–46, Jackson)—or that Czulada and Kurian used force that was disproportionate to the perceived assaults by Plaintiff and thus excessive. Similarly, the jury's Special Verdict finding that Deferrari believed that Plaintiff was throwing punches at police officers did not preclude a finding that the beating of Plaintiff with ASP batons or the pepper-spraying of him after he was restrained were excessive and that Deferrari therefore had a duty to intervene. Thus, the situation posited by Defendants is not one "[w]here the answer to one of the questions in a special verdict form would require a verdict in favor of the plaintiff and an answer to another would require a verdict in favor of the defendant, [rendering] the verdict irreconcilably defective." (Defs. Mot., at 27 (citing, *inter alia*, *Robertson Oil Co., Inc. v. Phillips Petroleum Co.*, 871 F.2d 1368, 1373 (8th Cir. 1989)).)

The reason that these, as well as the other interrogatory answers, are not inconsistent with the surviving verdicts is because—as Defendants well know—the Special Verdict was designed solely to aid the Court in its post-trial qualified immunity determination regarding Plaintiff's false arrest claims, and not to provide information dispositive of Plaintiff's excessive force claims.[13] The jury's Special Verdict answers were not intended to reveal the jury's findings about the specific timing or a chronology of the relevant events. Rather, the import of a positive response to any question in the Special Verdict Sheet as to a Defendant was so that Defendant might be eligible for qualified immunity as to the claims of false arrest or failure to intervene in the false

---

[13] As previously explained in its February 15 Decision on qualified immunity, the Court presented the jury with a series of factual questions, known as special interrogatories, in the Special Verdict Sheet to aid the Court in its qualified immunity determinations following the verdict in Plaintiff's favor. The jury was asked, as to each Defendant, whether that Defendant believed, even if mistakenly, that: (1) Plaintiff had assaulted Czulada; (2) Plaintiff had shoved Reo; (3) Plaintiff was "throwing punches at police officers while out in the street"; and (4) Plaintiff was "resisting arrest while out in the street." (Special Verdict Sheet, at 1.) These were the only questions asked in the Special Verdict Sheet. (*Id.*) The jury answered in the affirmative as to at least one of these questions for each Defendant, except Tellado and Braumann. (*Id.* at 1-7.)

arrest, based on the officer's belief that probable cause existed to arrest Plaintiff. Indeed, while Defendants complain about this design as if it were a flaw (Defs. Mot., at 27-28 (the jury "found that Officer Czulada believed that plaintiff assaulted him, but the parties are left to wonder what the basis of the finding was as well as the timing of this encounter")), this was precisely the intended format of the Special Verdict Sheet, and as discussed *infra*, a format that Defendants helped create and approved.

The fact that the Special Verdict confirms testimony by certain officers does not mean that the verdict itself was confusing. Rather, it means that the jury ultimately credited Plaintiff's testimony or other evidence, including his witnesses' testimony, over Defendants' testimony, and that its verdict turned substantially on the evaluation of the parties' credibility. *ING Glob. v. United Parcel Service Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014) (denying Rule 59 motion where evidence offered at trial largely consisted of witness testimony because although there was some evidence contrary to the jury's finding, the jury was free to reject that evidence and accept evidence presented by other witnesses).

Accordingly, the Court denies the request for a new trial for Defendants Czulada and Kurian on the basis that the jury's interrogatory answers were inconsistent with the surviving verdicts.

### 2. No New Trial is Warranted Based on the Jury's Purported Failure to Consider the Liability of Each Defendant Individually

Defendants argue that Defendants Czulada and Kurian are entitled to a new trial because the jury failed to consider the liability of each Defendant individually. Defendants' argument is premised entirely on the jury's alleged inability to apportion the compensatory and punitive damages as between: (1) the false arrest claims and the excessive force claims; (2) the excessive force claims based on conduct inside Plaintiff's house versus outside the house; and (3) the

surviving verdicts and those that were invalidated by way of Rule 50 or qualified immunity. (Defs.

