UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
LARRY JACKSON,

                      Plaintiff,

            - against -

JESUS TELLADO, STANLEY MACNEAR,
JOHN CZULADA, JAMES T. GHERARDI,
RYANN DUNN, ROBERT J. DEFERRARI,
KENNETH BRAUMANN, BEN KURIAN,
PETER BONETA, THOMAS E. REO,
MICHAEL FAILLA, AND BRIAN E.
HEEREY,

                     Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
11-CV-3028 (PKC) (SMG)

PAMELA K. CHEN, United States District Judge:

On February 3, 2016, after a seven-day trial, the jury returned a verdict in favor of Plaintiff

Larry Jackson, a New York City Police Department ("NYPD") officer, on his claims under 42

U.S.C. § 1983 against fellow NYPD Officers Jesus Tellado, Stanley MacNear, John Czulada,

James Gherardi, Ryann Dunn, Robert Deferrari, Kenneth Braumann, Ben Kurian, Peter Boneta,

Thomas Reo, Michael Failla, and Brian Heerey (collectively, "Defendants"). The jury determined

that Plaintiff had been falsely arrested and subjected to excessive force, and awarded Plaintiff

$12,500,000 in compensatory damages and a total of $2,675,000 in punitive damages, comprised

of varying amounts against each of the Defendants. Through two post-trial decisions, the Court

vacated the jury's verdict finding certain Defendants liable on Plaintiff's false arrest claim, but

upheld the jury's verdict finding all Defendants who went to trial liable of excessive force.

Pending before the Court is Defendants' motion for remittitur. For the reasons set forth

below, the Court finds the jury award of $12,500,000 in compensatory damages to be excessive

and reduces it to $2,750,000. However, the Court does not find the jury's punitive damages award

of $2,675,000 to be excessive, and that amount is not reduced. Plaintiff is directed to inform the Court by September 28, 2018 whether he accepts the total remittitur amount of $5,425,000 ($2,750,000 in compensatory damages and $2,675,000 in punitive damages) or seeks a new trial.

## BACKGROUND

On June 24, 2011, Plaintiff filed his complaint against the City of New York and twenty John Doe defendants. (Dkt. 1.) After initial discovery, Plaintiff filed an Amended Complaint on March 1, 2013, naming Defendants, and adding Officer Patrick D'Onofrio and Detective Robert Russo. (Dkt. 30.) Defendants moved for summary judgment on August 20, 2013 (Dkt. 55), and the Court granted that motion in part on March 17, 2014, dismissing Officer D'Onofrio and the City of New York (Dkt 67). The parties proceeded to trial on January 25, 2016. On February 1, 2016, the parties stipulated to the dismissal of Detective Russo (Dkt. 92), which the Court granted.

After seven days of trial, the jury returned a verdict finding that three Defendants— Deferrari, Reo, and Heerey—were personally involved in falsely arresting Jackson, that four Defendants—Tellado, MacNear, Boneta, and Failla—failed to intervene to prevent Plaintiff Jackson's false arrest, and that one Defendant—MacNear—was liable as a supervisory officer for Plaintiff's false arrest. (Verdict Sheet, Dkt. 95, at 1-2.)

With respect to Plaintiff's excessive force claim, the jury found that four Defendants— Czulada, Kurian, Reo, and Failla—were personally involved in subjecting Plaintiff to excessive force, that eight Defendants—Tellado, MacNear, Gherardi, Dunn, Deferrari, Braumann, Boneta, and Heerey—failed to intervene to prevent Plaintiff from being subjected to excessive force, and that one Defendant—MacNear—was liable as a supervisory officer based on Plaintiff having been subjected to excessive force. (*Id.* at 3-4.) Every Defendant who went to trial was found liable on at least one claim. The jury awarded compensatory damages in a lump-sum amount of

$12,500,000, as to which all Defendants are jointly and severally liable, and found Defendants liable for a total of $2,675,000 in punitive damages, with specific amounts of punitive damages being assessed against each liable Defendant.[1]

On February 15, 2017, the Court issued a Memorandum & Opinion ("February 15 Decision") holding that Defendants Deferrari, Reo, Heerey, MacNear, and Boneta were entitled to qualified immunity regarding the false arrest verdicts against them. (Dkt. 111.) The Court also found that Defendants Failla and Tellado were not entitled to qualified immunity for the false arrest verdicts against them, and that none of the Defendants who were found liable for excessive force were entitled to qualified immunity. (*Id.*)

On March 22, 2018, the Court issued a Memorandum & Order, granting in part and denying in part Defendants' Rule 50 motion for judgment as a matter of law, and denying Defendants' Rule 59 motion for a new trial in its entirety. (Dkt. 120.) In combination with the Court's qualified immunity rulings, this decision resulted in the overturning of all verdicts for Plaintiff relating to his false arrest claims. The Court denied Defendants' motion for judgment as a matter of law regarding the remaining claims.