Mot., at 30-32.) Citing an Arkansas state court decision, Defendants assert that because "it is

impossible to discern what injuries and damages were attributable to each defendant[,] . . . a new

trial is warranted." (Defs.' Mot., at 31.) These arguments are misguided for three reasons.

First, the Verdict Sheet did not allow the jury to apportion damages between the different

claims and Defendants. This in no way indicates that the jury failed to consider each Defendant

individually. Indeed, the opposite is true. The Court specifically instructed the jurors that they

had to consider each Defendant's conduct and liability individually. (Jury Instructions, at 10

("You must consider the evidence against each Defendant individually. Each Defendant is entitled

to fair, separate, and individual consideration without regard to your decision as to the other

Defendants.").) A jury is presumed to follow a court's instruction. *See, e.g., TradeCard, Inc. v.

S1 Corp.*, 509 F. Supp. 2d 304, 327 (S.D.N.Y. 2007) ("Courts are entitled to presume that the jury

followed the instructions given to it."). Indeed, the Verdict Sheet reflects the jury's individualized

determinations of liability as to each Defendant and as to each claim in the complaint. (Dkt. 95 at

2-4.)

The fact that the Verdict Sheet, which was approved by the parties, required the jury to

award a single, lump sum amount for compensatory damages does not reflect any failure by the

jury to individually consider each Defendant's liability, nor does it undermine those individualized

liability verdicts. Rather, and contrary to Defendants' arguments, whether the damages awarded

by the jury need to be reduced, based on the dismissal of claims, is properly the subject of the

remittitur process, discussed *infra*.

Second, Defendants have waived any argument that the Verdict Sheet was defective.

*Shade v. Housing Auth. of City of New Haven*, 251 F.3d 307, 313 (2d Cir. 2001) (stating that it is

extremely difficult to "see how holding the defendants to a jury verdict that faithfully followed an instruction and verdict form that they themselves urged upon the court could give rise to a miscarriage of justice"); *Thorsen v. County of Nassau*, 722 F. Supp 2d 277, 287 (E.D.N.Y. 2010) (holding that Defendant waived its ability to object to a verdict sheet because "the court adopted the damages special verdict sheet exactly as the defendants had advocated"). Here, Defendants proposed changes to a Verdict Sheet that the Court principally adopted and, to the extent that the Verdict Sheet was modified, Defendants did not object further. (2/1/16 Tr., at 246-248)[14]; (Dkt.

---

[14] Defendants similarly assisted in the preparation of, and ultimately approved, the questions in the Special Verdict Sheet. On February 2, 2018, the Court discussed the Special Verdict Sheet with the parties and sought feedback on its language:

> THE COURT: Okay so let's turn to the special verdict sheet, which is something I assume the defense wants to discuss. Now Mr. Sanders, we did not get any request from you for the special verdict sheet. We did get the defense's request. And let me start off by saying the reason we modified what the defense proposed is because the way I see the qualified immunity analysis is the jury has to find certain facts that I will then use in the event of a favorable verdict for the plaintiff to decide the qualified immunity issue as a matter of law. So that's why we phrased them all as factual findings. The analysis of reasonableness is obviously a blend of facts and law; and therefore, my view is that it's not within the jury's province to decide the reasonable belief, which is, I think what you wanted versus you simply they believed in. So with that, what did you want to say Mr. Modaferri?
> MR. MODAFFERI: Nothing.
> THE COURT: Oh . . .
> MR. MODAFFERI: My only, I guess, comment would be that --
> THE COURT: Do we have a spelling error?
> MR. MODAFFERI: No, no, no. That one of the defendants who was – well one, you know, these questions would only be asked in the event of liability, and they would only be asked with respect to the defendant to whom there was a finding of liability.
> THE COURT: Correct.
> MR. MODAFFERI: So if there is finding of liability against one, we're only going to hand them a special verdict form with four questions. Not --
> THE COURT: You're absolutely right.
> MR. MODAFFERI: Okay. That was the only question I had.