The Court also instructed the parties to submit briefing on whether the Court should grant remittitur with respect to the jury's compensatory damages award of $12,500,000 and punitive damages award of $2,675,000.[2] Defendants filed their motion for remittitur on May 29, 2018 (Dkt.

---

[1] The jury awarded $300,000 in punitive damages against Tellado; $300,000 against MacNear; $275,000 against Czulada; $150,000 against Gherardi; $150,000 against Dunn; $250,000 against Deferrari; $50,000 against Braumann; $400,000 against Kurian; $125,000 against Boneta; $275,000 against Reo; $350,000 against Failla; and $50,000 against Heerey, for a total of $2,675,000 in punitive damages. (Verdict Sheet, at 5.)

[2] Notably, in their post-trial motion for judgment as a matter of law or a new trial, Defendants did not seek remittitur of the jury's combined verdict of $15,175,000; indeed, Defendants argued that remittitur *would not be appropriate*. (Defs.' Rule 50/59 Mot., Dkt. 115,

122), Plaintiff filed his opposition on June 22, 2018 (Dkt. 125), and Defendants filed a reply on July 5, 2018 (Dkt. 127).

## DISCUSSION

## I.    Legal Standard for Remittitur

Remittitur is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990) (internal quotation omitted).  A jury award of damages for federal constitutional violations will be upheld unless it is "so excessive 'as to shock the judicial conscience.'" *Wheatley v. Ford*, 679 F.2d 1037, 1039 (2d Cir. 1982) (citation omitted).  A verdict shocks the judicial conscience "only if it surpasses an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable persons may differ, but a question of law." *Mazyck v. Long Island R.R. Co.*, 896 F.Supp. 1330, 1336 (E.D.N.Y. 1995) (internal quotation marks omitted).  It is appropriate to review the awards in comparable cases in determining a motion for remittitur.  *Martinez v. Port Authority of N.Y. & N.J.*, No. 01-CV-721 (PKC), 2005 WL 2143333, at *19 (S.D.N.Y. Sept. 2, 2005) (citing *Gardner v. Federated Dep't Stores, Inc.*, 907 F.2d 1348, 1353 (2d Cir. 1990)), *aff'd*, 445 F.3d 158, 160 (2d Cir. 2006) (per curiam).  Courts should not, however, "balance the number of high and low awards and reject the verdict in the

---

at 31.)  Even though Defendants, in effect, waived their rights to remittitur, *Promega Corp. v. Life Tech. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017) ("a party's right to remittitur may be waived"); *Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012) (holding that party waived argument for remittitur by not raising it in post-trial briefing), the Court still has a duty to ensure that the award is "fair, reasonable, predictable, and proportionate," *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013).  Therefore, the Court directed the parties to brief the remittitur question, due to the clear excessiveness of the jury's compensatory damages award.

instant case if the number of the lower awards is greater. Rather, [courts] inquire whether the . . . verdict is within reasonable range." *Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir. 1990).

## II.     Relevant Facts[3]

On August 21, 2010, Plaintiff, an off-duty African-American NYPD officer, hosted a party for his daughter's twenty-first birthday at his home. (1/27/16 Tr. 17–18, Jackson.) Late in the evening, two police officers, Defendants Czulada and MacNear, responded to a 911 call stating that a man outside Plaintiff's home appeared to have a gun. (*Id.* at 23–31; *see also* 1/26/16 Tr. 92–96, Strong.) Plaintiff approached Czulada and MacNear and said to MacNear, "hey, Sarge, I'm MOS" meaning he was a member of the police force. (*Id.* at 36.) While Plaintiff, Czulada, and MacNear were talking outside, Plaintiff's niece, Tiffanie Johnson, ran out from Plaintiff's home and stated that there were people fighting inside, at which point Plaintiff, Czulada, and MacNear all entered the home. (*Id.* at 39; 1/28/16 Tr. 78–79, MacNear.)

Inside the home, Czulada confronted Plaintiff with an "ASP", a collapsible baton. Plaintiff asked Czulada what he was doing, saying "I'm a cop, too." (1/27/16 Tr. 42, Jackson.) In response, Czulada punched him in the face. (*Id.*) When Czulada hit him a second time, Plaintiff "grabbed him by his shoulders" to prevent Czulada from hitting him again. (*Id.* at 43.) Someone Plaintiff could not see then lifted Plaintiff up with an ASP baton around his neck. (*Id.* at 46.) Plaintiff later learned that the person was Defendant Kurian. (*Id.* at 105.) Kurian kept telling Plaintiff to relax, and Plaintiff kept responding that he was relaxed, but that he could not breathe. (*Id.* at 47.)