(2/2/2016 Tr., 214:25-216:11).

93 (providing an attached revised Verdict Sheet for the parties' consideration).) Given that Defendants assisted in the preparation of, and agreed to, the Verdict Sheet, including the requirement that the jury return a single compensatory damage amount, without any breakdown for damages by claim, Defendants have waived the right to a new trial on that basis. *Bseirani v. Mahsie*, 881 F. Supp. 778, 784-85 (N.D.N.Y. 1995) (holding that defendant waived the right to object to the special verdict form).

Third, the verdict and the finding of punitive damages against Defendants individually shows that the jury carefully considered the testimony of all of the witnesses and decided that Defendants were individually liable. The award of punitive damages in this case is not irreconcilable with the answers on the Special Verdict Sheet, especially in light of the jury's finding that all Defendants were liable for using excessive force or failing to intervene in the use of excessive force—verdicts that the Court has upheld. Indeed, the jury's finding of punitive damages reinforces the Court's denial of a new trial under Rule 59. *See Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (instructing that a verdict must be vacated and a new trial ordered only where the verdict is "ineluctably inconsistent" and the jury's answers cannot be "harmonized rationally" (internal quotation marks, citations, and emphasis omitted)).

Accordingly, the Court finds that Defendants Czulada and Kurian are not entitled to a new trial on the basis of the jury's failure to individually consider Defendants' liability.

## III. MOTIONS ON REMITTITUR

As discussed above, Defendants have raised an issue about the appropriateness of the compensatory damages awarded by the jury in this case, in part, based on the vacating of the jury's verdicts as to Plaintiff's false arrest claims. The parties did not fully address in their post-trial motions whether the Court should affirm the jury's combined verdict of $15,175,000; indeed,

Defendants argue that remittitur would *not* be appropriate.  (Defs.' Mot., at 31.)  Even though Defendants have in effect waived their rights to remittitur, *Promega Corp. v. Life Tech. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017) ("a party's right to remittitur may be waived"); *Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012) (holding that party waived argument for remittitur by not raising it in post-trial briefing), the Court still has a duty to ensure that the award is "fair, reasonable, predictable, and proportionate," *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013).  As a result, the Court requires additional briefing regarding the appropriateness of the $12.5 million compensatory damages award and the $2.675 million punitive damages award.

The Court directs the parties to brief the issue of whether the Court should grant remittitur, the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial[,]" *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990) (internal quotation omitted), with respect to Plaintiff's compensatory and punitive damages awards.  The parties should discuss whether the awards were excessive, *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) ("jury's damage award may not be set aside as excessive unless the award is so high as to shock the judicial conscience and constitute a denial of justice"), and provide specific examples of comparable compensatory and punitive damages awards in other Section 1983 excessive force cases.

## CONCLUSION

For the reasons stated herein, Defendants' Rule 50 motion is granted in part and denied in part, and their Rule 59 motion is denied in its entirety.  The Court grants Defendants' motion for judgment as a matter of law with respect to the jury's verdicts in favor of Plaintiff for failure to intervene in Plaintiff's arrest as to Defendants Tellado and Failla.  In combination with the Court's

qualified immunity rulings, this decision results in the overturning of all verdicts for Plaintiff relating to his false arrest claims. The Court denies Defendants' motion for judgment as a matter of law regarding the claims against all other Defendants. The Court denies Defendants' motion for a new trial. Additionally, the Court instructs the parties to submit briefing on whether the Court should grant remittitur with respect to the jury's compensatory damages award of $12.5 million and punitive damages award of $2.675 million. Defendants shall submit a motion for remittitur by April 26, 2018; Plaintiff will respond by May 10, 2018; and Defendants will file a reply, if any, by May 24, 2018.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  March 22, 2018
        Brooklyn, New York