---

[3] In light of the dismissal of Plaintiff's false arrest claims, the Court only recites the facets relevant to Plaintiff's excessive force claims. *See Thomas v. Kelly*, 903 F. Supp. 2d 237, 266 (S.D.N.Y. 2012) (explaining that when determining whether a damages award is excessive, "federal trial courts reviewing a jury's verdict should relate the facts of the underlying case, construed in the light most favorable to the nonmoving party.") (citing *Scala v. Moore McCormack Lines*, 985 F.2d 680, 683 (2d Cir. 1993)).

Plaintiff and Kurian fell over the arm of the couch and onto Iris Strong, Plaintiff's 79-year-old mother-in-law, and who was rendered unconscious as a result. (*Id.* at 48-49, 51.) Charlene Strong, Plaintiff's wife, observed that none of the officers in the house tried to intervene, and "allow[ed] this process to happen." (1/26/16 Tr. 112, Strong.)

Plaintiff was "then . . . hit in the back of the head with something" by someone he could not see. (1/27/16 Tr. 54-55, Jackson.) In response to being struck in the head, Plaintiff ran out of his house and knelt down near the street curb. (*Id.*) At that point, officers started hitting Plaintiff with batons on the back of his legs and his back, hitting him "upward of 20, 30 times." (*Id.* at 57.) Plaintiff lay on his stomach in the street while a semicircle of officers proceeded to hit him with batons and to roll the batons over the backs of his ankles. (*Id.* at 58–60.) Two officers were positioned with their knees on his back, while other officers tried to get his arms. (*Id.* at 60.) After he was handcuffed, Plaintiff "looked up to one of the officers" and said "Guys, this was unnecessary . . . I'm a fellow cop, too." In response, Defendant Failla pepper-sprayed Plaintiff in the face. (*Id.* at 62.) The officers proceeded to search Plaintiff, at which point Defendant Czulada ran over to Plaintiff, called him a "fucking dirt bag", and said, "If you're really a cop, where's your ID?" (*Id.* at 64.) After Plaintiff told Czulada that his identification was in his right front pocket, an officer pulled it out of Plaintiff's pocket. (*Id.* at 64.) A few minutes later, the police removed Plaintiff's handcuffs and brought him down to the police station, where he was held in custody.

Plaintiff suffered lasting physical and emotional injuries as a result of the excessive force used against him on August 21, 2010. After Plaintiff was taken into custody, he was eventually removed to New York Hospital for treatment of a deep gash on his right hand, as well as bruises and contusions all over his face and body. Plaintiff's right hand was fractured and needed "four and a half stitches" to close the gash. (*Id.* at 99.) Approximately two months later, in October

2010, Plaintiff's doctor told him that he would not recover "full strength" in his right hand. (*Id.* at 189.) The doctor explained that this could be grounds for work disability, since Plaintiff might not be able to use a firearm. (*Id.*) Marc Janoson, a forensic psychologist who examined Plaintiff, made a similar observation, *i.e.*, that Plaintiff "was worried that he felt he couldn't do his job due to his physical injury of his hand." (1/28/16 Tr. 45, Janoson.)

Plaintiff also suffered emotional distress and humiliation resulting from the officers' use of excessive force. Forensic psychologist Janoson diagnosed Plaintiff with "psychological trauma secondary to being physically abused" with "considerable paranoia present." (*Id.* at 45.) Janoson recommended that Plaintiff pursue long-term psychotherapy to "address paranoia, nightmares, his psychological response to physical injuries and limitations," as well as "be evaluated for psychotropic medication, that is, some medication that would address his anxiety and depression and perhaps even his paranoia." (*Id.* at 41-42.)

## III. The Jury's Award of Compensatory Damages Requires Remittitur

### A. Compensatory Damages

"[W]here the jury has found a constitutional violation and there is no genuine dispute that the violation resulted in some injury to the plaintiff, the plaintiff is entitled to an award of compensatory damages as a matter of law." *Kerman v. City of N.Y.*, 374 F.3d 93, 124 (2d Cir. 2004). Compensatory damages arise from injury to reputation, personal humiliation, and mental anguish and suffering; they may include out-of-pocket expenses and other monetary harms. *Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986). While calculating damages is traditionally the province of the jury, the Second Circuit has held that an award can be amended or set aside as "excessive" in three different circumstances: (1) where the court identifies an error that resulted in the improper inclusion of a quantifiable amount, (2) where, although a particular

error cannot be identified, the award is "intrinsically excessive," *i.e.*, in excess of the amount any reasonable jury could have awarded, and (3) where the courts finds the amount of award "shock[s] the judicial conscience and constitute[s] a denial of justice." *Kirsch v. Fleet St. Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998).

Compensatory damages awards for excessive force vary widely in this Circuit. When adjusted to 2016 dollars[4], these awards have generally ranged between $10,000 and $2,200,000. *See Guzman v. Jay*, 303 F.R.D. 186, 197-98 (S.D.N.Y. 2014) (finding that an award of $2,205,000 million ($2,243,432.73 in 2016) was not excessive where the plaintiff was maced and slammed into the ground, causing lasting damage to his knees); *Ismail*, 899 F.2d at 185-87 (reducing an excessive force award to $650,000 ($1,197,530.30 in 2016) where the plaintiff was struck in the back of his head and kneed in the back, causing two displaced vertebrae, a cracked rib, and serious head trauma, and expert medical testimony showed that the plaintiff continued to suffer chronic and intermittent pain in his arms, torso, and head); *DiSorbo v. Hoy*, 343 F.3d 172, 183-86 (2d Cir. 2003) (reducing a $400,000 award to $250,000 ($321,114.57 in 2016) where plaintiff suffered no permanent injury but was "brutally attacked" while handcuffed, choked to the point that she began to lose vision, had two large hematomas on her head, and bruises throughout her upper body); *Blissett v. Coughlin*, 66 F.3d 531, 534-36 (2d Cir. 1995) (upholding a jury award of $75,000 ($116,079.14 in 2016) in compensatory damages where plaintiff claimed that defendants had

---

[4] It is appropriate to consider inflation when comparing prior jury verdicts and remittitur orders. *Martinez*, 2005 WL 2143333, at *20 & n. 9 (using United States Bureau of Labor Statistics calculator found at http://data.bls.gov/cgi-bin/cpicalc.pl for adjustment purposes) (citing *Gardner*, 907 F.2d at 1353 (2d Cir. 1990)); *see e.g. Palmer v. Molina Meneses*, No. 12-CV-4741 (RER), 2016 WL 7191668, at *2 n.1 (E.D.N.Y. Dec. 12, 2016) (adjusting award "from the year in which the verdict was entered, or the appeal concluded"). Here, the Court indicates in the internal parentheticals above that it will adjust inflation as of February 2016, when the verdict in this case was reached. Unless otherwise indicated, all of the comparator cases cited in this decision involved jury verdicts finding, *inter alia*, excessive force by police officers.

handcuffed him so tightly that it cut off the circulation to his hands, choked him to the point of unconsciousness, and struck him with a baton, resulting in emotional distress but no permanent injuries); *Byrnes v. Angevine*, No. 12-CV-1598 (GLS/DEP), 2015 WL 3795807, at *1-3 (N.D.N.Y. June 17, 2015) (awarding $10,000 after inquest where corrections officer placed plaintiff in choke-hold and kicked him twice, but plaintiff "suffered no out-of-pocket loss as a result of the incident, failed to present any objective medical documentation to support his claims of residual physical injuries, and acknowledged suffering from pre-existing mental conditions").

New York State Courts have also made awards within this range. *See Schneider v. Nat'l Railroad Passenger Corp.,* 987 F.2d 132, 135-38 (2d Cir. 1993) (upholding $1,750,000 compensatory damages award including $1,000,000 in "intangible damages" (totaling $4,540,774.72 in 2016) for plaintiff's post-traumatic stress disorder, depression, and brain syndrome arising from excessive force)*; Reynolds v. State*, 118 A.D.3d 1496, 1496-97, 988 N.Y.S. 2d 822 (4th Dep't 2014) (affirming award of $225,000 for past pain and suffering and $475,000 for future pain and suffering where plaintiff "suffered a closed head injury and herniated discs in his cervical spine as a result of the assault" by police officers); *Byrd v. New York City Transit Auth.*, 172 A.D. 2d 579, 581-82, 568 N.Y.S.2d 628 (2d Dep't 1991) (reducing $950,000 award to $250,000 ($438,444.90 in 2016) in compensatory damages where the plaintiff sustained permanent injuries in the form of minor scarring and post-traumatic stress disorder).

Here, Plaintiff introduced evidence that he sustained lasting physical and emotional injuries as a result of Defendants' unlawful actions. Plaintiff testified that he was forced to seek medical treatment for bruises and contusions all over his body, as well as a deep gash on his hand. (1/27/16 Tr. 99, Jackson.) Plaintiff stated that his right hand was fractured by the officers' excessive force, and that he has not regained full strength in it. (*Id.* at 189.) This injury has impacted his job as a

police officer; he has expressed concern that he can no longer use a firearm as he did before the assault. Plaintiff also stated that he suffered, and continues to suffer, emotional distress as a result of the incidents. Forensic psychologist Marc Janoson testified that he diagnosed Plaintiff with anxiety, paranoia, and depression resulting from the physical assault. (1/28/16 Tr. 41-45, Janoson.)

Plaintiff was the victim of an unjustified and brutal beating at the hands of his fellow officers in the presence of his extended family and friends. Plaintiff was punched, struck and choked with an ASP, and pepper-sprayed in the eyes when he was already subdued. Plaintiff went through an undeniably traumatic experience that has scarred him both physically and emotionally for life. Indeed, the jury found that he was entitled to substantial compensation for the injuries he suffered as a result of Defendants' conduct. Nonetheless, the jury's award of $12,500,000 compensatory award for Plaintiff's physical and emotional injuries is beyond any reasonable amount of compensation in cases such as this one. Other awards in this Circuit and in New York State make this clear.

In determining Plaintiff's compensatory damages for physical and emotional injuries, the Court focuses on the following three comparator cases:

First, in *Guzman*, 303 F.R.D. at 197-98, the court determined that an award of $2,205,000 million ($2,243,432.73 in 2016) was not excessive where the plaintiff was maced, had his head driven into ground, and was pulled by clothing around his neck area. Plaintiff suffered facial abrasions and a right leg injury, including torn anterior cruciate, posterior cruciate, and lateral collateral ligaments, permanent peroneal nerve damage, and a foot drop. He was required to walk with a corrective brace, experienced posttraumatic arthritis in his right knee, and had a high likelihood of needing total knee replacement in next 20 years. Notably, the court in *Guzman* did

not opine that an award of more than $2,205,000 million would have been excessive in that case, merely that the $2,205,000 million awarded by the jury was not excessive.

Second, in *Cardoza v. City of N.Y.*, 139 A.D.3d 151, 167-69, 29 N.Y.S.3d 330 (1st Dep't 2016) the Court awarded $400,000 for past pain and suffering and $1,250,000 for future pain and suffering where an officer pepper-sprayed plaintiff and struck him multiple times with a baton that fractured his hand, required surgery, and caused permanent damage, and further resulted in post-traumatic stress disorder and major depressive disorder.

Third, in *Figueroa v. City of New York*, 78 A.D.3d 4639, 910 N.Y.S.2d 76 (1st Dep't 2010), the court reduced a jury award for pain and suffering from $2,500,000 to $1,250,000 million ($1,354,591.80 in 2016) where the plaintiff sustained a fractured right hand and developed post-traumatic stress disorder after police "pointed a gun at him, 'smacked' him, hit him with the gun, stomped on him, and arrested him during an investigatory stop."

All three of these cases involved physical and emotional injuries that were similar in kind, degree, and effect to Plaintiff's. Plaintiff suffered a fractured hand (like *Cardozo* and *Figueroa*), was pepper-sprayed in the face (like *Cardozo* and *Guzman*), and was repeatedly struck in the face and body (like *Figueroa* and *Guzman*). Plaintiff also suffered from depression (like *Cardozo*), nightmares, flashbacks, and anxiety (like *Figueroa*) as a result of his physical injuries. Even though damages for pain and suffering are not always easily translated into a dollar amount, plaintiffs are entitled to be compensated for these injuries, and sometimes substantially so, as the jury plainly found here. *See Sulkowska v. City of N.Y.*, 129 F. Supp. 2d 274, 308 (S.D.N.Y. 2001) ("[T]he law does not provide a precise formula by which pain and suffering and emotional distress may be properly measured and reduced to monetary value."). Although, as of the trial, Plaintiff had not sought treatment for his psychological injuries, he can still be awarded damages for his

depression, anxiety, paranoia, nightmares, and flashbacks based on the objective circumstances of the assault. *See Gardner*, 907 F.2d at 1353 (upholding an award of $150,000 ($272,750.38 in 2016) for emotional damages and noting "sums of the magnitude of that awarded here for pain and suffering have been sustained, even absent a showing that the injuries were chronic or debilitating"); *Martinez*, 2005 WL 2143333 at *1-2 (plaintiff receiving, in false arrest and malicious process case, after remittitur, compensatory damages award of $464,000 ($576,018.35 in 2016), almost solely for emotional distress, mental anguish, loss of liberty, and psychological therapy expenses).[5]

This Court's task on a motion for remittitur is to ascertain the highest amount within the jury's discretion. *See Earl*, 917 F.2d at 1330 (noting that "a district court should remit the jury's award only to the maximum amount that would be held by the district court as not excessive"). Applying that standard here, the Court concludes that Plaintiff is entitled to $2,750,000 in compensatory damages. In the three cases most comparable to Plaintiff's, the plaintiffs received between $1,354,592 and $2,243,432.73. In *Guzman*, which resulted in the highest award of the three, the plaintiff, Noel Jackson Guzman, suffered an attack comparable to the one in this case. Although Guzman's injuries were arguably more severe than Plaintiff's, Plaintiff nonetheless suffered lasting and potentially permanent injury to his hand that could curtail or materially affect his career as a police officer and could place him at risk of harm given the nature of his job. The

---

[5] In *Martinez*, the plaintiff was arrested for public lewdness and was held for 19 hours without physical injury. *Id*. at *1. The plaintiff testified at trial to the injury he suffered as a result of the defendants' conduct, and presented testimony from his mental health care providers regarding the therapy he had received. *Id*. at *16. The jury awarded compensatory damages of $1,104,000, which included: $1,000,000 for emotional distress, mental anguish, and loss of liberty on the false arrest claim; $1,000 in therapy expenses on the false arrest claim; $100,000 in damages for emotional distress and mental anguish on the malicious prosecution claim; and $3,000 in legal fees on the malicious prosecution claim. *Id*. at *1. The court reduced that award to $464,000.

jury heard Plaintiff's concerns about not being able to return to his job as a police officer, including testimony about Plaintiff's difficulties in handling and discharging his service weapon. Even though the jury's verdict of $12,500,000 was outside the spectrum of reasonable awards, it still reflected the jury's assessment of "the nature and extent of the injuries sustained, the permanence and extent of the pain caused by those injuries, [and] the loss of enjoyment of life." *Marcoux v. Farm Serv. and Supplies*, Inc., 290 F. Supp. 2d 457, 478 (S.D.N.Y. 2003).

Furthermore, Plaintiff suffered emotional harm that the jury could have found more severe than other excessive force cases due to the unique circumstances of the incident. Plaintiff, an African-American law enforcement officer, was savagely beaten with batons, forced to the ground, handcuffed, pepper-sprayed, and called a "dirt-bag", all in the presence of his family and friends, by his fellow law enforcements officers, who were all white and/or Hispanic. The jury could have found that the impact of this betrayal of trust and loyalty, and the disrespectful and demeaning treatment, by Plaintiff's *own* colleagues (and officers of the law) wrought a particular emotional harm for Plaintiff. Indeed, Plaintiff testified to both the emotional distress *and* humiliation he experienced because of Defendants' use of excessive force, and his expert psychologist, Janoson, testified both to Plaintiff's psychological trauma secondary to the physical abuse and the presence of "considerable paranoia". Furthermore, because Plaintiff, a fifteen-year veteran of the NYPD at the time of his trial in 2016 (1/27/16 Tr. 13, Jackson), continues to work for the NYPD—side by side each day with police officers whom Plaintiff could perceive as no different than Defendants— it is reasonable to conclude that the emotional harm he experiences is ongoing and persistent.

Accordingly, given the extent of Plaintiff's physical and emotional injuries and the unique nature of the emotional and psychological harm he suffered, the Court remits Plaintiff's compensatory damages to an award of $2,750,000. The Court finds that this amount is within the

range of compensatory damages in comparable cases, will adequately compensate Plaintiff for his physical and emotional injuries, and is not excessive.[6]

## B. Punitive Damages

Punitive damages are available "in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). A jury may appropriately award punitive damages where the "character of the tortfeasor's conduct . . . is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards." *Id.* at 54. A plaintiff must show a "'positive element of conscious wrongdoing'" by the defendant. *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 121 (2d Cir. 2006) (citation omitted). There is no formula or objective standard that courts use to calculate punitive damages awards, which "are by nature speculative, arbitrary approximations." *Payne*, 711 F.3d at 93. Even so, courts bear a duty to ensure that such awards are fair and reasonable, as punitive damages may result in a windfall to a plaintiff fully compensated for his actual losses. *Id.* at 93-95.

The Supreme Court has established three guideposts to help determine the reasonableness of a punitive damages award: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the plaintiff's harm and the punitive damages award; and (3) the difference between the award and the criminal and civil penalties for the misconduct at issue. *BMW of N.*

---

[6] The Court notes that awards from other districts have far exceeded the award in this case. *See e.g., Jennings v. Fuller*, No. 13-CV-13308 (AC), 2017 WL 2242357, at *4-10 (E.D. Mich. May 23, 2017) (reducing $17.63 million compensatory damages and $19 million punitive damages awards to $5 million and $6 million, respectively, where five police officers beat, dragged, pepper-sprayed, and place a hood over plaintiff in a jail cell).

*Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). As with compensatory damages, the Second Circuit has further "found it helpful in deciding whether a particular punitive award is excessive to compare it to court rulings on the same question in other cases." *Payne*, 711 F.3d at 104. As discussed below, based on these factors, the Court does not find that the jury's award of $2,675,000 in punitive damages is excessive.

### 1. Reprehensibility of Defendants' Conduct

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). The Second Circuit also has identified several "aggravating factors" from the Supreme Court's decision in *Gore* "that are 'associated with particularly reprehensible conduct' and contribute to the sense that 'some wrongs are more blameworthy than others.'" *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (quoting *Gore*, 517 U.S. at 575). Aggravating factors include "(1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." *Id.*

Here, Defendants' conduct was reprehensible; their actions were both violent and malicious. The jury found that four officers—Czulada, Kurian, Reo, and Failla—used excessive force to violently subdue Plaintiff, who was punched in the face, choked and repeatedly hit with multiple batons, and pepper sprayed after he had already been subdued. The jury found that eight other officers—Tellado, MacNear, Gherardi, Dunn, Deferrari, Braumann, Boneta, and Heerey— failed to intervene to stop the excessive force. This was not an act of mere negligence; it was an assault intended to cause Plaintiff significant physical and emotional harm. The circumstances of Plaintiff's assault illustrate the reprehensible nature of Defendants' actions.

## 2.    Disparity Between Compensatory and Punitive Damages

The second guidepost a court must consider to determine the reasonableness of a punitive damages award is the disparity between compensatory damages, *i.e.*, the plaintiff's harm, and the punitive damages award.  "In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis."  *Gore*, 517 U.S. at 583.  Just as there is no mathematical formula used to calculate punitive damages, "there are no rigid benchmarks that a punitive damages award may not surpass."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003).  The award should, however, be proportionate to the harm considering that compensatory damages may already contain a "punitive element."  *Id.* at 426.

Here, the ratio between the punitive damages and the compensatory damages awarded— nearly 1 to 1—is within an acceptable range. *See, e.g., Blackledge v. Carlone*, 126 F. Supp. 2d 224, 229 (D.Conn. 2001) (holding that a 40 to 1 ratio in an excessive use of force case did not justify remittitur).  This is especially true given that the punitive damages here represent the aggregation of *individual* punitive damages awards against each Defendant.  Indeed, the largest individual punitive damages award is $400,000.  The Court, therefore, finds the jury's total punitive damages award reasonable and proportionate in relation to the compensatory damages and the harm suffered by Plaintiff.  *Campbell*, 538 U.S. at 426 ("In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.").

## 3.    Civil and Criminal Penalties

The third *Gore* factor asks what comparable civil and criminal penalties could be imposed for the misconduct.  *Gore*, 517 U.S. at 583 (1996).  "When penalties for comparable misconduct are much slighter than a punitive damages award, it may be said that the tortfeasor lacked 'fair

notice' that the wrongful conduct could entail a substantial punitive award." *Lee*, 101 F.3d at 811. Under New York law, a person is guilty of second degree assault when he intentionally causes a "serious physical injury" to another, or when he intentionally causes a "physical injury" to another by means of a "dangerous instrument." N.Y. Penal Law § 120.05(A)(1)-(2). A "serious physical injury" is one that causes "serious and protracted disfigurement . . . [or] protracted impairment of health," N.Y. Penal Law § 10.00(10), and a "physical injury" means "impairment of physical condition or substantial pain," N.Y. Penal Law § 10.00(9).

Here, Defendants could have been charged with second degree assault based on their conduct on August 21, 2010. *See, e.g., People v. Garris*, 196 A.D.2d 724, 724, 602 N.Y.S.2d 10 (1st Dep't 1993) (conviction upheld where evidence against defendant "included the testimony of the victim that defendant repeatedly struck her . . . in the head"). Second degree assault is a class D felony, N.Y. Penal Law §§ 120.05, 70.02(1)(c), punishable by two to seven years' imprisonment, N.Y. Penal Law § 70.02(3)(c), and a $5,000 fine, N.Y. Penal Law § 80.00(1)(a). That Defendants' actions might be deemed a violent felony in New York weighs in favor of a punitive damages award that reflects the severity of the offense. Moreover, Defendants' police training gave them notice as to the gravity of official misconduct and abuse of their authority as law enforcement officers. Defendants, therefore, had fair notice that their conduct could subject them to a substantial punitive damages award.

### 4. Awards in Comparable Cases

"Courts have often found it helpful in deciding whether a particular punitive award is excessive to compare it to court rulings on the same question in other cases. The undertaking is precarious because the factual differences between cases can make it difficult to draw useful comparisons." *Payne*, 711 F.3d at 104-05 (citation omitted). Numerous cases from this Circuit

have determined that punitive damages awards are appropriate for excessive force claims. *See O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988) (upholding $185,000 punitive damages award ($379,131.68 in 2016) where plaintiff was beaten by two officers after being handcuffed and suffered a fractured nose and lacerations to the head and face); *Ismail*, 899 F.2d. at 185 (upholding $150,000 punitive damages award ($276,353.15 in 2016) in Section 1983 action where arrestee suffered two displaced vertebrae, a cracked rib, and serious head trauma); *Lewis v. City of Albany Police Dep't*, 547 F. Supp. 2d 191, 209-10 (N.D.N.Y. 2008) (upholding $200,000 punitive damages award ($224,014.02 in 2016) where defendant's "use of excessive force against [plaintiff] was racially motivated and occurred while plaintiff was handcuffed"), *aff'd*, 332 Fed. App'x 641 (2d Cir. 2009); *Alla v. Verkay*, 979 F. Supp. 2d 349, 378-79 (E.D.N.Y. 2013) (upholding $150,000 punitive damages award ($157,603.29 in 2016) where the court found that the officer's excessive force "unquestionably qualifies as 'violent'" and noting the award was, "if anything, somewhat conservative").

In this case, the jury assigned a punitive damages amount to each Defendant. The jury awarded $300,000 against Tellado; $300,000 against MacNear; $275,000 against Czulada; $150,000 against Gherardi; $150,000 against Dunn; $250,000 against Deferrari; $50,000 against Braumann; $400,000 against Kurian; $125,000 against Boneta; $275,000 against Reo; $350,000 against Failla; and $50,000 against Heerey, for a total of $2,675,000 in punitive damages.

The Court finds that the total punitive damages award of $2,675,000 in this case is reasonable when compared to similar cases. The cases cited above show that a punitive damages range of $150,000 to $400,000 is reasonable for an excessive force claim that caused lasting injury. Considering a total of twelve officers were involved in the assault on Plaintiff—four perpetrating the assault and eight failing to intervene—the aggregate punitive damages award of $2,675,000

appropriately accounts for the severity of Defendants' actions. Indeed, the Second Circuit has explained that "punitive damages vary from one defendant to another" even though "there may not be additional compensatory damages for that same injury from two or more defendants." *Bender v. City of N.Y.*, 78 F.3d 787, 793 (2d Cir. 1996) (addressing punitive damages in Section 1983 cases); *see also Eun Hee Choi v. Kim*, No. 06-CV-2740 (LTS) (DCF), 2009 WL 1074768, at *8 (S.D.N.Y. Apr. 21, 2009) ("awards of punitive damages are not dictated solely by the nature of the defendant's conduct; rather, even where two defendants' conduct appears similar, punitive damages awards may vary substantially, based on the defendants' personal circumstances and means."). Here, the jury clearly distinguished between the severity of each Defendant's conduct, resulting in individual punitive damages awards ranging from $50,000 to $400,000.

The Court cannot lose sight of the principles that justify the imposition of punitive damages in the first place: punishment and deterrence. *See, e.g., Lee*, 101 F.3d at 809 ("In gauging excessiveness, we must keep in mind the purpose of punitive damages: to punish the defendant and to deter him and others from similar conduct in the future.") (internal quotation marks and citation omitted). In this case, there is a strong need for punishment and deterrence. Defendants' violent and malicious assault on Plaintiff is wholly improper behavior for law enforcement officers and warrants a strong message of deterrence and censure. The total punitive damages award given by the jury in this case, because it is a composite of twelve individual awards of amounts between $50,000 and $400,000, is not so high as to "shock the judicial conscience" or differ markedly from penalties imposed in comparable cases. Nor is the aggregate punitive damages amount disproportionate to the reduced amount of compensatory damages. The award of punitive damages in this case, therefore, satisfies the three prongs required by the Supreme Court to support a substantial punitive damages award.

Accordingly, the Court affirms the jury's punitive damages award of $2,675,000.

## IV.     New Trial

If Plaintiff chooses not to accept the remittitur amount of $2,750,000 in compensatory damages, the Court will grant a new trial on both liability and damages—both compensatory and punitive—on Plaintiff's excessive force claim. When presenting a prevailing party with the option of remittitur or a new trial, courts must determine whether to grant a new trial on all issues, or on a discrete issue, bearing in mind that: "a partial new trial may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *In re Joint E. Dist. & S. Dist. Asbestos Litig.*, 995 F.2d 343, 346 (2d Cir. 1993) (internal quotation omitted). As the Second Circuit has noted, where "the same jury hear[s] the liability and damage phases of the trial, [it makes] partial reversal more problematic than it would be if separate juries had been impaneled." *Id.* Thus, the determination of the extent of any new trial rests on the separation of the issues.

In this case, the compensatory damages award was closely linked to the evidence of liability such that it would be difficult to re-try only the damages portion of the case. The compensation to which Plaintiff is entitled cannot be separated from a determination of what amount of force Defendants were allowed to use in effecting the arrest, what amount of force was actually used, and what injuries resulted from any use of force that was excessive. Because the issue of damages is not sufficiently distinct from the issue of liability, it would be inappropriate to only re-try the issues of compensatory and punitive damages.

## CONCLUSION

For the reasons stated herein, the Court remits Defendants' compensatory damages to $2,750,000 and affirms the punitive damages award of $2,675,000, for a total damages amount of $5,425,000. The Court directs that Plaintiff must choose to either accept the total remitted damages or elect to have a new trial. Plaintiff will inform the Court of his decision by September 28, 2018.

SO ORDERED.

_/s/ Pamela K. Chen_
Pamela K. Chen
United States District Judge

Dated: August 24, 2018
      Brooklyn, New York